*LARUSSO & CONWAY, LLP*
*ATTORNEYS AT LAW*
*300 OLD COUNTRY ROAD*
*SUITE 341*
*MINEOLA, NEW YORK 11501*
Telephone No. (516) 248-3520
Facsimile No. (516) 248-3522

*FILED ECF*

July 18, 2012

Honorable Arthur D. Spatt
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

> Re: United States v. Frederick Celani
>     Criminal Docket No. 09 CR 405(ADS)

Dear Judge Spatt:

Please accept this letter requesting the appointment of a second attorney under the provisions of the Criminal Justice Act, 18 U.S.C. §3006, to (1) assist in the preparation for trial and (2) the presentation of evidence at trial in the above-captioned case.

The Law

Except for capital cases, there are "no" statutory provisions permitting the appointed of a second counsel. United States v. Freeman, 2005 WL 397932 at *2 (S.D.N.Y. 2005); see also, United States v. Davidson, 1992 WL 165825 at *4 (N.D.N.Y 1992)(In a capital case where the death penalty had been removed from consideration, a defendant was not "statutorily entitled to a second court appointed attorney[ ].") However, several courts have approved a second court-appointed attorney in the interest of justice and because of the complexity of the case. See, United States v. Davidson, 1992 WL 165825 at *6 (N.D.N.Y 1992)(Due to the complexity of the case, which "add significantly to the difficulty of preparing and trying this case," the

Court granted defendant's motion for appointment of a second chair in the interest of justice.")(Emphasis added); see also, United States v. Garcia, 2004 WL 1794489 *2 (S.D.N.Y. 2004)(Even after the death penalty was removed from a jury's consideration, the Court permitted a second counsel because, in part, of the "complexity of charges [and] the potentially voluminous evidence.") Mr. Celani's case is extremely difficult and complex and the evidence so voluminous that a second attorney should be selected in the "interest of justice."

The Indictment

Mr. Celani is charged in a superseding indictment with two complex securities frauds operating at different time periods. For ease of discussion, we will call the first scheme the "Rainmaker Scheme," and the second the "Kiosk Scheme," names taken from accounts through which investors' moneys where funneled.

The "Rainmaker Scheme" operated from December 2004 until August 23, 2005. The government alleged that the defendant, "together with others," falsely promised investors that their funds would be used solely for the acquisition of "assisted living centers or other commercial businesses." (See, ¶6 of the Superseding Indictment, Criminal No. 09-405(ADS) hereafter referred to as the "Indictment") The Indictment further alleged that "a substantial portion of the funds provided by Rainmaker investors was diverted to the personal use of the defendant Frederick Celani and others." See, ¶9.

A related Securities and Exchange Commission ("SEC") civil proceeding, brought in the Central District of California against the defendant[1] and two other co-conspirators, Alireza Dilmaghani ("Dilmaghani") and James Conway ("Conway"), identified over ninety investors nationwide and the theft of approximately $9.1 million. (See, Securities and Exchange Commission v. Rainmaker, et al., Receiver's First Interim Report, Civil Docket No. 05-6121(SJO), filed electronically as Document 101, and attached as Exhibit 1). Over $3.5 million of the investors'

---

[1]At the time of the litigation, Mr. Celani was using the name "Sid Levine," and therefore, the caption of the case was SEC against Dilmaghani, Conway, Levine and Rainmaker entities.

funds were recovered in Rainmaker accounts. (Document 101 page 5) A court appointed receiver traced $1.15 million in cash to Dilmaghani and $2.1 million to Conway. (Document 101 page 9) However, more significantly, the SEC experts were unable to trace through bank records or other pertinent documentation any stolen investors' funds to the defendant Frederick Celani. (See, Document 10 page 4, filed electronically in the SEC case, and attached as Exhibit 2)

After my appointment, I spent considerable time (1) reviewing records relating to my client's public agency defense; (2) examining relevant statutes and researching pertinent case law on the issue; (3) reviewing prior counsel's efforts to gather material evidence from disciplinary committees in New York and New Jersey and from a congressional subcommittee; (4) familiarizing myself with my client's medical condition by examining his medical records and reviewing correspondence with the Court and the Bureau of Prisons; (5) addressing the question of Mr. Celani's competency to proceed as a result of a series of strokes suffered last year.

In regard to my review of the voluminous discovery material provided by the government, the task ahead appears daunting. For example, I have already spent over thirty hours (1) reviewing the related SEC litigation of the Rainmaker scheme and (2) one file among the fifty-four files containing over 12,000 documents seized during a search related to the Rainmaker prosecution. To properly prepare for trial, it is necessary, not only to complete my review of the discovery documents, which, based upon the time already spent examining a single file will undoubtedly take substantial time, but to follow-up on numerous leads developed from the review. For example, based upon my early analysis of the material examined to date, I find it necessary (1) to gather impeachment evidence against codefendants Dilmaghani and Conway, who are likely government cooperators; (2) to interview the investors and ascertain their knowledge of my client's participation; 3) complete a careful review of Rainmaker records seized during the execution of an August 23, 2005 search warrant to prove my client received none of the stolen proceeds; and (4) interview "all" the employees at Rainmaker.

These areas are of paramount importance for several significant reasons. The government's complaint misleadingly stated that, from interviews with Rainmaker

employees and "records" seized during the execution of a search warrant on August 23, 2005, Mr. Celani and Dilmaghani "withdrew large amounts of cash from Rainmaker accounts on a weekly [basis]. . . and, on one occasion, [Celani] kept \$100,000 dollars in cash that was withdrawn from a Rainmaker account." (See, Complaint electronically filed as Document 1 in the above-captioned matter, Criminal No. 09-405(ADS)) The SEC investigation has refuted the allegation that "records" support the government's claim that Mr. Celani received any of the stolen Rainmaker proceeds. Therefore, a substantial part of the prosecution's case will hinge upon the unreliable testimony of co-conspirators and Rainmaker employees.

Another reason for interviewing and contacting investors and employees is our inability to locate any prosecution of co-conspirators Dilmaghani and Conway. The evidence against them of their participation in the Rainmaker Scheme is overwhelming. For example, Dilmaghani wrote all the checks withdrawing the investor's money from Rainmaker accounts, and Conway was the sales representative that initially dealt with investors responding to soliciting advertisements, and he was the person who received the majority of the diverted funds, that is, over \$2.1 million. In spite of the significant evidence of their participation in the scheme, we could find no record of their prosecution either in the Eastern District of New York or the Central District of California where the SEC action was brought. These factors lead us to conclude that Dilmaghani and possibly Conway are cooperating with the government, and a record of their prosecution has been sealed.

In preparing to confront Dilmaghani at trial, I have also been reviewing disciplinary records of Dilmaghani from the Supreme Court of the State of New York, Appellate Division, First Judicial Department, secured by Mr. Celani's former attorney James Neville. The available records demonstrate that Dilmaghani was charged with repeated misconduct involving lying to a federal magistrate, the Disciplinary Committee itself and many clients. To properly prepare for trial, I must secure the minutes of the federal proceeding, interview the witnesses supporting the charges of lying and obtain the documents corroborating his misdeeds. Dilmaghani received a three year suspension from the Appellate Division. Also, the Disciplinary records are incomplete, and further litigation

will certainly follow to secure all the necessary documents
for proper presentation at my client's trial.

As previously noted, my obligation to properly prepare
a defense to the Rainmaker charges depends upon a detailed
review of the voluminous discovery documents, only a
portion of which I have been presently able to thoroughly
examine. In addition, the Rainmaker scheme requires a
complete understanding and familiarity with the SEC
litigation in California and the disciplinary proceedings
here in New York. Unfortunately, there are many significant
filings in the SEC matter which must be secured, especially
"declarations" of potential witnesses at Mr. Celani's
trial, including Dilmaghani's own representations in
opposition to a summary judgment motion. Over twenty filed
documents are unavailable on "pacer," and my present
efforts to secure them have been unsuccessful.

The significance of Dilmaghani's participation in the
Rainmaker scheme to our defense cannot be underestimated.
In fact, we anticipate proving that Dilmaghani and others
committed the Rainmaker fraud to generate substantial sums
of money (1) to support a terrorist organization seeking to
overthrow the Iranian Theocratic Government and (2)
operating in the United States with our government's
approval. Pursuant to Rule 12.3 of the Federal Rules of
Criminal Procedure, Mr. Celani formerly served notice of
his public agency defense in an affidavit submitted to the
Court in May 2012. The government responded by letter dated
June 1, 2011. (See, Document 127 electronically filed in
captioned case)

The complexity of the Rainmaker charges is further
evidenced by the government's own complaint filed against
Mr. Celani under the alias "Sid Levine." In substantial
support of the complaint, the government relied upon an
investigation and report conducted by Barry Minkow
("Minkow"), then a director of "the Fraud Discovery
Institute, a private organization which employs a staff of
accountants and investigators and provides forensic
financial analysis as well as fraud protection training to
both corporations and individuals." (See, ¶¶10-11 of
Complaint filed as Document 1 in captioned case) The
complaint actually classified the report as the "Minkow
Report" and acknowledged that the government relied, in
part, on information contained therein. Though the
complaint represented that Minkow "has provided reliable

information to the F.B.I. and other law enforcement agencies in the past," it failed to disclose that Minkow was a convicted felon having served time in federal prison for his fraudulent activities. Also, in a file provided by Mr. Celani's former attorney, I found documents showing that Minkow was subsequently convicted in 2011 of securities fraud in the Southern District of Florida, and received a five year prison term.

The difficulty in preparing this case for trial is further evidenced by my inability to address the facts behind the second fraudulent scheme charged in the indictment. At present, I have been unable to find the necessary time to review the discovery material relating to Kiosk scheme which is contained in four compact disks. According to the government's discovery letter, these disks contain voluminous records. (See, Government's May 16, 2011 letter describing the contents as "three boxes taken from PODS store in Oakdale and one box of bank records," data from "hard drive . . . from two Gold & Green computers," and "thumb drive taken from PODS store." (See, Document 122 electronically filed in captioned case) Without a thorough review of the material, I am presently unable to provide an accurate picture of the complexity of the fraudulent scheme. However, the Court is aware that this case had been classified a "complex case," a designation I support based upon my present review of the discovery material.

Mr. Celani's Affidavit

In support of this application, Mr. Celani has prepared an affidavit which recites several pertinent facts that my client wishes to bring to the Court's attention. First, on October 14, 2010, "the court permitted the appointment of Counsel James Brandon . . . as the second seat in the matter to assist Counsel Neville" due to "discontent expressed by the defendant" and "to the lack of defense preparedness in this case." (See, ¶3 of Celani's Affidavit, hereafter referred to with the initials "CA", and attached as Exhibit 3) Almost a year later, on October 13, 2011, the Court approved a "second seat and investigator." (See, Document 166 in captioned case) During the year between the Court's rulings authorizing a second attorney, little movement was made in preparing defense motions, except that pro se motions were actually withdrawn by former counsel. (See, CA ¶¶6, 8 and 9)

Moreover, Mr. Celani is intent on reviewing the discovery material to assist in his own defense, and is probably in the best position to understand the burden ahead in preparing for trial. As he noted, "[i]t will be at least March to June of 2013, before discovery is completed if Mr. LaRusso starts his task now. Yet even Mr. LaRusso stated in open court that he is busy and has other cases to handle. This case involves discovery requests from various foreign governments, federal agencies, and state agencies wherein the defendants law firm operated. Mr. LaRusso cannot accomplish this alone. Mr. LaRusso will require court ordered subpoenas's and it is expected active motions practice . . ." (See, CA ¶15)

Based upon the voluminous discovery material that needs review, based upon the many interviews that have to be conducted, based upon the need for follow-up investigation to secure pertinent information for cross-examination and presentation of Mr. Celani public authority defense, we respectfully request that, in the interest of justice and due to the complexity of the case, the Court authorize the appointment of a second attorney to assist in the preparation for and trial on the charges.

Thank you very much for your consideration of our application.

Respectfully submitted,

Robert P. LaRusso
Attorney for Frederick Celani

cc:  Richard Lunger
     Assistant U.S. Attorneys
     Eastern District of New York
     610 Federal Plaza
     Central Islip, New York 11722
     (via ecf)

# Exhibit 1

FILED

MICHAEL A. PIAZZA, Cal. Bar No. 235881
E-mail: piazzam@sec.gov
JOSE SANCHEZ, Cal. Bar No. 161362
E-mail: sanchezj@sec.gov
SPENCER E. BENDELL, Cal. Bar No. 181220
E-mail: bendells@sec.gov
C. DABNEY O'RIORDAN, Cal. Bar No. 205158
E-mail: oriordand@sec.gov

2005 AUG 22  PM 1:55

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES

BY_____

Attorneys for Plaintiff
Securities and Exchange Commission
Randall R. Lee, Regional Director
Briane Nelson Mitchell, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:  (323) 965-3998
Facsimile:   (323) 965-3908

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

06929  SJO  (SHx)

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>    vs.<br><br>RAINMAKER MANAGED LIVING, LLC, a New York limited liability company; RAINMAKER MANAGED LIVING, LLC, a California limited liability company; FURMAN & DILMAGHANI P.C., a New York professional service corporation; ALIREZA DILMAGHANI; SIDNEY F. LEVINE; and JAMES JOSEPH CONWAY,<br><br>        Defendants. | Case No.<br><br>**DECLARATION OF JAMES C. BULLARD IN SUPPORT OF APPLICATION OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION FOR TEMPORARY RESTRAINING ORDER AND ORDERS: (1) FREEZING ASSETS; (2) REQUIRING ACCOUNTINGS; (3) PROHIBITING THE DESTRUCTION OF DOCUMENTS; (4) GRANTING EXPEDITED DISCOVERY; AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

19

1    I, James C. Bullard, declare, pursuant to 28 U.S.C. § 1746, as follows:

2        1.    I am a certified public accountant and have been licensed with the

3    State of California since 1970.  I am a Senior Staff Accountant with the U.S.

4    Securities and Exchange Commission (the "Commission"), Division of

5    Enforcement.  My office is located in the Commission's Pacific Regional Office in

6    Los Angeles.

7        2.    I submit this declaration in support of the Application of Plaintiff

8    Securities and Exchange Commission for Temporary Restraining Order and Orders

9    (1) Freezing Assets; (2) Requiring Accountings; (3) Prohibiting the Destruction of

10   Documents; (4) Granting Expedited Discovery; and (5) Order to Show Cause Re

11   Preliminary Injunction.

12       3.    I have personal knowledge of each of the matters set forth below, and,

13   if called as a witness, I could and would competently testify to the facts stated

14   herein.

15       4.    As part of my Commission duties, I analyze bank records, brokerage

16   records, financial records, and other books and records of companies, and I make

17   calculations and observations based on those records.  The documents I analyze in

18   the course of my Commission duties are of the type reasonably relied upon by

19   accountants in forming opinions and inferences about, among other matters, the

20   finances of a company and the disposition of company assets.

21       5.    During the Commission's formal investigation In the Matter of

22   Rainmaker Managed Living, LLC, Commission staff members subpoenaed from

23   Commerce Bank records for Rainmaker Managed Living, LLC, account number

24   7916184349 (the "Rainmaker Bank Account"), and American Planning

25   Incorporated, account number 7916148187 (collectively with the "Rainmaker

26   Bank Account," the "Bank Accounts").

27       6.    As part of my duties as a Commission Senior Staff Accountant, and in

28   preparing my opinion set forth herein I reviewed the following:

- 1 -

a. the bank records produced for the Bank Accounts (the "Bank Records") including any signature cards, account opening documents, monthly bank statements, debits and credits, cancelled checks, wire transfer confirmations, deposit slips and items deposited into the Bank Accounts, attached as Exhibits 1-12 to the Declaration of Irina Paritsky;

b. the investor list attached as Exhibit 12, pages 98 through 107, to the Declaration of Erendira Cronkhite;

c. the list of investors produced by PENSCO Trust Company and attached as Exhibit 21 to the Declaration of Spencer E. Bendell;

d. the documents regarding the checks deposited into the Rainmaker Bank Account for which there was no identifying information, attached as Exhibit 22 (pages 108 through 136), to the Declaration of Spencer E. Bendell; and

e. the documents produced by Equity Trust Company and attached as Exhibit 23 (pages 137 through 152) to the Declaration of Spencer E. Bendell.

## METHODS USED TO ANALYZE TRANSACTIONS REFLECTED IN THE BANK RECORDS

7. Under my direction and supervision, Commission staff members and an intern employed by the Commission:

a. reviewed all of the Bank Records for the period from December 7, 2004 through July 31, 2005 that were produced to the Commission by Commerce Bank;

b. prepared spreadsheets in Microsoft Excel, summarizing all the deposits and disbursements for the Bank Records for the period December 7, 2004 through July 31, 2005 on a combined basis; and

1
2

      c.  grouped the deposits and disbursements in the Bank Records into various categories, as described in Paragraphs 9 and 10, below.

3
4
5
6

8.    I carefully reviewed the spreadsheets and cross-checked the entered information and categorizations against the account statements. I then relied upon the spreadsheets in performing my analysis of the financial records set forth in this declaration.

7
8
9

9.    Under my direction and supervision, Commission staff members and an intern employed by the Commission categorized the deposits in the Bank Records as follows, which I subsequently confirmed:

10

      a.  <u>Investors</u>. Includes deposits

11
12
13
14

        (1) in the name of individuals and entities identified on the investor list dated as of March 23, 2005 ("Listed Investors"), attached as Exhibit 12 to the Cronkhite Declaration, at pages 98 through 107; or

15
16

        (2) made after March 23, 2005 that fit either of the following two criteria:

17
18

          (a) based on third-party information, was confirmed to have been an investment in Rainmaker, or

19
20
21
22
23
24
25
26
27

          (b) met all of the following criteria: (i) associated with a particular person or entity (i.e., the name was on the form of deposit or was otherwise identified by the staff), (ii) a minimum of $10,000 and in $1000 increments thereafter, and (iii) to whom was made at least one subsequent interest payment. A "subsequent interest payment" is a disbursement from the Rainmaker Bank Account that is similar to disbursements to Listed Investors in that the

28

          disbursement was (i) printed (not handwritten), (ii)

- 3 -

issued on the same date as Listed Investors, and (iii) had a check number in sequence with payments to Listed Investors.

Once an investor was identified as an Investor, all deposits by that same investor were included.

b. <u>Likely Investors</u>. Includes deposits of at least $10,000 in $1000 increments that are not otherwise identified as being associated with any Defendant (e.g., excludes a $75,000 deposit from a check identifying the Freedom Forum of New York City).

c. <u>Other Deposits</u>. Includes deposits that did not fall within categories in paragraphs 9(a) through 9(c), above.

10. Under my direction and supervision, Commission staff members and an intern employed by the Commission grouped the disbursements from the Bank Records as follows, which I subsequently confirmed:

a. <u>James Conway</u>. Includes all disbursements made out to James Conway or "JJ Conway".

b. <u>Alireza Dilmaghani</u>. Includes all disbursements in which Alireza Dilmaghani was the named recipient or checks made out to "cash" for which Dilmaghani appeared to have endorsed the check.

c. <u>Purported Interest Payments to Investors</u>. Includes any interest payment to individuals or entities identified in paragraphs 9(a) and 9(b), above.

d. <u>Other Disbursements</u>. Includes all other disbursements made from the account, including $103,194.02 paid to Erendira Cronkhite as a refund of her investment via check number 675 dated June 21, 2005.

11. Based on my review of the documents set forth in Paragraph 6 and the spreadsheets created under my supervision as set forth in Paragraphs 7 through 10,

- 4 -

I have determined that for the period from December 7, 2004 through July 31, 2005, a total of $8,268,948.49 was deposited into the Bank Accounts, as set forth below.

|                   | Total Amount      | % of Total Deposit |
| ----------------- | ----------------- | ------------------ |
| Investors         | $ 7,035,638.49    | 85.09%             |
| Likely Investors  | $ 1,073,000.00    | 12.98%             |
| Other deposits    | $   160,310.00    | 1.94%              |
| Total             | $ 8,268,948.49    | 100.00%            |

12.    Using the analysis set forth in Paragraph 11, above, I created a pie chart demonstrating my determinations, as set forth below:



Summary of Deposits
For the Period Inception Through July 31, 2005

Other Deposits, $160,310, 2%

Likely Investors, $1,073,000 , 13%

Investors, $7,035,638 , 85%

- 5 -

13.    Based on my review of the documents set forth in Paragraph 6 and the spreadsheets created under my supervision as set forth in Paragraphs 7 through 10, I have determined that for the period from December 7, 2004 through July 31, 2005, a total of $5,434,237.39 was withdrawn from the Bank Accounts, of which $4,674,524.47 was disbursed to Conway, Dilmaghani, and as Purported Interest Payments to Investors, as set forth below:

|  | Total Amount | % of Total Disburs. |
|---|---|---|
| James Conway | $ 1,758,761.26 | 32.36% |
| Alireza Dilmaghani | $ 2,036,784.50 | 37.48% |
| Purported Interest Payments to Investors | $   878,978.71 | 16.17% |
| Subtotal | $ 4,674,524.47 | 86.02% |
| Other Disbursements | $   759,712.92 | 13.98% |
| Total Disbursements | $ 5,434,237.39 | 100.00% |

14.    Using the analysis set forth in Paragraph 13, above, I created a pie chart demonstrating my determinations, as set forth below:



Summary of Disbursements
For the Period Inception Through July 31, 2005

Other Disbursements, $759,713 , 14%

Payments to Conway, Dimaghani, and Investors, $4,674,524 , 86%

15.    To the best of my knowledge and ability, the summaries in Paragraphs 11-14 are accurate summaries under Rule 1006 of the Federal Rules of Evidence of the underlying bank records provide to the Commission staff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of August 2005, in Los Angeles, California.

James C. Bullard

- 7 -

# Exhibit 2

1  JOHN W. COTTON (SBN 54912)
   jcotton@cgllp.com
2  AARON C. GUNDZIK (SBN 132137)
   agundzik@cgllp.com
3  COTTON & GUNDZIK LLP
   801 South Figueroa Street
4  12th Floor
   Los Angeles, CA 90017
5  Telephone:  213/312-1330
   Telecopy:   213/623-6699
6
   Receiver for
7  Rainmaker Managed Living LLC

8

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13  SECURITIES AND EXCHANGE          )   Case No. CV 05-6121 SJO (SHx)
    COMMISSION,                      )
14                                   )   RECEIVER'S FIRST INTERIM
         Plaintiff,                  )   REPORT AND MOTION FOR
15                                   )   APPROVAL OF REQUEST FOR
         v.                          )   DISBURSEMENT OF FUNDS
16                                   )
    RAINMAKER MANAGED LIVING         )   DATE:    July 24, 2006
17  LLC, ET AL.                      )   TIME:    10:00 a.m.
                                     )   PLACE:   Courtroom 1600
18       Respondents.                )            The Hon. James S. Otero
                                     )
19

20

21

22

23

24

25

26

27

28

# I.

# INTRODUCTION

This is the Receiver's First Interim Report ("Report") since being appointed by the Court on February 22, 2006. The purpose of the Report is two-fold: first, to report on the present status of the Receivership estate; and second, to request the Court's approval of an interim distribution to the qualified investors who have filed properly-completed claim forms regarding their investments in Rainmaker Managed Living LLC ("Rainmaker") and whose status as innocent victims of the fraud perpetrated upon them has been established by the audit and investigation the Receiver has conducted to date.

# II.

## PRESENT STATUS OF THE RECEIVERSHIP ESTATE

A.    <u>Determination of Rainmaker Investors Eligible for A Distribution</u>

The Receiver has concluded the most pressing matter to be addressed, that of the determination of the actual number of Rainmaker investors, the validity of their investments and their entitlement to a *pro rata* distribution of estate assets based upon verifiable proof of those investments.

Soon after being approved by this Court, the Receiver set-about locating qualified  personnel to assist him in determining the precise number of Rainmaker investors, the validity of their claims to an investment in Rainmaker and the total amount of those claims, net of any return of interest or principal. To accomplish this, the Receiver utilized the part-time services of Diane Gotori, a paralegal in the office of Cotton & Gundzik LLP, who organized and monitored the investor claim form process and reduced the gathered information to spread sheet (MS Excel) format. Ms. Gotori personally handled nearly all of the inevitable investor calls for update information, ensured that each known investor received and completed a claim questionnaire, determined who had and had not responded to the initial

1  mailing, and followed-up with non-responding investors to produce a 94% response
2  rate.[1]

3      The Receiver also hired Mr. Steven Shelburne ("Shelburne"), a local
4  independent consultant, well-versed in bookkeeping, bank account reconciliation
5  and the use of Excel to create a tool for synthesizing all the financial information in
6  order to balance and reconcile Rainmaker's records of deposits and withdrawals
7  within investor's records of deposits and disbursements. Shelburne's work has
8  produced a very useful and reliable interactive Excel spread sheet which can be
9  used not only by the Receiver, but by the plaintiff Securities & Exchange
10  Commission ("SEC"), to determine who received what funds and when (including
11  the Rainmaker defendants); and whether and to what extent there were
12  discrepancies between the Rainmaker bank records and those of the investors as to
13  how much the latter invested and/or received back as interest distributions. While
14  there were slight variations between the investors records and the bank records, in
15  nearly every case the variations have been reconciled as to how much and why.[2]

16      The Rainmaker bank records indicate that ninety (90) investors participated
17  in the Rainmaker investment. The total amount invested by the group was
18  $9,176,138.49. Rainmaker paid back monthly interest payments totaling $965,174
19  to many of the investors, which only came from the invested funds. Three (3)
20  investors received a full return of their original investments ($363,000) and

21

22  [1]  There still remain a few investors who have not filed a claim form. Two (2) have not
23  returned a claim form probably due to their being fully-paid back by the Rainmaker defendants.
    (Cronkhite and McNaughton; See: Tab A) Another one (1) has not filed a claim form probably
24  because she did not invest her own money, but money received from Rainmaker defendant Conway.
25  (Ramelot; See: Tab A) Only one (1) otherwise entitled investor simply has not responded for as yet
    unknown reasons.  (Bongerz; See: Tab A)
26

27  [2]  Most variations were due to simple incorrect addition; the failure to count, or
    deduct, certain interest payments; and the addition of unpaid interest that the investor incorrectly
28  added to the claim.  The variations were very small, and were nearly all immaterial in amount. All
    have been reconciled.

3

additional interest payments ($15,011.21).  Five (5) investors are considered "insiders" due to their relationship with defendant J.J.Conway.  The eight (8) investors mentioned in this paragraph, as discussed below, are not being recommended for any distribution.  The total funds disbursed to all investors was $1,328,175, leaving net investor funds retained of $7,847,964.

The Receiver is satisfied that the investor account reconciliation process has been completed, and that with the exception of one large putative investor claim (Mr. Brian Simon, discussed below), all investors and investor deposits have been accounted for in the Rainmaker bank records. There remain eighty (80) investors who are presently entitled to a distribution of estate funds.[3]  While it is always possible that an as yet unknown investor gave his/her investment check directly to a Rainmaker defendant, who then cashed or deposited the check in a non-Rainmaker account, there has been no indication so far that such ever happened. Since the SEC action was filed nearly 10 months ago and no unknown investors have surfaced during this time, there is little likelihood such occurred. Moreover, as can be deduced from page 2 of Tab A, the Receiver's accounting reconciliation shows that the difference between Rainmaker total bank deposit records ($9,176,138) and investor deposit claims ($8,965,138) is only $211,000, or 2%.[4]  Thus, the near even match of bank records and investor claims as to investor deposits gives comfort to the fact that all significant investor deposits have been accounted for.

///

---

[3]    As discussed, there are eight (8) investors, some of whom filled out claim forms, whom the Receiver will recommend not participate in any distribution. There are two (2) others (Bongerz and Lucas)who have not yet provided sufficient documentation to verify their investment claim. If they do, then they will be entitled to a distribution as well. Their inclusion would take the total number of investors qualified to receive a distribution to eighty-two (82).

[4]    The $211,000 is the absolute difference of the two sums (bank records of deposits less verified and reported investor records of deposits). If all reported and unreported (e.g. unreturned claim forms) investment claims are included, there would only be a difference of $79,000, of the total that remains unreconciled. (See: Tab A)

4

INTERIM REPORT AND FIRST REQUEST FOR DISBURSEMENT

B.   Rainmaker Cash Assets

When the SEC sought a temporary freeze order of this Court in August 2005, Rainmaker had all of its known cash assets at the Commerce Bank of New York. The cash balances in the Commerce Bank accounts at the time of the freeze was $3,553,363. Those funds remained at Commerce Bank from the time of the freeze until they were transferred into the Receiver's name at the California Bank, where they now await distribution to the investors. (The funds have been put into an interest-bearing account at California Bank.)

There were several accounts maintained by the Rainmaker defendants during the life of Rainmaker Managed Living LLC, including not only the two accounts at Commerce Bank, but also four predecessor accounts maintained by the Rainmaker defendants at the Bank of New York. The bank records for all of the accounts at the two banks have been retrieved and reviewed by the Receiver for this report.

Two accounts at the Bank of New York were called "Freedom Forum of NYC Inc." and "Freedom Forum of New York City". These bank accounts were in existence from September 13, 2002, until July, 2005. However, most of their activity ceased in April 2004, just after the Rainmaker accounts at Commerce Bank were opened in March 2004. There were no cash balances in the Bank of New York accounts at the time of the Court's freeze order in August, 2005. With the exception of the putative claim of investor Brian Simon, it does not appear that any Rainmaker investor deposits and distributions of interest were made to and/or from the "Freedom Forum" accounts at the Bank of New York. It appears that all of the deposits by, and distributions to, Rainmaker investors came from the accounts at Commerce Bank.

All the investor deposits and distributions to and from the Commerce Bank accounts have been reviewed and reconciled by Shelburne and are reported as part of the total cash invested figure of $9,176,138.49. The Receiver is satisfied that all

1  of the known investors' deposits and distributions have been reconciled with the
2  bank records, and that any entitlement to a distribution recommended to the eighty
3  investors whose claims have been verified is merited by these records.

4      There were several discrepancies noted in the Commerce Bank records
5  which may lead to additional funds being credited to the Rainmaker accounts.
6  There remain $25,000 of funds claimed to be invested (and for which investor
7  records have been presented) but which are unaccounted for in the bank records.
8  There is also a $9,000 discrepancy that may be as a result of a bank error. Lastly,
9  there is some evidence that the bank may have cashed a check for $75,000
10 presented by defendant Levine after it received notice of the freeze. These matters
11 are still under investigation and could bring in some additional cash funds to the
12 estate.

13      C.    Non-Cash Rainmaker Assets

14      The Receiver is continuing his efforts to locate and retrieve any known non-
15 cash assets that may rightfully belong to the Receivership estate. Based upon the
16 bank records, however, it appears that outside of two cash deposits for
17 uncompleted Rainmaker real estate transactions, one of which was in litigation
18 when the Receiver was appointed and the other of which is still held in escrow,
19 there are no other material, tangible assets of the estate that have been located or
20 that are implicated from any unusual banking activity. There were no recorded
21 large purchases of homes, automobiles, machinery, furniture, artwork or jewelry, or
22 any other similar asset that can be detected in the Rainmaker bank records at
23 Commerce Bank or the Bank of New York.[5] Notwithstanding this determination,

24

---

25      [5]    While there were significant cash disbursements to Defendants Dilmaghani and
   Conway totaling $3,272,310, neither apparently used the Rainmaker bank checking accounts at
26 either bank for the direct purchases of traceable, tangible assets. While it is possible that the
   numerous cash disbursements to these two defendants could have been aggregated by them and
27 used to purchase large assets, without cooperation from them, it is impossible to trace the use of
   the cash proceeds. There also were a few isolated, smaller payments to third parties, for example
28 one for $15,000 to a Frank Simon, which states on the check it was for an "automobile". However,

1  the Receiver will recommend below that the Court approve an estate fund "hold-
2  back" at the present time to pay for, among other things, the reasonable expense of
3  determining whether the use of legal process in Pennsylvania and/or New York
4  state should be undertaken to recover some or all of the $200,000 involved in the
5  two real estate transactions.

6       The two potential real estate "assets" consist of a deposit and a down-
7  payment respectively for two real estate transactions; one of which did not close
8  and the other which was in litigation soon after the first down-payment. The first is
9  a $100,000 "earnest money" deposit held in an escrow account for unimproved
10  land located in Allentown, Pennsylvania for which Rainmaker apparently entered
11  into a real estate contract shortly before the Court freeze order. Despite numerous
12  contacts with the attorney who allegedly represents the various members of the
13  seller group, no formal response has been made to the Receiver's many calls and
14  letters to negotiate a resolution of the status of this earnest money down-payment.
15  Obviously it would be preferable to some court action (particularly considering the
16  amount involved and the distant forum) that a settlement for the return of some of
17  the funds be undertaken. This offer to negotiate was made to the attorney allegedly
18  representing the sellers, but he recently stopped communicating with the Receiver,
19  apparently due to his inability to obtain a consensus of the six owners of the land to
20  even allow him to represent them.[6] As a result, the Receiver requests that the
21  Court permit the retention of local counsel in Philadelphia to assist in filing an
22  action for recovery of the funds if such is merited by the terms of the contract and
23  the prevailing law in Pennsylvania. This should force a response by all the owners.
24
25
26  the amount involved is too small to attempt any further investigation or recovery of that asset which
is probably located in New York in any event.

27      [6]    One of the members, a Mr. Hostetler, called the Receiver on May 12, 2006 to
28  express his frustration that the matter could not be resolved due to the recalcitrance of one co-
owner to agree to hire counsel to negotiate.

7

1      The second real estate "asset" also involved a sum of $100,000, but
2  unfortunately it is not in an escrow account, but was paid out to the sellers as a
3  down-payment on a nursing home, its license to do business and its contents before
4  the SEC action was commenced. The former Rainmaker principals alleged in a
5  lawsuit filed shortly after the signing of the sales contract, that the sellers had
6  breached the purchase and sale agreement with regard to the maintenance of the
7  nursing home license and equipment that accompanied the real estate. The sellers'
8  counsel vigorously denied the charges. When efforts to resolve the dispute failed,
9  suit was filed by Rainmaker's former managers in New York state court. The
10  complaint was not served on all the defendants, and the action now remains
11  dormant in New York. Due to the likelihood of a counter-claim against the
12  Rainmaker estate for specific performance if the action is resuscitated and it
13  prevails, it is recommended that the Receiver be permitted to have local counsel
14  dismiss the action without prejudice.[7] Otherwise, any success in completing the
15  contract would of necessity obligate the estate to complete the contract and make
16  more payments.

17      As is obvious from the foregoing, there is little likelihood of substantial
18  additional funds being recognized from these two "assets", and the chief goal in
19  proceeding with any action on them will be to not waste good assets chasing after a
20  potentially minimal recovery.

21      There also remains the issue of tracing cash funds that were obtained by
22  Rainmaker defendants and employees, some of whom were apparently related by
23  blood or marriage to the Rainmaker defendants. Of these, Loanna and Pam Checo
24  (sisters and employees of Rainmaker, one of whom is married to defendant

25

26      [7]    There has not been any counter-claim in this action, as there has not been any service
27  upon, or any responsive pleading filed by, the defendants. However, if the Receiver proceeds with
the litigation, it is likely that a counterclaim for failure to complete the purchase contract (specific
28  performance) will be filed against the estate and could end up wasting estate assets. The Receiver
has hired local counsel to assist in the termination of this litigation.

1  Dilmaghani) received nearly $50,000, some of which may not have been for

2  legitimate employment services. Some further investigation will be needed to

3  determine if this is the fact. If the amounts paid to Conway, Ramelot, Sirios and

4  Garrett (mentioned elsewhere herein) as investment "returns" are included in this

5  category, then the total amount of potential recovery might be as much as

6  $133,000. However, due to the diverse geographic location of these individuals, the

7  cost of litigation over the recovery of assets must be examined against the

8  likelihood of recovery.

9       It appears that cash funds from Rainmaker in the amount of $1,157,173.79

10  were obtained by Dilmaghani, and $2,115,136 by J.J. Conway during the life of the

11  Rainmaker enterprise. Conway has provided financial information to the SEC

12  which indicates the source and use of all funds he received from Rainmaker, as

13  well as a balance sheet showing his present assets. His records generally comport

14  with those of the Receiver obtained from the Rainmaker bank records. His bank

15  accounts holding approximately $300,000 have been frozen by the SEC, and these

16  funds will, if ordered disgorged, provide additional recovery to the estate.

17  Dilmaghani claims that the cash disbursements he obtained from the bank were all

18  given to defendant Levine and used for the operation of Rainmaker. His decision to

19  no longer communicate with the Receiver makes it impossible to do any further

20  meaningful investigation of the use of the cash disbursements.

21       D.   Assets in the Possession of the Defendants

22       There has been very little discovery conducted of the defendants at this time,

23  as two appear to each be determined to exercise his Fifth Amendment privilege

24  against self-incrimination and the third has not yet been located. At the recently-

25  scheduled deposition of defendant Conway, which was taken by the SEC in early

26  May 2006, the asset-directed questions posed by the SEC were not answered by

27

28

1  him.[8]  While there were additional cash payments totaling $120,667.38 made to

2  relatives and associates of defendants Conway and Dilmaghani, there have not yet

3  been efforts undertaken to obtain those funds for the estate. (The Receiver will

4  address this issue below as well.)

5       E. Recovery from Third Parties for Aiding and Abetting Rainmaker

6       The Receiver has not yet seen any evidence of any potential recovery from

7  third parties for the aiding and abetting of any of the wrongful conduct alleged

8  against the Rainmaker defendants. There is no evidence of the involvement of

9  accountants or law firms (other than Furman & Dilmaghani) to whom estate assets

10  were paid for professional services which might lead to claims for malpractice, or

11  other forms of negligence.[9]  There were no brokerage firms, escrow agents, banks

12  or insurance companies involved in the Rainmaker solicitation of investors from

13  which any "deep pocket" liability claims might be fashioned for any breaches of

14  fiduciary duty. In short, the Receiver has yet to see any form of recovery beyond

15  the frozen Rainmaker funds that are now in the Receiver's possession at the

---

[8]       The Receiver has been informed by defendant Dilmaghani that at this time he too would be inclined to exercise his privilege against self-incrimination. This limits the ability of the Receiver to make any determination as to whether these two defendants, and others, still control significant funds of Rainmaker which are held by them, or for them by third parties, or whether there are sufficient personal assets of these defendants to seek to recover from them that which they may have improperly taken. However, as the SEC will seek disgorgement of any such assets located as part of its scope of work in this litigation, the Receiver recommends against the expenditure of estate assets at this time to accomplish essentially the same thing. If the SEC is successful in its disgorgement efforts, it has informed the Receiver that any funds recovered would go to the Rainmaker estate for distribution to the investors.

[9]       All malpractice policies exclude coverage for dishonest or fraudulent conduct similar to that alleged in the SEC's complaint against the Rainmaker defendants. They also exclude claims based on a lawyer's acting as an officer, director or employee of any corporation, even one to which the lawyer has provided legal services. Therefore, even if lawyers (including Furman & Dilmaghani) aided and abetted the Rainmaker fraud, such would not be covered by their malpractice policies, and any claim attempting to reach those policies would likely be a costly waste of estate assets with no likelihood of recovery.

1 | California Bank, and potentially funds of Conway which were frozen by the SEC
2 | as well.

3

### III.

### RECOMMENDATION FOR A FIRST INTERIM DISTRIBUTION

As this Court well-knows, many of the Rainmaker investors placed their entire life-savings and/or retirement funds with the Rainmaker defendants. In many instances, the passage of time since the Court ordered freeze August, 2005, has wreaked great hardship on these individuals. While there is obviously an embedded extra cost in making more than one distribution, the considered view of the Receiver is that a significant, interim distribution should be made here, with the final distribution after the completion of the remaining tasks mentioned in this Report.

First, there are only 80 investors in Rainmaker who will get a distribution and the incremental cost of preparing another set of 80 checks, and needing two mailings rather than one, is insignificant to an estate with such a small number of investors. Second, the amount that will be returned now, if the Court approves this recommendation, will temporarily leave sufficient funds available in the unlikely event that either the completion of the investigation locates one or more as-yet-unknown investors who need to share in a full distribution, and/or the cost of any further court-ordered investigative and recovery work by the Receiver needs to be underwritten. It will also allow for the legal cost of recovering overpayments from the three overpaid investors, and others connected with the Defendants if this Court approves undertaking that task.

As the accompanying exhibits indicate, there is approximately $3,500,000 in the Receiver's Rainmaker bank account at California Bank. (See: Tab B) Based on the net investor funds deposited with Rainmaker (investor deposits less the amounts of interest that was paid to many of them), which total $7,847,628, the *pro*

1  *rata* return to investors could approximate $.45 on each hard dollar (e.g. net dollar)

2  invested. The Receiver proposes that $3,000,000 be distributed now.

3      The hold-back of $500,000 would chiefly be for potential investor claim

4  "insurance" so that in the event an unknown investor were located, or the Court

5  determines to award payment to the several "insiders" identified below, there

6  would be sufficient funds to allow them also to participate in an equitable

7  distribution. Additionally, to the extent this Court authorizes any legal action in

8  Pennsylvania and/or New York regarding the real estate deposits mentioned below,

9  or to seek recovery from the three fully-paid investors, there would be sufficient

10  funds as well to cover those costs of recovery. Finally, there has not yet been a

11  determination of whether there are any third party trade creditors to whom

12  payments are rightfully due (although at this point none have made any demand on

13  the Receiver). If there are such creditors, and this Court permits their claims, the

14  hold-back should provide sufficient funds to cover such remaining debts of

15  Rainmaker.

16                                   **IV.**

17  **INVESTORS FOR WHOM NO DISTRIBUTION IS RECOMMENDED**

18      As mentioned above, there are three investors for whom no distribution is

19  recommended. Investors, Cronkhite, McNaughton, and Ho all received back 100%

20  or more of their investment from Rainmaker's bank accounts. (See: Tab A) Of the

21  three, only Ho made a written claim against the estate; the others failed to return

22  their claim forms.[10]  (The Receiver will make a recommendation to the Court in the

23  next report as to whether legal action should be taken to recover the total

24  overpayment of approximately $207,900 (estimated 55% overpayment) to these

25  three investors, what legal support there is for such an action and what the likely

26  cost of such an effort is estimated to be.)

27  _____

28      [10]      Ho is seeking the full amount of promised monthly interest that he claims he did not
     receive.

                                   12

1      Five other putative investors (including two joint claims by husbands and
2 their wives) are known to have been related to, or closely associated with
3 defendant Conway. They include investors Daniel and Karma Conway (his brother
4 and his wife), George and Jennie Conway (his parents), Michelle Ramelot (his live-
5 in girl friend and/or fiancee), Mark and Sheri L. Sirios (his brother-in-law and wife)
6 and Jaimey Garrett (whose investment was self-disclosed as coming from Conway
7 generated funds). These five made "investments" with funds that directly or
8 indirectly came from defendant J.J. Conway, who in turn obtained the invested
9 funds from other Rainmaker investors. Of the five, only Ramelot failed to file a
10 claim form; the other four did file but cannot provide evidence of their investment
11 from independent funds un-associated with Conway. Of the five, there was also a
12 total return of Rainmaker funds as interest payments to them of approximately
13 $41,917 for which the Receiver will also make a recovery recommendation in the
14 next report. All of these five are recommended for no distribution of estate funds,
15 as they have not provided evidence of independent sourcing for the investment and
16 more importantly, even if they had, then the funds that Conway gave to them
17 (which exactly match their "investments") would rightfully belong to the estate
18 anyhow and should be returned to it.

19

## V.

## INVESTORS WITHOUT COMPLETED CLAIM FORMS

21      There are several investors whose claims appear legitimate, in whole or part,
22 but whose paperwork is not complete or has not been turned in.  Approximately
23 $50,000 in otherwise apparently valid investor claims have not been made through
24 a completed, returned claim form, but the Rainmaker bank records support a
25 distribution to those investors in any event.[11]

26

27

28     [11]    Claim forms mailed to investors Chad, Justine, Julie and Dean Restum ($40,000),
and Michael Bongerz ($10,000).  (See: Tab A)

1        The missing Restum claims can be explained in that the investments were
2  made by Albert and Barbara Restum (who have filed a claim on their own behalf)
3  on behalf of their children and spouses who have not filed a claim. However, the
4  reconciliation by Shelburne has shown that the records of Albert Restum sent with
5  his claim form establish that the investments for his children were validly made by
6  him, as was the one made for him and his wife. Thus the Receiver recommends the
7  Restums' claim for $100,000 be recognized.[12]

8        Investor Bongerz, who invested $10,000, has not filed a claim form as of the
9  date of this report. However, the Rainmaker bank records clearly reflect that his
10  investment was made. (See: Tab A). The Receiver recommends that continued
11  efforts be made to get him to file a claim form, and if he does not do so before the
12  final distribution, that he be precluded from receiving any share of the estate. The
13  amount to which he would be entitled can be paid from the hold-back.

14        One other investor, Ed Beiler and his wife, have made a claim for $121,000,
15  but Rainmaker bank records indicate that they have only invested $111,000. (See:
16  Tab A, fn. 3). This may again be as a result of bank error, and is being further
17  investigated. At this time the Receiver recommends only recognizing Beiler's
18  verified deposit of $111,000 until such time as verification of the additional
19  $10,000 can be obtained. If that occurs, the extra credit to Beiler will be available
20  from the hold-back.

21       Finally, one investors, Lucas has not provided sufficient evidence of the
22  amount he is claiming invested. Lucas claims $20,000 but the bank records only
23  reflect $5,000 on his account. He has been asked to provide further documentation

24

25      [12]    The Restums' presented evidence of $100,000 being invested; however the bank
records only showed $91,000 on their account. Shelburne has determined that the Commerce Bank
26  made an error in crediting a $10,000 Restum check for only $1,000, which explains the discrepancy.
(See: Tab A, fn. 4). The Receiver will attempt to get the Commerce Bank to correct the error, but
27  if it fails to do so, the Restum's should still have the full amount of $100,000 invested credited to
them. (Albert Restum also appears to have been paid a $2,500 "referral fee" by Conway, which will
28  be off-set from his total claim in any event.)

14

1   for the additional $15,000. Again, if there is verification of his full claim, the hold-
2   back will be sufficient to recognize it in the final distribution.[13]

3       The Receiver recommends that there be a hold-back of any full distribution
4   to the investors noted until they either complete their forms and/or provide
5   adequate and reliable evidence of their full investments. If they do not do so within
6   one month of the approval of this report and recommendation by the Court, then
7   they will be recommended for either no distribution at all (Bongerz), or only a
8   partial distribution based on the verified amount of their investment. Any
9   remaining, undistributed funds will be distributed *pro rata* to the other investors in
10  the second and final distribution.

11  

## VI.

## PUTATIVE INVESTMENT OF BRIAN SIMON

13      The Receiver continues to investigate the claim of one putative investor, Mr.
14  Brian Simon, who claims that defendant Levine conned him out of his home equity
15  in the amount of $320,000, and that Levine promised him that these funds would be
16  invested in Rainmaker Managed Living. Moreover, according to a letter Simon
17  wrote on May 31, 2006, this same home in Belle Harbor, New York was used by
18  Levine as a "showcase" house in which to promote Rainmaker to prospective
19  investors who were taken through the house while being told it was to be used as a
20  managed care facility. This documentation is the only evidence to support his
21  claim. (See: Tab C)

22      While there is no tangible, independent evidence that the home equity funds
23  Simon says were given to Levine were solicited as part of the Rainmaker operation,
24  the timing of these proceeds may match two deposits from as yet undetermined
25  sources into the "Freedom Forum of New York," Bank of New York account.

---

27      [13]   The reconciliation shows that both Lucas and Seitz did receive interest disbursements
28  in the respective amounts of $2,611 and $2,138 respectively. Absent evidence of the amount they claim, each will have been overpaid on their investment by these amounts.

1   These two deposits total $279,000, an amount which comes close to matching the

2   investment Simon claims, and which allegedly occurred in early 2004 when the two

3   undetermined deposits were also made.

4        The Receiver recommends further investigation of this claim before any final

5   decision on whether or not to recognize it.

6                                    **VII.**

7                    **RECEIVERSHIP EXPENSES TO DATE**

8        The total expenses of the Receiver and the two others thus far involved in

9   the recovery of assets and entitlement to proceeds phase of this matter are

10  approximately $22,873.65 to date. Accompanying this report as Tab D are the

11  monthly bills which support the time spent by these professionals. The Receiver

12  has paid Shelburne $5,740 for all his work through May 31, 2006. The services of

13  Mr. Shelburne have been obtained for $75 an hour, which was commensurate with

14  the rates charged by others similarly skilled whom the receiver contacted before

15  engaging Mr. Shelburne. The bulk of Mr. Shelburne's work has been completed.

16       The Receiver's bills for legal services to the estate from commencement

17  through June 16, 2006, total $17,133.65. The Receiver's hourly rate was

18  previously agreed at $295 per hour, a substantial reduction from his normal billing

19  rate as a courtesy to the SEC and the investors who lost so much. There have been

20  no other expenses, save for postage and copying, which are included as

21  disbursements in the bills from the Receiver's office. The Receiver would ask that

22  the Court approve the interim payment to the Receiver of $17,133.65 for time and

23  costs to date.[14]

24  ///

25  ///

26

27      [14]     The Receiver's original estimate to the SEC for the entire matter was between
28  $75,000 and $100,000. It appears that the estimate was higher than what is estimated to conclude
    the Receiver's work.

## CONCLUSION

The Receiver respectfully requests that this Court permit the distribution of $3,000,000 to the 80 investors listed in Tab A on the terms outlined herein. Further, the Receiver requests that this Court, after permitting them an opportunity to be heard in response to this Motion, foreclose investors Michelle Ramelot, Karma and Daniel Conway, George and Jennie Conway, Mark D. and Sheri L. Sirios and Jaimey Garrett from any distribution of estate funds. The Receiver also requests this Court permit him to conduct limited, further investigation of the potential to recover assets from the two Rainmaker real estate contracts, the three overpaid investors and the payments to relatives of Dilmaghani. Lastly, the Receiver requests approval of his interim fee application of $17,133.65.

DATED:  June 22, 2006                    COTTON & GUNDZIK LLP

                                         John W. Cotton

                                         Receiver for Rainmaker Managed Living
                                         LLC

---

17

INTERIM REPORT AND FIRST REQUEST FOR DISBURSEMENT

**EXHIBIT A**

Recommended RML Disbursements

6/20/2006

| | Source/Payee | Deposits | | Bank Record | Disbursements | Investor | Investment net of Interest Received gain/(loss) | Money From JJ Conway | Recommended Disbursement Prorate ROI 46.57% | This Disb. as a % of basis |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Bank Record | Investor Claim | Record | % ROI | Claim | | | | |
| 3k | Ronald & Donna McNaughton | $60,000.00 | $50,000.00 X | $63,300.03 | | $6,083.36 Rec | ($42,395.80) | $50,000.00 | | 0.02% |
| 3k | Erendira Crenshaw | $110,000.00 | $50,000.00 X | $115,565.26 | | $6,352.00 Rec | ($42,825.34) | $50,000.00 | | 31.70% |
| 3k | Andrew Ho | $193,000.00 | $228,000.00 Rec | $190,145.92 Rec | | $190,000.00 Rec | ($85,352.80) | $100,000.00 | | 35.09% |
| | | $383,000.00 | $383,000.00 | $378,011.21 | | | | | | |
| 3.1n | George & Janice Conway | $50,000.00 | $50,000.00 X | $7,604.20 | | $0.00 | ($34,260.20) | $40,000.00 | | 31.96% |
| 3.1o | Same & Gwen Conway | $50,000.00 | $50,000.00 X | $7,174.66 | | $0.00 | ($43,296.30) | $50,000.00 | | 43.04% |
| 3c | Michelle Reinach | $100,000.00 | $0.00 | $14,937.20 | | $1,663.52 | ($249,080.44) | | | 40.09% |
| 3.1f | Mark & Sheri Silloa | $40,000.00 | $40,000.00 X | $5,768.60 | 14.35% | $5,739.80 X | | | | 36.43% |
| 3.1l | Jaimey Barrett | $50,000.00 | $50,000.00 X | $6,763.70 | 13.58% | $6,763.70 X | | | | 41.84% |
| | | $290,000.00 | $290,000.00 | $41,919.56 | | | | | | 41.43% |
| 3.1y | Cecilo Lucas | $5,000.00 | $20,000.00 note 1 | $4,890.40 | 97.81% | $3,240.00 Rec | ($109.60) | | $16,473.94 | 38.05% |
| 3.2d | Midge Seitz | $10,000.00 | $10,000.00 | $2,138.20 | 100.00% | $1,721.52 Rec | ($67,861.80) | | $199,719.47 | 42.31% |
| 3h | Edwin & Barry Bixler | $111,000.00 | $121,000.00 note 3 | $10,263.63 | 17.37% | $9,572.88 Rec | ($91,716.07) | | $36,729.55 | 40.28% |
| 2w | A. Albert & Paula Premm | $51,000.00 | $100,000.00 note 4 | $5,418.61 | 10.62% | $4,766.83 | ($45,381.49) | $2,500.00 | $10,979.57 | 40.59% |
| 3.1g | Charles & Christine Restum | $30,000.00 | $0.00 note 5 | $1,751.65 | 5.84% | $0.00 | ($28,248.15) | | $10,983.81 | 40.59% |
| 3.1h | Dean & Julie Ann Restum | $10,000.00 | $10,000.00 | $1,052.40 | 10.52% | $0.00 | ($8,947.60) | | $26,778.34 | 41.71% |
| 3.2c | Terri-Lee Jones & Michael Martinez | $10,000.00 | $0.00 | $1,563.52 | 15.84% | $1,663.52 | ($8,436.48) | | $9,413.70 | 36.91% |
| 7j | Micheal Bangerz | $10,000.00 | $0.00 | $777.99 | 7.78% | $0.00 | ($9,222.01) | | $33,688.80 | 41.53% |
| 3.1a | Hector York | $190,000.00 | $195,000.00 Rec | $16,014.20 | 8.43% | $16,076.18 Rec | ($173,385.80) | | $4,342.19 | 38.38% |
| 3.1aa | Laura York | $50,000.00 | $50,000.00 | $6,708.88 | 13.42% | $6,708.88 X | ($43,291.12) | | $16,473.94 | 41.01% |
| 3.1b | Winnie Lee | $500,000.00 | $600,000.00 | $33,114.78 | 7.02% | $35,114.78 X | ($468,885.22) | | $199,719.47 | 38.66% |
| 3.1c | Kamyar Mohamed | $101,000.00 | $101,000.00 | $10,299.76 | 10.20% | $10,312.24 Rec | ($90,700.24) | | $36,729.55 | 40.28% |
| 3.1d | Robert Domino | $30,000.00 | $33,100.00 | $2,930.12 | 0.77% | $2,830.15 Rec | ($27,069.88) | | $10,979.57 | 40.59% |
| 3.1e | Paul Swift | $30,000.00 | $30,000.00 | $2,915.08 | 9.72% | $2,760.00 Rec | ($27,084.12) | | $10,983.81 | 40.59% |
| 3.1k | Wilcox Family Revocable Trust | $75,000.00 | $75,000.00 | $5,094.00 | 7.09% | $5,994.90 X | ($569,005.10) | | $26,778.34 | 41.71% |
| 3.1k | Susan Curtis | $30,000.00 | $30,000.00 | $4,485.99 | 14.98% | $4,377.00 Rec | ($25,504.01) | | $9,413.70 | 36.91% |
| 3.1l | Surety Venture Capital | $88,000.00 | $88,000.00 | $7,132.97 | 8.11% | $7,132.97 X | ($80,867.03) | | $33,688.80 | 41.53% |
| 3.1m | Cristina Tuttle | $13,000.00 | $13,000.00 | $1,685.34 | 12.08% | $1,685.34 X | ($11,314.66) | | $4,342.19 | 38.38% |
| 3.1p | Amberway Equities | $400,000.00 | $400,000.00 | $35,317.38 | 2.00% | $35,316.88 Rec | ($363,882.62) | | $149,145.22 | 41.01% |
| 3.1q | Don DesBiens | $990,000.00 | $900,000.00 | $113,013.75 | 12.59% | $113,013.75 X | ($786,986.25) | | $304,277.10 | 38.66% |
| 3.1r | Joseph Cezza | $70,000.00 | $70,000.00 | $7,132.63 | 10.19% | $7,132.63 X | ($62,367.37) | | $25,323.32 | 40.28% |
| 3.1s | Richard Halvey | $24,000.00 | $24,000.00 | $2,711.23 | 11.30% | $2,711.23 X | ($22,741.23) | | $55,416.63 | 38.54% |
| 3.1t | Keystone Investments | $120,000.00 | $120,000.00 | $14,847.60 | 12.37% | $14,847.60 X | ($105,152.40) | | $48,297.16 | 38.79% |
| 3.1u | James Johnson | $10,000.00 | $10,000.00 | $0.00 | 0.03% | $0.00 | ($10,000.00) | | $4,036.56 | 37.76% |
| 3.1v | Gerald Jonte | $20,000.00 | $20,000.00 | $4,476.38 | 22.38% | $3,639.88 Rec | ($15,523.62) | | $4,798.75 | 30.30% |
| 3.1w | Joshua Jonte | $20,000.00 | $20,000.00 | $3,328.84 | 16.64% | $2,870.60 Rec | ($16,671.06) | | $5,944.19 | 37.10% |
| 3.1x | Darwin Little | $13,000.00 | $13,000.00 | $1,874.01 | 14.73% | $1,331.17 Rec | ($11,865.49) | | $4,113.02 | 20.23% |
| 3.1z | Rachel Goodman | $20,000.00 | $920,000.00 | $14,843.67 | 24.22% | $4,643.67 X | ($15,156.33) | | $4,429.48 | 39.06% |
| 3.2a | Thomas Osisek | $20,000.00 | $20,000.00 | $1,740.51 | 17.40% | $1,740.35 X | ($8,259.65) | | $2,686.21 | 35.66% |
| 3.2b | Ray Mor Enterprises | $10,000.00 | $10,000.00 | $1,664.51 | 16.65% | $1,664.51 X | ($8,335.49) | | $2,972.05 | 39.45% |
| 3a | Paul Medina | $841,000.00 | $841,000.00 | $57,888.13 | 16.65% | $108,160.51 X | ($732,608.49) | | $281,744.60 | 35.96% |
| 3b | Karen Nishimura | $40,000.00 | $40,000.00 | $6,500.94 | 12.86% | | | | $12,045.52 | 35.42% |
| 3c | Nanci Lewis | $20,000.00 | $20,000.00 | $3,389.22 | 14.14% | $3,389.22 X | | | $5,683.91 | 37.54% |
| 3d | Brian Tully | $12,000.00 | $12,000.00 | $1,696.32 | 16.19% | $1,156.84 Rec | | | $3,887.56 | 36.02% |
| 3e | Tom & Sandra Dawson | $90,000.00 | $90,000.00 | $14,558.13 | 16.19% | $14,558.13 X | ($875,441.87) | | $27,170.93 | 37.54% |
| 3b | New Adventure Holdings (Tom Dawson) | $100,000.00 | $100,000.00 | $20,190.78 | 20.10% | $22,085.78 Rec | ($79,709.22) | $52,800.00 | $622.66 | 2.17% |
| 3f | Leona Jo Halvey | $111,000.00 | $111,000.00 | $13,788.94 | 12.45% | $13,788.94 X | ($97,211.06) | | $37,676.93 | 38.86% |
| 3g | Hanh Hayenhjda | $250,000.00 | $290,000.00 | $29,496.12 | 11.86% | $29,496.12 X | ($220,933.86) | | $86,419.00 | 39.19% |
| 3g | William Page | $10,000.00 | $10,000.00 | $1,500.00 | 16.05% | $1,250.00 Rec | ($8,500.00) | | $3,136.56 | 36.90% |
| 3r | Cathy Goodman | $144,000.00 | $144,000.00 | $40,952.90 | 28.45% | $40,952.90 X | ($103,037.10) | | $25,603.64 | 35.42% |
| 3r | Ken Goldmann | $102,000.00 | $102,000.00 | $10,910.48 | 10.71% | $12,072.32 Rec | ($391,073.52) | | $38,386.46 | 35.93% |
| 3m | James & Joanna Lang | $160,000.00 | $150,000.00 | $23,085.78 | 15.40% | $23,100.08 X | ($3,126,699.91) | | $46,446.38 | 33.93% |
| 3n | Dominick Mellace | $175,000.00 | $175,000.00 | $20,085.78 | 11.82% | $20,727.44 Rec | ($154,314.22) | $15,800.00 | $53,193.25 | 34.47% |

Page 1 of 2

SEC 1 00000021

# Recommended RML Disbursements

8/20/2008

| Source/Payee | Deposits Bank Record | Deposits Investor Claim | Disbursements Bank Record | % ROI | Investor Claim | Investment net of Interest Received gain/(loss) | Money From JJ Conway | Recommended Disbursement Prorata ROI 46.37% | This Disb. as a % of loss |
|---|---|---|---|---|---|---|---|---|---|
| 3p Harold Schwartz | $365,000.00 X | $65,000.00 X | $7,098.78 | 10.91% | $6,633.68 Rec | ($57,911.22) | | $23,048.89 | 39.00% |
| 3r James & Judy Sasso | $25,000.00 X | $25,000.00 X | $3,293.50 | 13.17% | $3,293.50 X | ($21,706.50) | | $8,297.91 | 38.23% |
| 3s Check Family Trust | $40,000.00 X | $40,000.00 X | $4,091.89 | 10.23% | $4,091.89 X | ($35,908.11) | | $14,454.37 | 40.26% |
| 3t Gary Strobel | $10,000.00 X | $10,000.00 X | $1,334.35 | 13.34% | $1,101.68 Rec | ($8,665.65) | | $3,302.21 | 36.11% |
| 3u Steven & Jennifer Weil | $70,000.00 X | $70,000.00 X | $12,205.68 | 17.44% | $7,393.17 Rec | ($57,794.32) | | $29,250.27 | 35.04% |
| 3v Gordon & Patricia McGrane | $25,000.00 X | $25,000.00 X | $2,660.51 | 10.64% | $2,660.51 X | ($22,339.49) | | $8,930.90 | 39.98% |
| 3w Street Dimension | $1,010,000.00 X | $1,010,000.00 X | $140,222.88 | 13.88% | $127,462.88 Rec | ($869,767.12) | $18,000.00 | $319,714.38 | 36.76% |
| 3x Ronald Horowitz | $50,000.00 X | $50,000.00 X | $5,729.20 | 11.46% | $3,124.98 Rec | ($44,270.80) | | $17,453.62 | 39.42% |
| 7a CG Investments | $200,000.00 X | $200,000.00 X | $19,166.68 | 9.58% | $19,166.68 X | ($180,833.32) | | $73,564.62 | 40.68% |
| 7b Rod & Delores Mcbastour | $200,000.00 X | $200,000.00 X | $12,500.01 | 6.25% | $12,500.01 X | ($187,499.99) | | $80,231.28 | 42.79% |
| 7d LSI Alliance (Bruce Yates) | $75,000.00 X | $75,000.00 X | $4,687.50 | 6.25% | $3,125.00 Rec | ($70,312.50) | $5,000.00 | $27,768.45 | 39.49% |
| 7e Michael Talbot | $60,000.00 X | $60,000.00 X | $2,559.82 | 4.27% | $2,559.82 X | ($57,440.18) | | $25,269.57 | 43.98% |
| 7f Chris Nelson | $75,000.00 X | $75,000.00 X | $5,149.63 | 6.87% | $5,149.63 X | ($69,850.37) | | $29,624.41 | 42.41% |
| 7g Mindy Fox-Sachs | $77,638.49 X | $77,638.49 X | $3,898.58 | 5.15% | $3,898.58 X | ($73,639.91) | | $33,798.01 | 43.45% |
| 7h Carsdmv Athas-Vasquez | $20,000.00 X | $20,000.00 X | $1,833.36 | 9.17% | $1,833.36 X | ($18,166.64) | | $7,439.77 | 40.32% |
| 7i Kevin Priest | $10,000.00 X | $10,000.00 X | $916.68 | 9.17% | $916.68 X | ($9,083.32) | | $3,719.88 | 40.95% |
| 7j Randy & Kay Meere | $10,000.00 X | $10,000.00 X | $916.68 | 9.17% | $458.34 Rec | ($9,083.32) | | $3,719.88 | 40.95% |
| 7k Darren Dzienciol | $10,000.00 X | $10,000.00 X | $916.60 | 9.17% | $1,145.65 Rec | ($9,083.32) | | $3,719.88 | 40.95% |
| 7l Mark Mordecai | $101,000.00 X | $101,000.00 X | $8,666.68 | 9.57% | $9,666.68 X | ($91,333.32) | | $37,162.63 | 40.69% |
| 7m Michael Zippilo | $200,000.00 X | $200,000.00 X | $11,081.20 | 5.50% | $6,209.53 Rec | ($189,899.80) | | $81,730.10 | 43.24% |
| 7n Luciano & Anna Chicca | $50,000.00 X | $50,000.00 X | $4,583.32 | 9.17% | $4,583.32 X | ($45,416.68) | | $18,599.50 | 40.95% |
| 7o Alan Novoselsky | $75,000.00 X | $75,000.00 X | $5,593.38 | 6.94% | $3,900.00 Rec | ($69,041.62) | | $28,815.98 | 41.74% |
| 7p Carol Ann Madsen | $50,000.00 X | $50,000.00 X | $3,125.01 | 6.25% | $3,125.01 X | ($46,874.99) | | $20,057.81 | 42.79% |
| 7q Stephen Bagnasco | $50,000.00 X | $50,000.00 X | $4,583.36 | 9.17% | $4,583.36 X | ($45,416.64) | | $18,599.46 | 40.95% |
| 7r Robert Hahn | $40,000.00 X | $40,000.00 X | $1,999.13 | 5.00% | $1,217.40 Rec | ($38,000.87) | | $16,547.13 | 43.54% |
| 7r Rose Schmor | $145,000.00 X | $145,000.00 X | $7,293.52 | 4.99% | $7,203.52 X | ($137,706.48) | | $53,996.67 | 43.55% |
| 7t Robert Ulm | $58,000.00 X | $58,000.00 X | $3,163.76 | 5.45% | $3,163.76 X | ($54,836.24) | | $25,726.52 | 43.27% |
| 7u Elba Investments (Judie Kloster) | $25,000.00 X | $25,000.00 X | $1,195.85 | 4.76% | $1,195.85 X | ($23,804.15) | | $10,365.98 | 43.47% |
| 7v Pamela Meyer | $25,000.00 X | $25,000.00 X | $88.52 | 0.27% | $88.52 X | ($24,931.48) | | $11,522.99 | 46.22% |
| 7w Donald Pearson | $350,000.00 X | $350,000.00 X | $4,905.87 | 1.40% | $4,905.87 X | ($345,094.13) | | $157,373.90 | 45.60% |
| 8a Beulah Wenger | $50,000.00 X | $50,000.00 X | $0.00 | 0.00% | $0.00 X | ($50,000.00) | | $23,182.80 | 46.37% |
| 8b Michael Byg | $55,000.00 X | $55,000.00 X | $0.00 | 0.00% | $0.00 X | ($55,000.00) | | $25,501.11 | 46.37% |
| 8c Lianna Dzienciol | $10,000.00 X | $10,000.00 X | $916.68 | 8.17% | $916.68 X | ($9,083.32) | | $3,719.88 | 40.95% |
| 8e David Harris | $25,000.00 X | $25,000.00 X | $0.00 | 0.00% | $0.00 X | ($25,000.00) | | $11,591.41 | 46.37% |
| 8m Mullioex Financial Group (Bruce Yates) | $100,000.00 X | $100,000.00 X | $2,187.50 | 2.19% | $2,187.50 X | ($97,812.50) | | $44,178.15 | 45.17% |
| 8n Roger Reiner | $10,000.00 X | $10,000.00 X | $916.68 | 9.17% | $916.68 X | ($9,083.32) | | $3,719.88 | 40.95% |
| 8r Troy Richardson | $40,500.00 X | $40,500.00 X | $0.00 | 0.00% | $0.00 X | ($40,500.00) | | $3,719.88 | 46.37% |
| 8s Hagop Saghiretian | $12,500.00 X | $12,500.00 X | $154.26 | 1.23% | $154.26 X | ($12,345.74) | | $18,778.00 | 46.37% |
| 8t Jan Storey | $12,500.00 X | $12,500.00 X | $154.26 | 1.23% | $154.26 X | ($12,345.74) | | $5,841.45 | 45.70% |
| | $8,523,138.49 | $8,955,138.49 | $308,243.37 | 10.66% | $1,059,510.83 | ($7,614,895.12) | $23,980.00 | $3,000,000.00 | |

No investment claim received
Monies from Conway

| | | | |
|---|---|---|---|
| RML Deposits v. Investor Claims | $9,165,138.49 | $8,955,138.49 | |
| RML Disbursements v. Investor Claims | $1,326,174.14 | 14.49% | $1,059,510.83 |

| | | Of Funds Invested |
|---|---|---|
| Funds Available | $3,908,243.37 | 46.37% |
| Less Interest Received | $908,243.37 | 10.77% |
| To be Disbursed | $3,000,000.00 | 35.55% |

1. Possible 9/04 deposit for $15K to FFNYC (CB) account
2. Possible ...
3. Possible 9/04 deposit for $10k to FFNYC (CB) account
4. Investor records may differ due to bank error in recording deposit ($1,000 deposit credited v. $10,000 act. check amount 4/28/05)
5. Possible mis-application of $20,000 from A Restum to C Restum's account based on interest payment audit

FILED

1   JOHN W. COTTON (SBN 54912)
    jcotton@cgllp.com
2   AARON C. GUNDZIK (SBN 132137)
    agundzik@cgllp.com
3   COTTON & GUNDZIK LLP
    624 South Grand Avenue
4   22ⁿᵈ Floor
    Los Angeles, CA 90017
5   Telephone:  213/312-1330
    Telecopy:   213/623-6699
6
    Receiver for
7   Rainmaker Managed Living LLC

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  SECURITIES AND EXCHANGE          )  Case No. CV 05-6121 SJO (SHx)
    COMMISSION,                      )
13                                   )  RECEIVER'S FINAL REPORT AND
         Plaintiff,                  )  MOTION FOR APPROVAL FOR
14                                   )  DISBURSEMENT OF FUNDS TO
         v.                          )  INVESTORS
15                                   )
    RAINMAKER MANAGED LIVING         )  DATE:     September 17, 2007
16  LLC, ET AL.                      )  TIME:     10:00 a.m.
                                     )  PLACE:    Courtroom 1600
17       Respondents.               )            The Hon. James S. Otero
                                     )
18  ─────────────────────────────────

19

20

21

22

23

24

25

26

27

28
                                    1
    FINAL INTERIM REPORT AND REQUEST FOR FINAL DISBURSEMENT



1  JOHN W. COTTON (SBN 54912)
   jcotton@cgllp.com
2  AARON C. GUNDZIK (SBN 132137)
   agundzik@cgllp.com
3  COTTON & GUNDZIK LLP
   624 South Grand Avenue
4  22nd Floor
   Los Angeles, CA 90017
5  Telephone: 213/312-1330
   Telecopy:   213/623-6699
6
   Receiver for
7  Rainmaker Managed Living LLC

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

| 12 | SECURITIES AND EXCHANGE COMMISSION, | ) | Case No. CV 05-6121 SJO (SHx) |
|----|-------------------------------------|---|-------------------------------|
| 13 | | ) | RECEIVER'S FINAL REPORT AND MOTION FOR APPROVAL FOR DISBURSEMENT OF FUNDS TO INVESTORS |
| 14 | Plaintiff, | ) | |
| 15 | v. | ) | |
| 16 | RAINMAKER MANAGED LIVING LLC, ET AL. | ) | DATE:    September 17, 2007<br>TIME:    10:00 a.m.<br>PLACE:   Courtroom 1600 |
| 17 | Respondents. | ) | The Hon. James S. Otero |

18

19

20

21

22

23

24

25

26

27

28

1

## I.

## INTRODUCTION

The Receiver's First ("FIR"), Second ("SIR"), and Third Interim Reports ("TIR") were approved by the Court on July 24, 2006, and February 6 and May 29, 2007, respectively. Each reported on the activities of the Receiver up through those dates. The purpose of this Final Interim Report is three-fold: first, to report on the activity of the Receiver since the TIR was approved; second, to request the Court's approval of the Receiver's final expenses and fees; and third to approve the final distribution of estate funds to the investors of Rainmaker Managed Living LLC ("Rainmaker").

## II.

## FINAL STATUS OF THE RECEIVERSHIP ESTATE

A.      The Results of the Interim Distributions To Date

As of the date of this report, the eighty-one (81) previously-approved investors have received and cashed their interim distribution checks in the total amount of $3,780,000. No other putative investors have come forward claiming any interest in the estate and therefore the Receiver is satisfied that these 81 investors still constitute the entire universe of those entitled to a distribution. None of the approved investors have noted any discrepancies in the calculation of their distribution amount and there have been no complaints made concerning the method and amount of the interim distributions. Finally, none of the disqualified claimants (those whose invested funds came directly or indirectly from defendants in this action) have yet complained to the Receiver about their disqualification after being given notice that they would be so disqualified in the FIR.

As of the date of this report, there remains approximately $171,000.00 of available estate funds on deposit in the Receivership's checking and money

2

1   market accounts.[1] The Receiver is recommending a final, *pro rata* distribution of

2   $160,000.00 of these funds to the 81 investors as their final distribution of estate

3   assets.

4   B.   The Results of the Receivership

5   With the approval of this final, recommended distribution, the total amount

6   that will have been distributed to the Rainmaker investors is $3,940,000. When

7   calculated against the amount of net out-of- pocket investment dollars, the 81

8   investors received back 50% of their net invested funds.[2]  The total cost of the

9   Receivership estate to-date has been $79,800.00, which results in only 2% of the

10  recovered investor funds being used to cover the cost of estate administration.[3]

11  C.   Amounts Recovered from Defendants

12  As the Court knows, on September 7 and 12, 2006, respectively, it entered

13  final judgments against defendants Alireza Dilmaghani and  J. J. Conway.  The

14  September 7th judgment against Dilmaghani ordered him to pay $1,157,173.79 in

15  disgorgement, plus $446,850.17 in prejudgment interest, and a $130,000 civil

16  penalty. Dilmaghani, whose debtor examination under penalty of perjury was

17  taken in December of 2006, regarding any available assets to satisfy his

18  disgorgement order, has not paid anything into the Receivership estate and

19

20

21   [1] The Receiver will still have to file Federal and state tax returns for 2007 (although the
22  return will not show taxes due since receivership expenses outweigh interest income), and will
    also have to handle residual issues and questions that inevitably come up as the Receivership
23  closes, including those related to tax and estate issues. There are also unpaid fees of
    approximately $2,500 and the fees for this report and any hearing regarding it. The Receiver is
24  therefore recommending a small hold-back of $7,500 from the residual amount in the estate to
    cover those anticipated expenses.
25
    [2] This is calculated by dividing the amount of net invested funds reported in the First
26  Interim Report of $7,847,628 by the total amount that will have been distributed after the
27  presently recommended amount, or $3,940,000.

28   [3] A schedule of the payments to professionals is attached hereto as Exhibit A. Fees paid
    to the Receiver have been $52,592.00, and the balance went to other counsel and professionals.

3

FINAL INTERIM REPORT AND REQUEST FOR FINAL DISBURSEMENT

1    therefore still owes the full amount ordered by this court of $1,334,023.96, not

2    counting any accrued interest.[4]

3        The September 12th judgment against Conway ordered him to pay

4    disgorgement of $2,115,136.26, plus prejudgment interest of $85,634.93, and a

5    $130,000 civil penalty for a total of $2,330,771.19. As of the date of this report,

6    Conway has paid into the Receivership estate the net amount of $315,000.[5] This

7    leaves a present balance of $2,015,771.19, not counting any accrued interest

8    since the date of the judgment.

9        On August 22, 2006, the Court entered a final judgment against defendants

10   Furman & Dilmaghani, P.C. and Sidney F. Levine, ordering Levine to pay

11   $4,294,601 in disgorgement plus prejudgment interest of $11,967.86, and a

12   $130,000 civil penalty. The Receiver has been unable to collect any of the money

13   payable by Levine because his whereabouts are unknown. Thus, Levine still

14   owes the entire balance of $4,436,568.86.

15        As the Receiver is recommending herein that he be relieved of any further

16   duty to attempt to collect funds from the defendants by way of disgorgement, he

17   also recommends that the Court order the defendants to make any remaining

18   payments of their judgment directly to the SEC.

19   D.     <u>Likelihood of Future Recovery of Funds</u>

20        Several investors have inquired as to what further efforts the Receiver

21   would undertake to monitor the future ability of the defendants to make

22   disgorgement or restitution payments. The short answer is that the Receiver

23   cannot continue his role indefinitely, and with the presently recommended last

24

---

25      [4] As the Receiver noted previously, nothing in Dilmaghani's deposition suggested that

26   he had any material assets from which any disgorgement could be obtained.

27      [5] The $140,000 Franchise Tax Board (FTB) rebate check which Conway turned over to
the Receiver was in turn paid by the Receiver to the FTB. Since this amount did not belong to

28   Conway, as it was based on an incorrect rebate calculation, it did not benefit the investors and is
therefore not a credit toward the amount of disgorgement.

1  distribution, there will be no further assets remaining with which to pay for the
2  continuation of the Receivership estate other than to wind it down. All known and
3  available methods for locating assets of the defendants have been exhausted, and
4  there is no reasonable prospect of any material amount of recovery on the
5  horizon. The Receiver therefore recommends that this Court discharge the
6  Receiver of any further obligations, and save for the remaining administrative
7  items set-forth herein, permit the Receiver to close the estate and close out the
8  file.

9  E.    Receivership Expenses to Date

10      As mentioned above, the total cost of administration of the Rainmaker
11  Receivership estate, including the request for disbursement herein, has been
12  $79,800. This includes the cost of the Receiver, his tax accountant, his forensic
13  accountant, any retained experts and attorneys in distant forums, and the
14  Receiver's staff. The original estimate to the SEC for the work of the Receiver
15  was between $75,000 to $100,000, and the administrative expenses to date have
16  obviously been within that range. The Receiver's remaining invoices totaling
17  $2,060.08 are attached as Exhibit B.

18  F.    Receivership Hold Back

19      It can be anticipated based on the Receivers's previous receivership
20  assignments, that over the next one to four months, there will be additional
21  questions put to the Receiver by Rainmaker investors (tax and distribution
22  questions) and/or the defendants and their counsel; requests for information and
23  assistance on disgorgement collection efforts by the SEC and/or the U.S.
24  Treasury, and possible questions by others, including the Office of United States
25  Attorney. It is impossible with any amount of precision to estimate the amount of
26  additional time that might be required, but it could easily range between 10 to 35
27  additional hours. For this reason, the Receiver is asking this court for a small
28  hold-back of $7,500 from the final distribution, to cover these potential time

1 | requirements. The Receiver would fully credit this amount to his firm, and
2 | assume responsibility for any remaining work and compensate for it from this
3 | fund.

4 | ### CONCLUSION

5 |  The Receiver respectfully requests that this Court approve his Final fee
6 | application of $2,500, his hold back in the amount of $7,500 and the
7 | disbursement to investors of $160,000. The Receiver expects to wind up the
8 | entire estate within the next two months, close out the file and send the records to
9 | storage where they will be maintained for a period of two years before being
10 | destroyed.

11 |

12 | DATED:  August 10, 2007     COTTON & GUNDZIK LLP

13 |

14 | John W. Cotton

15 | Receiver for Rainmaker Managed Living LLC

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

4:12 PM
08/03/07

R· ᷢmaker Manged Living LLC Rece;
Transaction List by Vendor
All Transactions

| | Type | Date | Num | Memo | Account | Split | Amount |
|---|------|------|-----|------|---------|-------|--------|
| **Cotton & Gundzik, LLP** | | | | | | | |
| | Check | 08/04/2006 | 95 | | California Bank Trust | Legal Fees | -17,133.65 |
| | Check | 08/16/2006 | 10001 | | California Bank Trust | Legal Fees | -1.00 |
| | Check | 02/16/2007 | 1006 | | California Bank Trust | Legal Fees | -25,665.01 |
| | Check | 06/01/2007 | 10195 | | California Bank Trust | Legal Fees | -9,792.70 |
| | | | | | | | -52,592.36 |
| **Leven Friedman LLP** | | | | | | | |
| | Check | 09/11/2006 | 10093 | Invoice #470 | California Bank Trust | Legal Fees | -8,562.86 |
| | | | | | | | -8,562.86 |
| **Miller Korzenik Sommer LLP** | | | | | | | |
| | Check | 07/27/2006 | 93 | | California Bank Trust | -SPLIT- | -682.50 |
| | Check | 09/11/2006 | 10092 | | California Bank Trust | -SPLIT- | -292.50 |
| | Check | 11/10/2006 | 1003 | 09/26/06 - 10/31/06 | California Bank Trust | Legal Fees | -1,078.00 |
| | Check | 02/08/2007 | 1005 | 11/27/06 - 01/22/07 | California Bank Trust | Legal Fees | -2,962.80 |
| | Check | 05/08/2007 | 10193 | services thru 04/30/07 | California Bank Trust | Legal Fees | -1,028.30 |
| | | | | | | | -6,044.10 |
| **Steve Shelburne** | | | | | | | |
| | Check | 06/08/2006 | 91 | | California Bank Trust | Consulting | -5,730.00 |
| | Check | 07/05/2006 | 92 | | California Bank Trust | Consulting | -1,665.00 |
| | Check | 08/14/2006 | 94 | | California Bank Trust | Consulting | -630.00 |
| | Check | 09/01/2006 | 100 | Invoice #10028 | California Bank Trust | Consulting | -480.00 |
| | Check | 10/03/2006 | 1002 | Invoice #10030 | California Bank Trust | Consulting | -975.00 |
| | Check | 01/08/2007 | 1004 | Invoice #10034 | California Bank Trust | Consulting | -427.50 |
| | | | | | | | -9,907.50 |
| **Marc Bratman** | | | | | | | |
| | Check | 08/09/2007 | 1009 | August Invoices | California Bank Trust | Legal Fees | -2,750.00 |
| | | | | | | | -2,750.00 |
| | | | | | | | -79,856.82 |

7

Page 1 of 1

# COTTON & GUNDZIK LLP

624 SOUTH GRAND AVENUE
22ND FLOOR
LOS ANGELES, CA 90017

| DATE | INVOICE # |
|------|-----------|
| 6/4/2007 | 3720 |

BILL TO

RAINMAKER MANAGED LIVING LLC RECEIVERSHIP
JOHN W. COTTON, RECEIVER
624 SOUTH GRAND AVENUE, 22ND FLOOR
LOS ANGELES, CA 90017

## INVOICE

| NAME | DATE | DESCRIPTION | HOURS | RATE | AMOUNT |
|------|------|-------------|-------|------|--------|
| JOHN COTTON | 5/10/2007 | EDIT AND FINALIZE THE THIRD REPORT TO THE COURT | 0.8 | 295.00 | 236.00 |
| JOHN COTTON | 5/10/2007 | DRAFT LETTER TO FTB ON CONWAY REFUND CHECK AND REVIEW DOCUMENT'S FOR EXHIBITS TO SAME | 0.5 | 295.00 | 147.50 |
| JOHN COTTON | 5/10/2007 | CONTINUE DRAFTING THIRD REPORT | 0.5 | 295.00 | 147.50 |
| JOHN COTTON | 5/13/2007 | EDIT AND FINALIZE REPORT FOR FILING | 0.3 | 295.00 | 88.50 |
| JOHN COTTON | 5/15/2007 | TELEPHONE CALL FROM WILBUR SHORTZ AT FTB ON CONWAY REPAYMENT | 0.2 | 295.00 | 59.00 |
| JOHN COTTON | 5/15/2007 | EDIT THE FINAL AND FILED BRIEF AND DRAFT ORDER | 0.3 | 295.00 | 88.50 |
| DIANE GOTORI | 5/15/2007 | DRAFT NOTICE TO THIRD INTERIM REPORT; REVISE THIRD INTERIM REPORT; CALLS TO BANK RE STATUS OF ACCOUNT; CALL TO BOOKKEEPER RE UPDATES FOR INTERIM REPORT; CALL TO INVESTOR GARY STROBEL RE DISBURSEMENT CHECK AND MAILING ADDRESS | 2 | 75.00 | 150.00 |
| JOHN COTTON | 5/18/2007 | TELEPHONE CALL FROM DESBIENS ON RECOVERY ISSUES | 0.5 | 295.00 | 147.50 |
| REIMB GROUP | | | | | |
| | 5/16/2007 | 04/12/07 FEDEX TO LOUISE SOMMERS | | 43.11 | 43.11 |
| | 5/24/2007 | BEVERLY HILLS EXPRESS - USDC | | 55.00 | 55.00 |
| | 5/29/2007 | 05/15/07 FEDEX TO GARY STROBEL | | 16.93 | 16.93 |
| | | TOTAL REIMBURSABLE EXPENSES | | | 115.04 |

| | TOTAL | $1,179.54 |
|--|-------|-----------|

FEDERAL ID#95-4873544
TERMS: DUE IN 30 DAYS.

$\mathcal{B}$

# COTTON & GUNDZIK LLP

624 SOUTH GRAND AVENUE
22ND FLOOR
LOS ANGELES, CA 90017

| DATE | INVOICE # |
|------|-----------|
| 8/10/2007 | 3818 |

BILL TO

RAINMAKER MANAGED LIVING LLC RECEIVERSHIP
JOHN W. COTTON, RECEIVER
624 SOUTH GRAND AVENUE, 22ND FLOOR
LOS ANGELES, CA 90017

## INVOICE

| NAME | DATE | DESCRIPTION | HOURS | RATE | AMOUNT |
|------|------|-------------|-------|------|--------|
| JOHN COTTON | 6/4/2007 | DRAFT LETTER TO INVESTORS | 0.3 | 295.00 | 88.50 |
| AARON GUNDZIK | 6/4/2007 | REVIEW ISSUES RE DISTRIBUTION ORDER | 0.25 | 295.00 | 73.75 |
| JOHN COTTON | 6/8/2007 | DRAFT E-MAIL TO DAWSON INQUIRY AND FINISH LETTER TO INVESTORS | 0.2 | 295.00 | 59.00 |
| JOHN COTTON | 6/27/2007 | INVESTIGATION OF THE LOSS OF SIMON CHECK AND E-MAILS TO SIMON AND TELEPHONE CALL TO CAL BANK AND TRUST | 0.5 | 295.00 | 147.50 |
| JOHN COTTON | 6/28/2007 | TELEPHONE CALL FROM SIMON ON CHECK AND E-MAIL ON SAME | 0.1 | 295.00 | 29.50 |
| JOHN COTTON | 7/5/2007 | TELEPHONE CALL FROM SIMON AND CONFER WITH D. GOTORI ON FUNDS TRANSFER | 0.2 | 295.00 | 59.00 |
| JOHN COTTON | 7/16/2007 | FINISH AND SIGN TAX RETURNS FOR 2006; CHECK ON ACCOUNT BALANCES FOR FINAL DISTRIBUTION; CHECK OUTSTANDING INVOICES | 0.5 | 295.00 | 147.50 |
| JOHN COTTON | 7/31/2007 | DRAFT FINAL REPORT | 0.8 | 295.00 | 236.00 |
| REIMB GROUP | | | | | |
| | 6/15/2007 | LEXIS RESEARCH | | 14.67 | 14.67 |
| | 6/26/2007 | 06/08/07 FEDEX TO BRIAN SIMON | | 25.12 | 25.12 |
| | | TOTAL REIMBURSABLE EXPENSES | | | 39.79 |

| TOTAL | $880.54 |
|-------|---------|

FEDERAL ID#95-4873544
TERMS: DUE IN 30 DAYS.

*9*

## PROOF OF SERVICE

I declare that I am employed in the County of Los Angeles, California. I am over the age of eighteen years and not a party to the within case; my business address is: Cotton & Gundzik LLP, 624 South Grand Avenue, 22ⁿᵈ Floor, Los Angeles, California 90017.

On January 8, 2007, I served the foregoing document described as:

FINAL INTERIM REPORT AND REQUEST FOR FINAL DISBURSEMENT

on the following interested parties in this action:

**Plaintiff**
Molly White
C. Dabney O'Riordan
Securities and Exchange Commission
5670 Wilshire Blvd., 11ᵗʰ Floor
Los Angeles, CA 90036
T: 323/965-3998
F: 323/965-3908

Alireza Dilmaghani
Rainmaker Managed Living LLC
Furman & Dilmaghani PC
106 Central Park South
Suite 8D
New York, NY 10019
T: 646/375-2393
F: 646/375-2235

**Counsel For James Joseph Conway**
Stephen Lehat
895 Dove St.
3rd Floor
Newport Beach, CA 92660
T: 323/935-3517
F: 323/935-0410

**Daniel J Cheren**
Cheren & Associates
16055 Ventura Boulevard, Suite 525
Encino, CA 91436
818-990-7700
Fax: 818-990-9888

Rainmaker Managed Living LLC
c/o James Joseph Conway
1129 West Second Street
San Pedro, CA 90731

**(BY MAIL)** [] **(BY CERTIFIED MAIL)** by placing a true copy thereof in a sealed envelope with postage fully prepaid. I am readily familiar with the business practice of Cotton & Gundzik LLP for collection and process-ing of correspondence for mailing with the United States Postal Service, and the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business.

[] **(BY TELEFACSIMILE TRANSMISSION)** at approximately _____ [] AM [] PM, from the telefacsimile transmitting machine at the offices of Cotton & Gundzik LLP, 624 South Grand Avenue, 22ⁿᵈ Floor, Los Angeles, California 90017 [facsimile number (213) 623-6699], to the attention of the following interested parties in this action, at addressee's facsimile numbers set forth in the attached facsimile cover sheet.

This transmission was reported as complete and without error.

*10*

1   []    **(BY OVERNIGHT DELIVERY)**

2       []      BY FEDERAL EXPRESS DELIVERY

3

4         I declare under penalty of perjury under the laws of the State of California

5   that the foregoing is true and correct.  Executed on <u>January 8, 2007</u> at Los Angeles, California.

6

7   <u>Diane M. Gotori</u>

8   name                         signature

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINAL INTERIM REPORT AND REQUEST FOR FINAL DISBURSEMENT

# Exhibit 3

TRULINCS ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ - Unit: BRO-C-A

--------------------------------------------------------------------------------------------------

FROM: ▓▓▓▓▓▓▓
TO:
SUBJECT: Affidavit
DATE: 06/24/2012 09:19:53 PM

### AFFIDAVIT OF DEFENDANT FREDERICK GEORGE CELANI
### IN SUPPORT OF APPOINTMENT OF ADDITIONAL COUNSEL

COMES NOW THE AFFIANT, Frederick George Celani, the defendant in the matter of United States of America, v. Frederick G. Celani, and in support of a letter motion by appointed counsel Robert LaRusso, for appointment of additional counsel in this case hereby states under the penalty of perjury to wit:

1. The case currently before the court was first presented on March 17, 2009. Since that time more THREE YEARS and THREE MONTHS (emphasis added) 39 months, have elapsed. In that time the court has taken the following steps in this case.

2. The Court appointed James Neville, Esquire of Port Washington, New York, to act as primary counsel. The first Neville appointment took place on August 10, 2009. [Dkt Ent 23] Months elapsed between the appointment of Counsel Neville and Neville's first visit to the Nassau County Jail, to see the defendant.

3. Thereafter on October 14, 2010, [Dkt. Ent: 95] the court permitted the appointment of Counsel James Brandon. Brandon, as the second seat in the matter to assist Counsel Neville. This appointment was pursuant to the discontent expressed by the defendant, as to the lack of defense preparedness in this case.

4. On December 17, 2010, [Dkt Ent. 101] the defendant requested that Counsel Neville be removed. The court agreed and counsel Brandon assumed first seat in the case.

5. On February 18, 2011, [Dkt Ent. 107] the defendant elected to proceed pro-se. Counsel Brandon was removed and Richard Miller, Esq. was appointed as the courts standby counsel.

6. During the period of time the defendant was acting pro-se, from February 18, 2011 to August 5, 2011, the defendant filed numerous motions. [See: Dkt Ent: 157; 158; 166; 167; and 168.]

7. In early August of 2011, Counsel Neville approached the defendant at the MDC Federal Holding Facility and requested he be allowed to rejoin the defense as he was sorry that he had been remiss in his past performance. The defendant relented to the request and Counsel Neville was re-assigned as C.J.A. primary counsel.[See: Dkt Ent: 134].

8. The court then set new motions dates. [See Dkt Ent: 152; 153; 154; 157; and 168] Each and every date for filing of motions was "MISSED" by Counsel Neville. In fact Counsel Neville went so far as to withdraw every motion filed by the defendant, as set forth at paragraph six (6) supra. As of the date of this affidavit there are no pending motions [Dkt Ent: 168] as counsel Neville "NEVER" (emphasis added) accomplished any of the courts date specific orders to complete the filing of the motions.

9. Counsel Neville, fully aware of the fact he had missed each and every motions filing deadline, again requested a second seat and investigator. [Dkt Ent 166] Again, the court approved the second seat and investigator. THIS WAS THE COURTS SECOND TIME APPROVING ADDITIONAL COUNSEL TO ASSIST NEVILLE, (emphasis added).

10. Counsel Neville informed the court that he chose Stephen Zissau, (phonetic) as co-counsel and the record reflects Zissau (phonetic) never filed his appearance in the case, and appeared only one time at the MDC to speak with the defendant.

11. After three years of Counsel Neville's folly, the defendant wrote to the court and advised the court that he was being told by Counsel Neville to handle the case himself. Counsel Neville admitted to the defendant that he suffered from a alcohol addiction and had never worked on the case in any productive manner.

12. The defendant was able to ascertain that Counsel Neville had in fact hired a man named Andrew Oliveras, a newly license attorney to act as a paralegal. Oliveras "NEVER" (emphasis added) came to see the defendant at the MDC. Oliveras was allowed by Neville to proceed unsupervised with no experience in federal criminal law. Attached are four emails which detail the fact that Counsel Neville had no faith in the ability of Oliveras to handle the assigned tasks. [See: Exhibits A; B; C; and D; attached hereto and fully incorporated herein by reference.]

---------------------------------------------------------------------------------------------------------------------

13. The court then appointed Counsel Robert LaRusso as primary counsel and demoted Neville to the role of second seat. Thereafter Neville caused to be sent to the defendant, an email making demands that the defendant take action to remove derogatory comments about Counsel Neville from the internet. (This email is in the TRU-LINCS email cache of the MDC email system. The defendant cannot print it as the defendant does not have the money to pay for the printing).

14. On June 22, 2012, during a status hearing the defendant requested that Neville be removed due to irreconcilable differences. The court granted the request, yet curiously denied appointment of replacement counsel after having previously assigned second seats, ON TWO OCCASIONS, (emphasis added) as set forth at paragraphs three (3) and Nine (9) supra. The court did invite counsel LaRusso to send the court, within ten (10) days, a letter requesting a second seat, which the defendant has demanded that counsel LaRusso append this affidavit to.

15. The court appears to have set this case on a fast track after almost three and a half years. The courts reasoning was not explained. The fact remains that the court for 39 months allowed counsel Neville to escape even a modicum of responsibility to this defendant. Other than the discovery disks the defendant was able to obtain pro-se from the prosecution, the defendant has yet to see one page of discovery. The court appears to be ready to set a trial date on September 28, 2012. That is rather curious, when after 39 months not even the basic task of discovery review has been had, let alone motions practice.

16. This case is not now, nor will it be ready for a trial date on September 28, 2012. It will be at least March to June of 2013, before discovery is completed if Mr. LaRusso starts his task now. Yet even Mr. LaRusso stated in open court that he is busy and has other cases to handle. This case involves discovery requests from various foreign governments, federal agencies, and state agencies wherein the defendants law firms operated. Mr. LaRusso cannot accomplish this alone. Mr. LaRusso will require court ordered subpoena's's and it is expected active motions practice will result via motions to modify or quash.

17. The defendant is entitled to present his defense. This court well aware of the Second Circuits decision in United States v. Jeffrey Goldson, regarding the presentation of an "alternative Defense" and for that matter "MULTIPLE ALTERNATIVE DEFENSES". (emphasis added). In Goldson the Second Circuit stated at 954 F.2d 55 & 56 the following:

"The fact that Goldson urged alternative theories was not a correct reason to have refused to hive (sic)his requested instruction. There was ample evidence to support either of Goldson's defenses. Accordingly, Goldson should have been allowed to contend that he did not throw the brick, but, even if he did throw it, he did so only because he thought that McGurk was a private citizen who intended to harm him" This case was reversed and remanded for retrial. The same situation in Goldson is present in the Celani case.

18. The problem herein presented is a complex one wherein all the bricks that Celani needs to throw at the governments case have not been dug up due to Counsel Neville's neglect, which a study of the record would appear to have been condoned by the court.

19. After 39 months the appointment of a second seat to help Mr. LaRusso dig up the bricks, in the humble opinion of the defendant, can best be described as a Judicial necessity, in order to ensure the publics perception as to the integrity of the courts in the eyes of the public.

20. To do other wise is a gross miscarriage of justice, and a denial of due process, under both the Fifth and Sixth amendment to the United States Constitution.

PRESERVATION OF THE RECORD: The defendant wishes to preserve the points raised herein for appellate purposes and objects as to the courts denial of a second seat on due process grounds.

SWORN UNDER THE PENALTY OF PERJURY PURSUANT TO 28 U.S.C. ss: 1746.

Dated: June 25, 2012

By: _____

Frederick George Celani
Defendant
Reg No: 06691-026
MDC Brooklyn

TRULINCS  06691026 - CELANI, FREDERICK GEORGE - Unit: BRO-C-A

---------------------------------------------------------------------------------------------------

FROM: 06691026
TO: Neville, James; Oliveras, Andrew
SUBJECT: Discovery Issues
DATE: 02/09/2012 01:59:13 PM

Dear Counsel Oliveras:

I had a conversation with Jim Neville regarding the discovery review you are engaged in. I am deeply concerned that the mountain of discovery in this case is being left unplowed. I have no idea if you are aware that discovery is set to close on April 2, 2012. AT that time the court has "Strongly" indicated that it will set a trial date.

I cannot help but wonder how you are going to review the discovery having never met with me to discuss the case. Discovery review rests on salient issues to be raised by the defendant. That said, are you aware of what the salient issues are?

James says you have agreed to undertake and will scan all the documents in all the boxes you have, and send me the disks. When will that be accomplished?

James also tells me that he instructed you to make a hard copy of Disk Number 1, in total for me to review here, all of the documents on that disk.

Has that been accomplished?

I feel that you must obtain a copy of every status hearing transcript in this case. I have been trying to get them for 2 years and have thus far been unsuccessful.

We are now six weeks from a trial date being set. I would like to have all of the disks referenced supra in my hands no later than February 17, 2012.

I suggest you make duplicates so I can reference what I see on my copies to the copies you and James retain.

I am deeply concerned that we continue to be in the exact same spot we were one year ago, regarding trial preparation, in a case that will be three years old on March 17, 2012.

I have sent an electronic copy of this message to Jim Neville and a hard copy by snail mail to Steve and Ron to preserve the record.

Best regards
Fred Celani

$EXH - "A"$

TRULINCS 06691026 - CELANI, FREDERICK GEORGE - Unit: BRO-C-A

--------------------------------------------------------------------------------------------------------

FROM: Neville, James
TO: 06691026
SUBJECT: Re: RE: Re: Witness List Additions
DATE: 02/27/2012 03:03:14 PM

Please hold me to this. A week-to-week assessment of Andrew. He's on perpetual probation. The hot seat. I've got to get this going.

FREDERICK GEORGE CELANI on 2/27/2012 12:32:32 PM wrote
Proud of you
-----Neville, James on 2/27/2012 10:03 AM wrote:

>

got 'em, and have forwarded 'em to the appropriate spot. He's got one week to show his stuff. I'll make a very objective assessment on Friday, and it's either thumbs up or down. This rating will continue on a week-to-week basis. No tenured positions in this club. Week-by-week. Friday to Friday. Fred to Fred. Spanky to Cranky. Jim to Gerry Spence!

FREDERICK GEORGE CELANI on 2/27/2012 7:01:21 AM wrote
James
Please add to the second list re: MEK
Thanks
Fred

[36] Iranian Intelligence Ministry C/O: Itamian Trade Mission on 3Rd Avenue in NYC
[37] Amnesty International
[38] Human Rights Watch
[39] Reeza Khalili CIA in Iran Website: A Time To Betray.Com
[40] Media Matters - David Brock

EXH - "B"

Email # 8

TRULINCS 06691026 - CELANI, FREDERICK GEORGE - Unit: BRO-C-A

-----------------------------------------------------------------------------------------------------

FROM: Neville, James
TO: 06691026
SUBJECT: Re: Witness List
DATE: 02/26/2012 11:48:13 PM

Great meeting. Met with Andrew, he says he's on board. Told him he has a week to show me his intentions, or I'll get someone else. Impressed upon him how important his role is right now, that he's the epicenter of the defense efforts right now with his work, especially since you are basically unable to help given your condition. He said all the right things and followed up with a good email tonight, but we'll see. Nice guys finish last, so I'm trying to be a bit of a prick right now. It's kind of fun! Got the list, and am forwarding it for further review and work. I expect that we'll have many, many witnesses. I'll keep you posted on the doctor exam.

FREDERICK GEORGE CELANI on 2/26/2012 8:17:43 PM wrote
James:
I found someone to help me type this as my sight is just about shot.
Great meeting. I hope all went well with Andrew
Here is my input.
Please send me back this email with the word received and acknowledged
This needs to be done ASAP.
Let me know what you find out about the doctor exam
Thank you
Fred


This is your original list:
====================
[1] White House
[2] Titlebaum Atty Sunken Meadow
[3] ABC Primetime
[4] Departmental Disciplinary Committee -Naomi
[5] WMET
[6] Our Lady of Mercy Dans Autopsy
[7] Department of State - Limited to Iranian Parliament in Exile DID NOT REFER TO MEK
[8] Kolken Buffalo Dilmaghani Pictures and Green Card App
[9] Disciplinary Review Board NJ Dans United Nations ID
[10] DOJ - JTTF regarding Dan and Dilmaghani
[11] Register.Com G2PEG Emails
[12] Yahoo Ji Han emails
[13] John Dingell
[14] D.C. Bar List of all Butler Law Clients
[15] Arthur Handler _ Atty for Sid & Al Re Sunken Meadow
[16] Laura Miranda Atty for Al re: NJ Disciplinary Comm
[17] Craigslist - Loanna Checo Whore ads
[18] MDC Travel list and Dingell Furlough

All 18 had return dates of January 13, 2012.
All except for Number Three (3) Prime Time Live are later.
All except number three (3) need motions to compel and enforce production. ASAP.

THIS IS MY LIST FOR NEW WITNESSES:
Number 1 through 35 are all the same M.E.K.
with the three page synopsis and NY Times article attached.
=======================================================
[1] Department of State
[2] Alirezza Jefarazedah
[3] Estate of Richard Holbrooke
[4] Scott Ritter
[5] Ritters Publisher
[6] Scott Shane & N.Y. Times

EXH-C"
P9-1

TRULINCS  06691026 - CELANI, FREDERICK GEORGE - Unit: BRO-C-A

--------------------------------------------------------------------------------------------------

[7] CIA
[8] NSA
[9] White House - NSC
[10] FBI
[11] James Woolsey
[12] Porter Goss
[13] Louis Freeh
[14] Michael Mukasey
[15] Tom Ridge
[16] James Jones - Obama's guy
[17] Rudy Giuliani
[18] Howard Dean
[19] Dell Daily State Department
[20] U.K. Officials (You need to find the article)
[21] Rupert Murdoch
[22] Fox News New York City
[23] NY Post
[24] NY Daily News
[25] 1010 Wins
[26] Washington Post
[27] Politico.Com
[28] JTTF NEY YORK CITY
[29] Homeland Security - Janet Napolitano
[30] Huffington Post
[31] Matt Drudge - Drudge Report
[32] United Nations
[33] Geraldo Rivera WABC Radio
[34] John Bachelor WABC Radio
[35] Aaron Kline WABC Radio

SEPARATE WITNESS ISSUES THAT ARE NOT M.E.K.
=============================================

[1] Gary Null  All Codex Alimentary
[2] Al Sharpton All the  Westchester Terrorist files on the four Black Men
[3] Canadian State Department re Dilmaghanis Father
[4] Sunshine Suite  All Video Surveillance from Freedom Forum of NYC
[5] Ace Pump All leases from Daniel Furman and Alireza Dilmaghani Furman Law and Freedom Forum
[6] O'Connell and Arronowitz Albany Law Firm regarding Sunken Meadow
[7] Pamela Checo All photos, marriage documents and green car documents regarding alireza Dilmaghani - Spouse
[8] Bank of New York NOW called Chase all Freedom Forum and Furman Law documents
[9] Minkow and his Florida Counsel All Documents and emails and letters and cooperation agreement between Minkow and the FBI and especially Galliotto

E XH-"C"
pq z

TRULINCS 06691026 - CELANI, FREDERICK GEORGE - Unit: BRO-C-A

----------------------------------------------------------------------------------------------------

FROM: Neville, James
TO: 06691026
SUBJECT: Re: RE: Re: Islamic Center
DATE: 03/02/2012 08:18:17 PM

Got it. I'm seeing that Andrew has to be pushed a lot. He may not be our guy. Jury's still out. Meeting with him on Sunday re subpoenas. MAY see you Sunday a.m., just not sure. Ravenna will be at the house Sat. p.m. as she's in N.Y. for a track meet, so I may want to lounge and hang out with her a bit Sunday a.m. However, I may drive with her back up to Boston on Sun. evening, throw down a sleeping bag in her apt., and drive down on Monday. If I do that, seeing her Sunday a.m. becomes less important...So, we'll see. I'd like to see you on Sunday a.m., and I'd like to see my daughter, too. However, if I do the Boston ride with her, we'll have plenty of time to talk.

FREDERICK GEORGE CELANI on 3/2/2012 6:32:44 AM wrote
I will tell you about this guy when I see you.I think there is a lot of bullshit going on in this city as this guy was a major focus of Rainmaker as a information source. Will explain later.
-----Neville, James on 3/1/2012 11:18 PM wrote:

>

Washington Place, and Washington Square North

FREDERICK GEORGE CELANI on 3/1/2012 8:03:48 PM wrote
Transcribed by GG

James:
Please find out what are the cross streets for 371 SIXTH Avenue
St. Josephs Church.
This is an important point.
I am writing a letter that I will send to you probably tomorrow, if this place is where I think it is.
The add the three page synopsis of the case and forward to the Imam for me.
Thank you
Fred

$EXH - D$