UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     :  09-CR-405

       -against-                  US District Court
                                  Central Islip, NY
FREDERICK CELANI,
                 Defendant. :  February 5, 2010
- - - - - - - - - - - - - - X  1:40 pm

        TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE ARTHUR D. SPATT
        UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:
                        BENTON J. CAMPBELL
                        United States Attorney
                        One Pierrepont Plaza
                        Brooklyn, New York 11201
                        By:  RICHARD LUNGER, ESQ.
                        United States Attorney

For the Defense:        JAMES NEVILLE, ESQ.


Also Present:           Matthew Galioto - FBI




Court Reporter:         Dominick M. Tursi, CM, CSR
                        US District Courthouse
                        1180 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6108  Fax:  712-6124
                        DomTursi@email.com




        Proceedings recorded by mechanical stenography.
           Transcript produced by CAT.

1      (Call to Order of the Court.  Appearances stated

2  as indicated above.)

3      THE COURT:  Good afternoon.

4      Mr. Neville sent me a couple of letters.  One

5  letter says that he has spent some time with Mr. Celani at

6  the MDC and one of the topics covered was the fact that he

7  still does not have a hearing aid.

8      And Mr. Neville said:

9      *"Mr. Celani informed me during yesterday's*

10  *meeting that he does not want to come to court tomorrow,*

11  *Friday, February 5, 2010, because at previous court*

12  *sessions Mr. Celani has not been able to well capture what*

13  *was transpiring due to his hearing impairment.*

14      *"Mr. Celani asserts that it is a violation of*

15  *his right to constitutional due process of law not to be*

16  *able to hear the proceedings and thus to be prevented from*

17  *assisting his counsel in his defense.  Mr. Celani does not*

18  *want to return to court until he is fitted for and given a*

19  *hearing aid by the Bureau of Prisons or by the United*

20  *States Marshal Service."*

21      That is the end of the letter.

22      Now, please advise Mr. Celani that if he cannot

23  hear anything he is to let us know and we will make sure

24  that he is able to hear.  If he can't hear, we are going

25  to bring him right up here, right in front, with the

1   marshals with him of course, and so he will be able to

2   hear everything.

3           Can he hear, Mr. Neville?

4           (Counsel and client confer.)

5           MR. NEVILLE:  Your Honor, Mr. Celani informed me

6   that he would like to approach to be closer to your Honor

7   to be able to hear.

8           THE COURT:  Sure.  Tell him to come up.

9           (Counsel and the defendant move closer to

10  bench.)

11          THE COURT:  Tell Mr. Celani that if he doesn't

12  hear anything, to raise his hand and we will make sure he

13  hears everything.

14          Is he hearing me now?

15          THE DEFENDANT:  He is.  Yes, sir.

16          THE COURT:  There was another letter I received

17  from Mr. Neville concerning alleged technology.

18          I assume you got copies of these letters,

19  Mr. Lunger.

20          MR. LUNGER:  I did, your Honor.  But when they

21  came cross my screen I was on trial before Judge Seybert.

22          THE COURT:  I know.  You have been busy.  How

23  come you are here?

24          MR. LUNGER:  Fortunately, Judge Seybert gives us

25  Friday off.

1        THE COURT:  You didn't see this letter?

2        MR. LUNGER:  I probably glanced at it briefly,

3 your Honor.

4        THE COURT:  Do you want to take another look at

5 it?

6        MR. LUNGER:  May I, your Honor?

7        (Referring.)

8        MR. LUNGER:  Thank you, your Honor.

9        THE COURT:  Well, I'm glad we have a

10 representative of the FBI present.  That is very handy for

11 this letter.

12        The letter involves a claim by Mr. Celani -- are

13 you listening to this, agent?

14        SPECIAL AGENT GALIOTO:  Yes.

15        THE COURT:  A claim by Mr. Celani that certain

16 technology was placed in the air traffic control system in

17 this country that could cause great destruction.

18        The letter by Mr. Celani, which is cited by

19 Mr. Neville in his letter, says:

20        *"Additionally, in 2008 the above-mentioned*

21 *Russian coconspirators revealed to Mr. Celani the*

22 *existence of electronic technology capable of sabotage*

23 *which has been, according to Mr. Celani, inserted into the*

24 *terminal radar approach control systems of the New York*

25 *John F. Kennedy and Chicago O'Hare Airports, which*

*terminal radar approach control systems guide aircraft within a 30 to 50 nautical mile radius of those airports. This technology, which Mr. Celani claims has been installed illegally and surreptitiously by Russians, was put in place sometime during the year 2005 and are ready to be engaged at any time.*

*Mr. Celani states that these systems are designed to interrupt and disrupt the terminal radar approach control systems of the airports mentioned above.*

*Mr. Celani has said that if these systems are utilized, what could result would be midair collisions between and among hundreds of aircraft.*

*Mr. Celani has told me that Daniel Furman, of the aforementioned law firm, Furman and Dilmaghani, was murdered due to the fact that Mr. Furman had opposed the placement of this electronic technology capable of the sabotage of the aforementioned traffic control systems."*

That is what Mr. Celani is alleged to have told his lawyer Mr. Neville.

Mr. Neville goes on in his letter dated February 4, 2010, to say:

*"Mr. Celani asked me to write this letter emphasizing this issue again.  He claims that this technology is in place and that it could cause the destruction outlined above if no one should intervene.*

1    *Previous attempts by Mr. Celani to give this information*

2    *at proffer sessions with the government have been ignored*

3    *by the FBI and the Department of Justice who appear to*

4    *rely instead upon an investigation done by the "FDI"*

5    *(Fraud Discovery Institute) led by one Barry Minkow, a*

6    *professional 'con' artist, himself."*

7          And Mr. Neville goes on to say:

8          *"This allegation of Mr. Celani must be explored*

9    *further.  If he is correct, the government will have the*

10   *opportunity to stop a devastating terrorist attack and*

11   *save many lives."*

12          And then Mr. Neville concludes the letter as

13   follows.

14          *"I cannot, myself, verify any of these claims by*

15   *Mr. Celani, but as I pore over the information that*

16   *Mr. Celani gives me about himself, this case, and other*

17   *matters related, I have yet to 'catch him in a lie.'  In*

18   *the event that Mr. Celani's version of the facts proves to*

19   *be true, I do not want to be in a position where I had*

20   *heard something this dire and did nothing."*

21          Well, I am turning this information over to you,

22   Mr. FBI Agent.  I'm going to give you a copy of this

23   letter and give it to whoever reviews these claims.  I'm

24   not saying that you should investigate the claim but you

25   have to decide whether to investigate this claim, whatever

1  it is.

2          So I'm turning it over to you.  Is that all

3  right with you?

4          SPECIAL AGENT GALIOTO:  Yes.

5          THE COURT:  Okay.  Now, Mr. Neville, is there

6  anything else you want to bring up?  Any other letters or

7  any matters?

8          MR. NEVILLE:  At this point, your Honor, no,

9  thank you.

10          THE COURT:  Has your client heard all of the

11  things that have gone on so far?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Where are we now, Mr. Lunger?  I

14  know you are tied up in another case and you are going to

15  be busy for at least another two or three days on this

16  case.

17          MR. LUNGER:  Definitely another month or two,

18  your Honor.  But I'm fortunate that the FBI has made some

19  good progress in discovery here.

20          I think the last time I was here, I told the

21  court that there were --

22          THE DEFENDANT:  I can't --

23          THE COURT:  You can't hear that?

24          THE DEFENDANT:  I can't hear that.

25          THE COURT:  You get closer to him.

1          MR. LUNGER:  I will try to keep my voice up.

2          I think the court may remember that the last

3   time I was here, I described approximately nine hard

4   drives that were seized from the Rainmaker facility in

5   this case, that the FBI was currently processing them so

6   that they could be read by, you know, anyone who wanted to

7   search them.

8          Out of those nine hard drives, five of them have

9   been processed, and any of information that out of an

10  abundance of caution we thought might be of a privileged

11  nature has now been exported from the hard drives and it

12  is now available to turn over in camera.  So we could

13  probably do that next week, if the court would like.

14         With respect to the data that remains, the data

15  that we have a comfort level in saying there is no

16  privilege that attaches here, I have told Mr. Neville that

17  those hard drives are available in the first instance for

18  him to inspect.  The way he can do that is, he can go down

19  to the FBI's offices in Melville and they will sit him in

20  front of a computer and he can look through any of the

21  computer files that he wishes.  And anything he wants a

22  copy of, the FBI will provide him with a copy of.

23         The reason I proposed this in the first

24  instance, it is the quickest way for Mr. Neville and the

25  defendant to have access to the data.  Anything that he

1   wants to be put either on a compact disk or on a hard

2   drive, the FBI will provide that to him.

3           There are still four more hard drives that have

4   not yet been processed, and that is going to be the FBI's

5   next task.  But because we have five hard drives that are

6   available now, my proposal to Mr. Neville was come now and

7   start going through them so that discovery will move

8   forward.  The FBI can complete its task of processing the

9   remaining hard drives and we can move forward.

10          And Mr. Neville was agreeable to that process,

11  although he said, you know, I may get there and say:

12  Mr. Lunger, I want everything.  And I said:  Okay.  That

13  is fine, too.  But I did tell him that if he wants

14  everything on these hard drives -- now, remember, your

15  Honor, these hard drives have 160 gigabytes of memory.

16          THE COURT:   What does that mean?

17          MR. LUNGER:  What I have been told is, one

18  gigabyte is the equivalent of 1,000 novels.

19          THE COURT:  1,000 what?

20          MR. LUNGER:  Novels.

21          THE COURT:  Novels?

22          MR. LUNGER:  Yes.  So there is a lot of data.

23          THE COURT:  Are you serious?  I think that the

24  treasury will go into bankruptcy paying Mr. Neville to

25  look at these things.

1    MR. LUNGER:  Well, my suggestion was to have him

2  come and start to look at them because it may be --

3  remember, your Honor, these were taken from offices, so

4  there may be a lot of data on that is completely

5  irrelevant to this case.

6    So, for instance, there may be administrative

7  matters on there that have no relationship to this case

8  and he may get in and say:  Well, I know I don't want

9  these files because they have nothing to do with the case,

10  but I do want you to make a hard copy of certain other

11  files.

12    So that was the procedure I proposed.  And

13  Mr. Neville, at least in the first instance, was amenable

14  to this.

15    THE COURT:  Mr. Neville, are you prepared to

16  give up all the other cases that you have, stop living,

17  and go there and take care of this, the thousands of

18  novels that are on these, whatever they are?

19    MR. NEVILLE:  I also wanted to tell the court

20  that I'm a very slow reader, too.

21    I think Mr. Lunger's suggestion is a good one,

22  and under the circumstances I will go there and explore

23  and see what it is all about and report back.

24    My guess is that a lot of the material will be

25  very easy to go through very quickly, I would imagine.

1  But I will certainly let the court know.  But as I said,

2  Mr. Lunger's suggestion is a good one, for me to go to the

3  FBI and start the process.

4          THE COURT:  Well, that is very good.  How long

5  do you think is going to take?

6          MR. LUNGER:  That is an excellent question, your

7  Honor.  I'm hesitant to give a prediction now because I

8  think a lot of it is going to depend on when Mr. Neville

9  gets there.  And he may say to me, Rick, a lot of this is

10  completely irrelevant, I don't need it.  Or he may say

11  just the opposite.  He may say I want everything.  And if

12  he says I want everything, then I have been told for each

13  hard drive, it may take a couple of weeks per hard drive

14  to export all the information on there and hand it over.

15          We have been doing status conferences every 60

16  days.  I think that is a good practice because in the last

17  60 days they were able to process roughly half of the hard

18  drives, so I hope in the next 60 days they will be just as

19  efficient and I will be able to report to you that all the

20  hard drives are now processed and available for

21  inspection.

22          THE COURT:  What do these hard drives consist

23  of?  What material is on these hard drives?

24          MR. LUNGER:  It would be various files like

25  Microsoft Word files that perhaps the court and I am

familiar with.  They would be probably some Excel

spreadsheets.  All your typical business software that,

you know, contains correspondence.  These are business

records.

They are business records, your Honor.  That is

what they are.

MR. NEVILLE:  Your Honor, I will say, and I have

made some, well, rather extensive comments in written

submittals to the court, that according to Mr. Celani the

case really revolves around a defense of duress and that I

do think it is important that I review, to whatever extent

necessary, these the materials that Mr. Lunger has been

speaking of.

However, I think that, based on what Mr. Celani

has told me, the extensive materials about which we are

speaking now are of secondary importance for Mr. Celani

and his defense in this case.

The interesting and dramatic and somewhat

colorful statements and allegations that we have made,

that I have made, that Mr. Celani has made through me to

this honorable court; case in point, example, the letter

that your Honor just read into the record regarding these

allegations of potential sabotage of an air traffic

control system.

But Mr. Celani has informed me, has spoken to

1   me, has given me vast amounts of information of a whole

2   part of this case that has nothing to do with all those

3   files, and that is really what I have been focusing on

4   with Mr. Celani so far.

5           And again, I say it is important that I review

6   to some extent these documents that Mr. Lunger is speaking

7   of.  But the case, according to Mr. Celani the importance

8   of the case, the nexus of the case, revolves around

9   allegations that I have written to the court about, that

10  the business, I can't say it was a law firm that

11  Mr. Celani was running because he did not have a license

12  to practice law, but the apparent law firm that Mr. Celani

13  was working in according to Mr. Celani was, for lack of a

14  better word, now invaded by or infected by certain people

15  who took the firm over and began the whole Rainmaker

16  fraudulent scheme for the ultimate motive or purpose or

17  goal of gaining funds which were then funneled or sent to

18  organizations that are supporting efforts to topple the

19  present government of Iran.

20          This is what Mr. Celani is telling me.  And he

21  has told me lot about this.  And I have done the best I

22  can in my small way to corroborate what Mr. Celani has

23  said.  And so far everything that Mr. Celani has told me

24  has checked out, for lack of a better word.  And

25  Mr. Celani claims that persons that we anticipate will be

1  government witnesses in this trial were actually part of

2  this group that is called the Iranian Parliament in Exile.

3          According to Mr. Celani, a group of people who

4  want to go back to the former government when the Shah of

5  Iran was in power before he was toppled by the revolution

6  in 1979.  I think it was in Iran.  And this Iranian

7  Parliament in Exile, according to Mr. Celani, is an

8  organization that is operating as I speak, that it gathers

9  funds and it sends money to people who are trying to

10  undermine and sabotage the present government of Iran.

11          And according to Mr. Celani, the United States

12  government, or elements of the United States government,

13  support this Iranian Parliament in Exile because the

14  United States foreign policy, I'm told, would not object

15  to the present government of Iran being toppled.

16          Mr. Celani has claimed to me that certain people

17  came into this business, this apparent law firm that

18  Mr. Celani was operating, and essentially threatened

19  Mr. Celani and Mr. Celani's children with death if

20  Mr. Celani did not go along with this whole operation

21  which I just described earlier, getting money and

22  funneling it to this Iranian Parliament in Exile.

23          So our case is one of, our defense is one of

24  duress.  Mr. Celani claims that, either literally or by

25  threat, a gun was put to his head, so to speak, and that's

1  why Mr. Celani was involved in the case.

2          Now, your Honor, I will say this, and this is

3  one of the things that has been very intriguing to me.  I

4  don't consider myself crazy, although maybe after this

5  case I will be and maybe after this case other people will

6  think I am, but I do know that in this world that we live

7  in, there are events that occur and therefore efforts that

8  are taken by governments, by groups that nobody knows

9  about, and that there is undercover stuff that occurs.

10  There is activity with spies and CIA and the Russians and

11  all the stuff that we read about in novels and see in

12  movies.  I think that a lot of that stuff does occur in

13  the world.

14          So I'm not ready to dismiss Mr. Celani out of

15  hand even though this is a very colorful and dramatic and

16  somewhat, some would say outrageous claim on his part.

17          One thing among many but one example I will give

18  your Honor right now without taking too much time gives me

19  pause and makes me believe Mr. Celani, or at least not

20  dismiss what he says.

21          There was a Securities and Exchange Commission

22  civil action brought against Rainmaker out in California.

23  And essentially factually what we have here before your

24  Honor, that there was a fraud, that people were duped to

25  give their money, to invest, and that it was just a fraud

1    and that people's money was stolen.

2              In that civil action in California, and I have

3    gone on the computer, your Honor, and I have looked at the

4    docket sheet for the case, I have printed the complaint,

5    the civil complaint in that case, and in that civil

6    complaint there is a long and detailed description of this

7    scheme of Rainmaker.  There is a man in that case as a

8    defendant, by the name of Sidney Levine, who is Frederick

9    Celani.

10             But, your Honor, in that Rainmaker case in

11   California there are other individuals who were part and

12   parcel, according to the SEC, of that fraud.  And now we

13   have come to New York in a criminal matter and the only

14   person that stands as a defendant in the case is Frederick

15   Celani.  The other individuals are not mentioned.  They

16   are not arrested.  They are not defendants.  And that

17   seemed very odd to me.

18             And that was one of numerous points that

19   Mr. Celani has made to me.  He claims, Mr. Celani claims,

20   that the one person in this case who I think is going to

21   be a government witness against Mr. Celani, Alireza

22   Dilmaghani, this man is, as I understand it, according to

23   Mr. Celani, is an Iranian national.  He lives in this

24   country and he is part of this group that is fomenting

25   sabotage of the present government of Iran.  He is part of

this Iranian Parliament in Exile. And his father, who lives in Canada, is also part of this whole effort. Mr. Dilmaghani's father in Canada, according to Mr. Celani, was a member of the secret police under the Shah of Iran in the 1970s.

And this group of people, your Honor, is the group that came into this law firm that Mr. Celani was working at and threatened Mr. Celani to go along with this whole effort.

And that is in a nutshell -- and believe me, your Honor, there is a lot more to it. I have spent a lot of time with Mr. Celani. But that in a nutshell is what Mr. Celani's defense is, as crazy as that sounds.

But as I say, your Honor, I have done enough research. I have researched on the internet. I have followed pretty much every lead that Mr. Celani has given to me and, lo and behold, your Honor, there is something to it. I don't think he has made this up out of whole cloth.

But the core, the nexus of the case, your Honor, was, is, was: Mr. Celani threatened to do this. And we have a man here, Mr. Celani, whose past precedes him. He is a man with a long list of convictions and a past of being a very accomplished con man, himself. So that adds to the puzzling nature of this. And it also of course

1  gives me pause when Mr. Celani speaks to me, and I always

2  have to be very careful to corroborate everything that

3  this man says to me.  But so far, your Honor, everything

4  that he has said to me to some extent or other has checked

5  out.

6          (Counsel and client confer.)

7          MR. NEVILLE:  Your Honor, Mr. Celani wants to

8  speak to me.  May I take a minute?

9          THE COURT:  Sure.

10         (Counsel and client confer.)

11         MR. NEVILLE:  Your Honor, this whole case is

12  very interesting, but I must say --

13         THE COURT:  It is getting more interesting each

14  session.

15         MR. NEVILLE:  That's right.  And you haven't

16  heard the half of it yet, your Honor.

17         THE COURT:  I can hardly wait, Mr. Neville.

18         MR. NEVILLE:  But, your Honor, what I think is

19  important here is to corroborate Mr. Celani because, what

20  if what Mr. Celani has said is true?  I don't think that

21  everything that has ever come out of this man's mouth is a

22  lie.

23         A lot of what has come out of his mouth in his

24  life has been a lie, but what if these things that

25  Mr. Celani has been telling me are true?  For example,

1    that letter that I wrote to the court, Mr. Celani asked me

2    to write it about the area traffic control system.  I

3    don't know what is going on with possible terrorist

4    attacks, but this kind of thing can be true.

5          And Mr. Celani has told me enough to give me

6    pause and make me wonder:  Gee whiz, what if what he is

7    saying is true?

8          So what I think I'm trying to do here, your

9    Honor, aside from bring your Honor up to speed a little

10   bit as far as what is going on on our side of this case,

11   not with the government's discovery issues with the

12   documents but these more colorful facts that I'm dealing

13   with with Mr. Celani, I would like to try to have the

14   court help me in some way to corroborate Mr. Celani,

15   because if he is lying -- he has told me that if your

16   Honor were to review something in camera, for example, for

17   example to have the information come to your Honor to vet

18   what I have said about Mr. Dilmaghani, for example, what

19   is his background, what is he all about?

20         And if your Honor then finds something which is

21   radically opposite to what I have been saying, and I have

22   just been basically parroting what Mr. Celani has told me

23   but I have tried to filter it as best as I can by looking

24   on the internet, by reading articles, by speaking the

25   other people.  I mean, I wouldn't just stand up here and

1  say these things unless I made some good-faith effort to

2  see whether I was just making crazy allegations or

3  possibly something that I am saying might be true.

4         But I think that if your Honor could, in camera,

5  without myself, and I would even suggest that Mr. Lunger

6  and the FBI agent could go in with your Honor to review

7  whatever information your Honor could have before your

8  Honor, and I wouldn't even be there, where you, your

9  Honor, could make some determination as to the bone fides

10  of what I have been saying that Mr. Celani has told me.

11  Because Mr. Celani has said to me that the first time we

12  catch him in a lie, he will plead guilty to the charges.

13  No trial.

14         THE COURT:  Do you have a copy of the indictment

15  with you, by any chance?

16         MR. LUNGER:  Yes, your Honor.

17         THE COURT:  Can I see it, please.

18         MR. LUNGER:  Yes, your Honor.

19         THE COURT:  According to this indictment, this

20  is a scheme to defraud, allegedly, involving this

21  Rainmaker Managed Living, Inc, and assorted other

22  companies allegedly involved in a scheme to fraudulently

23  induce investors to invest, promising that the funds would

24  be used for the purchase of property and they would

25  receive a minimum return of 25 percent.  And the scheme

1    allegedly is that they never intended to do this and

2    deprive these investors of their money involving wire

3    communications.

4         It is a rather simple type of indictment.  You

5    of course do what you want to do as far as a defense of

6    your client.  I see no reason for me to take part in any

7    of this at this time.  If you feel that all of this

8    discovery that is being provided by the government is not

9    really relevant to your defense here or is immaterial or

10   you are not interested in it, that is up to you.  The

11   government has a duty to provide all the discovery for

12   your use.

13        Also, I would request that the government at one

14   time sometime before this trial, as soon as possible, tell

15   you what evidence they do intend to use.  I don't believe

16   in waiting until the last minute.  I want them to tell you

17   what evidence they are going to use at this trial.

18        Now you bring forth this purported defense of

19   duress.  That is another matter.  Is that not really

20   dependent upon the discovery material?  That is your

21   defense, you say.  The question is when this case is going

22   to be mature enough to go to trial.  And I'm sure your

23   client, who I think is hearing everything I'm saying now,

24   wants to go to trial as soon as possible.

25        So the government is going to provide you with

1   all this discovery, which you can review whenever you have

2   the time to do it.  But your defense, it seems to me, is

3   something entirely separate from that, Mr. Neville.

4           MR. NEVILLE:  Yes, I think it is, your Honor.

5           THE COURT:  I would like to get this case to

6   trial as soon as possible.  I think your client, being

7   incarcerated, should have a trial as soon as possible.

8           So Mr. Lunger is being very cooperative and he

9   will continue to be cooperative and get you all this

10  discovery material.  And it is up to you to tell me when

11  you are ready to go to trial.

12          MR. NEVILLE:  I will do that, your Honor.

13          THE COURT:  But all the things that you brought

14  out are not for my consideration at this time.

15          I have to say that I commend you, Mr. Neville.

16  I think you are doing an outstanding job and you personify

17  what a federal defender, appointed by the court, should

18  do.  So I appreciate that.

19          MR. NEVILLE:  Thank you.  I appreciate those

20  comments.

21          THE COURT:  However, as I said, let's get this

22  case going so we can get to trial.

23          How much time do you want to do this?  I know it

24  is a big job.  It is an incredible job.

25          MR. NEVILLE:  Yes, indeed, your Honor.

1      THE COURT:  Has your client been hearing

2    everything I said?

3      THE DEFENDANT:  Yes, sir.

4      THE COURT:  Okay.

5      MR. NEVILLE:  Your Honor, my client just

6    whispered into my ear 90 days.  But I don't think that is

7    enough time for me, speaking for myself, at all, to get

8    this case ready for trial.

9      THE COURT:  Well, the first step is for you to

10   examine, to look at the records, the hard drives that

11   counsel has.

12      I would like to have a status conference after

13   that and see where we are going to go.

14      MR. LUNGER:  Yes, your Honor.

15      THE COURT:  Maybe you will decide you don't want

16   to see all these hard drives.  That is up to you to

17   decide.

18      MR. NEVILLE:  Yes, your Honor.  And a lot will

19   depend upon what Mr. Celani tells me because it could come

20   to pass, I'm not saying that it will, but based on my time

21   that I have spent with him and getting to know him a

22   little bit, he may insist on a speedy trial; not in the

23   term of art sense but a trial within a shorter period than

24   I might feel comfortable with.

25      But Mr. Celani potentially maybe is capable of

1  telling me not to even worry about all those discovery

2  materials; that we should just go forward with our side of

3  the defense.  I won't be surprised if he said that to me.

4          I am not saying that he has said it to me or

5  that he will say this to me, but that is the kind of thing

6  that might happen.

7          THE COURT:  That is up to you.  Meanwhile, we

8  are going to give you a date if you want to review these

9  hard drives.

10          How much time do you think that would be?  At

11  least 30 days.  Maybe more.

12          MR. LUNGER:  I was thinking more on the order of

13  45 or 60 days, your Honor.

14          THE COURT:  Let's make it 60 days, to give him a

15  chance.

16          MR. LUNGER:  Okay.

17          MR. NEVILLE:  Thank you, your Honor.

18          THE COURT:  I will return this indictment to

19  Mr. Lunger.

20          MR. LUNGER:  Thank you, your Honor.

21          THE COURTROOM DEPUTY:  April 9 at 1:30.

22          THE COURT:  How does that sit with you?  You

23  will be on trial.  Right, Mr. Lunger?

24          MR. LUNGER:  It is possible, your Honor, yes.

25  It is a Friday so it is okay.

1      MR. NEVILLE:  April 9 at 1:30.  Correct?

2      THE COURT:  How is that, Mr. Neville?

3      MR. NEVILLE:  That is great, your Honor.  Thank

4   you.

5      THE COURT:  Is that all right with your client?

6      THE DEFENDANT:  Yes, sir.

7      THE COURT:  Has he heard everything that has

8   gone on so far?

9      THE DEFENDANT:  Yes, sir.

10     THE COURT:  Do you want a waiver of speedy

11  trial?

12     MR. LUNGER:  Yes, your Honor.  It is designated

13  complex.

14     THE COURT:  Does your client understand what

15  that is, Mr. Neville?

16     MR. NEVILLE:  Oh, I think he does, your Honor,

17  but I will make sure.

18     (Counsel and client confer.)

19     MR. NEVILLE:  Yes, your Honor, he understands.

20     THE COURT:  Does he agree to that?

21     MR. NEVILLE:  Yes.

22     THE COURT:  Okay.

23     I'm going to give you a copy of this letter,

24  Mr. Galioto.

25     Do you want to give him a copy of this letter,

1   Madam Deputy, the letter with these allegations with the

2   terrorist and the sabotage.

3           MR. NEVILLE:  Your Honor, my client has just

4   told me, reminded me to just apprise the court that our

5   intention is to issue subpoenas on various governments,

6   United States government agencies, to try to gain access

7   to materials that could corroborate and verify the

8   statements and the allegations that we make.

9           THE COURT:  Not about the terrorism.  That has

10  nothing to do with this case,.

11          MR. NEVILLE:  Right.  Well --

12          THE COURT:  I'm not going to issue subpoenas

13  about that.  Subpoenas will only be about the matters in

14  this case and your defense or defenses.

15          MR. NEVILLE:  Yes, your Honor.  That's correct.

16          And I would be -- at the appropriate time.  And

17  of course I will present the documents to your Honor for

18  your Honor's review because I think that the subpoenas

19  will carry more weight if they are so ordered.

20          THE COURT:  I would be glad to sign any

21  subpoenas that help you in setting forth and arriving at

22  evidence of your defense to this case.  Of course.

23          MR. NEVILLE:  Thank you.

24          THE COURT:  Do we have the form?

25          MR. LUNGER:  I'm handing it up, your Honor.

1       THE COURT:  Let the record indicate that the

2  defendant, Frederick Celani, his attorney, James Neville,

3  and the prosecutor, Richard Lunger, have signed the waiver

4  of speedy trial form.  And I am signing an order excluding

5  the time between today, February 5, 2010, and April 9,

6  2010, from the operation of the Speedy Trial Act.  And I

7  do so with the consent of the defendant, in the interests

8  of justice, and in the public interest.

9       We will see you on April 9.

10      MR. LUNGER:  Thank you, your Honor.

11      MR. NEVILLE:  Thank you very much, your Honor.

12      THE COURT:  Thank you again, Mr. Neville.

13      (Proceedings adjourned at 2:30 pm.)

14

15

16

17

18

19

20

21

22

23

24

25