UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA      :  09-CR-405

       -against-                    US District Court
                                    Central Islip, NY
FREDERICK CELANI,
                  Defendant. :  March 6, 2012
- - - - - - - - - - - - - - X   9:10 am

          TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ARTHUR D. SPATT
          UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:

                         BENTON J. CAMPBELL
                         United States Attorney
                         One Pierrepont Plaza
                         Brooklyn, New York 11201
                         By:  RICHARD LUNGER, ESQ.
                         United States Attorney

For the Defense:         JAMES NEVILLE, ESQ.

Court Reporter:          Dominick M. Tursi, CM, CSR
                         US District Courthouse
                         1180 Federal Plaza
                         Central Islip, New York 11722
                         (631) 712-6108  Fax:  712-6124
                         DomTursi@email.com

Proceedings recorded by mechanical stenography.
Transcript produced by CAT.

1        (Call to Order of the Court.)

2        MR. LUNGER:  Richard Lunger for the United

3   States.

4        MR. NEVILLE:  James Neville for Frederick

5   Celani.

6        THE COURT:  Let the record indicate that the

7   defendant, Frederick Celani, has waived his appearance.

8        Is that correct, Mr. Neville?

9        MR. NEVILLE:  Yes, your Honor, that's correct.

10  And I believe that I wrote a letter indicating such, that

11  is filed.

12        THE COURT:  Also, while they do not transport

13  prisoners from the MDC on Tuesday, this was put on for

14  Tuesday because, Mr. Lunger, we generally put them on

15  Wednesday or Friday, that is when we transport prisoners,

16  but Mr. Lunger was tied up or something and we put it on

17  for Tuesday.

18        Is that right, Mr. Lunger?

19        MR. LUNGER:  That's correct, your Honor.

20        THE COURT:  What is happening now with this

21  matter, Mr. Neville?

22        What is the condition of Mr. Celani now?

23        MR. NEVILLE:  Your Honor, his condition is poor

24  in my opinion.  I'm a layperson of course but my

25  observations of him are that he is a radically different

1  person than he was when I first met him.  Obviously,

2  especially since October 14 of last year, of 2011, when

3  Mr. Celani experienced and suffered a quite powerful

4  stroke.

5          Since that time, October 14, 2011, I have

6  noticed a marked difference physically in Mr. Celani.  He

7  lost a lot of weight.  He moves more slowly than he did

8  before.  And from my observations in speaking with him he

9  tells me that his memory has diminished extensively.  And

10 I do notice that when I speak to him he speaks in a more

11 halting way.

12         Your Honor, this man was, and your Honor I think

13 knows because Mr. Celani represented himself for a period

14 in this case, he was very active in his defense, he has a

15 very rich, creative mind in speaking about his case and

16 his possible legal defenses, and I have seen all that

17 change quite a bit.  He can still speak, he can still talk

18 to me, I'm not suggesting that he is a vegetable, but I do

19 notice a marked diminution.

20         THE COURT:  What is wrong with him?

21         MR. NEVILLE:  He had a serious stroke on October

22 14.

23         THE COURT:  Which caused what?

24         MR. NEVILLE:  I believe it has caused him to

25 lose memory and lose neurological ability to speak, to

1    walk as well as he was before his stroke.

2            Also, your Honor, he reports that he has lost

3    vision in his right eye.  And that he also had, according

4    to a physician, with whom I have not spoken and I have not

5    seen these records, but Mr. Celani reported that he

6    suffered some kind of hemorrhage behind his right eye

7    which apparently was all part of his very high blood

8    pressure which I believe now has been brought under

9    control, frankly.  I think now he is getting the correct

10   medication.  But the damage was done.

11           So he has difficulty controlling the right side

12   of his body.  He has lost vision in his right eye.  His

13   memory is diminished.  And his ability to speak is

14   diminished.  And I have noticed, myself, diminution of his

15   ability to speak, because I have spent a lot of time with

16   this man.

17           When he had the stroke in October, your Honor,

18   apparently the doctors can see in their examination, by a

19   blood that had clotted earlier, that apparently they think

20   he had two previous strokes, less severe than the third

21   one that he had on October 14, 2011.

22           Following his third stroke, on October 14, which

23   was a much stronger stroke, it almost killed him, I think

24   he lost consciousness.  And by the good work of the MDC,

25   he was taken to Lutheran Trauma Center very quickly and I

1   believe that is what saved his life and saved his ability

2   to still speak at all.

3           THE COURT:  Where was he taken?

4           MR. NEVILLE:  To Lutheran Medical Center, your

5   Honor.  It is in Sunset Park in Brooklyn.  It is not far

6   from the MDC.  And it is a very, very good trauma center.

7   So Mr. Celani was lucky.

8           And Mr. Celani told me that as he was having the

9   stroke, the doctor of the MDC just happened to be in the

10  unit and the doctor instructed people to get Mr. Celani to

11  the hospital as soon as possible.  So he was very lucky

12  and fortuitous that things happened as quickly as they

13  did.  He would have either died or really lost his mental

14  ability if more time had passed.  So we are grateful for

15  that.  But nonetheless, damage was done apparently from

16  this stroke.

17          And your Honor knows, we have been to court with

18  Miss McFarland from the MDC's legal department, and quite

19  frankly she did a great job to make sure that Mr. Celani

20  had follow-up examinations regarding all these.  And

21  Mr. Celani has been taken, I think at least twice since we

22  have been together, I can't remember the date but it is a

23  few weeks ago, maybe a month ago, at the most, when

24  Ms. McFarland from the MDC legal department was here,

25  Mr. Celani has been taken at least twice to I think it is

1  New York Eye and Ear Infirmary in Manhattan for follow-up

2  examinations.  And that is where apparently it was

3  determined that Mr. Celani had some kind of hemorrhage

4  behind his right eye subsequent to the October 14 stroke.

5  So there are medical records at New York Eye and

6  Ear Infirmary.  I have in my possession records from

7  Metropolitan Hospital in Manhattan which Mr. Celani was

8  transferred to from Lutheran Medical Center a day or two

9  later or maybe the same day, October 14, 2011, when he had

10  his most severe stroke.

11  And the records from Lutheran Medical Center I'm

12  told are downstairs in this courthouse in the Clerk's

13  office.  I subpoenaed the records from Metropolitan and

14  Lutheran.  I have yet to subpoena records from New York

15  Eye and Ear.  But in anticipation of any medical

16  examination of Mr. Celani, I believe that all those

17  records should be gathered to allow the physician that

18  will examine Mr. Celani to read them and study them before

19  he or she sees Mr. Celani.

20  THE COURT:  You say the records from the

21  hospitals are downstairs in the Clerk's office.

22  MR. NEVILLE:  From Lutheran Medical Center.

23  They are downstairs.

24  THE COURT:  Why don't we get them right away.

25  THE COURTROOM DEPUTY:  Yes.  We can get them.

1        THE COURT:  Please do that now.  I would like

2   the see those records.

3        THE COURTROOM DEPUTY:  I have to go downstairs

4   and get them.

5        THE COURT:  Would you please do that.  I was

6   going to ask you if you have a copy of the Lutheran

7   Medical record.  I would like to see it.

8        MR. NEVILLE:  Yes.  By chance, Metropolitan sent

9   the records right to me.  But Lutheran --

10       THE COURT:  Do you have the records from

11  Metropolitan?

12       MR. NEVILLE:  I don't.  I did see those.  I

13  don't have them me today, your Honor.  No.  I don't have

14  them with me.  But I have looked at them, and indeed he

15  did have a stroke.  There is no question in my mind that

16  Mr. Celani had a stroke.  This is not a malingering

17  person.

18       THE COURT:  Well, the question I have is, is he

19  medically able or physically able or mentally able to

20  stand trial.  That is the issue here.

21       MR. NEVILLE:  That is right.  And that is a good

22  question.  I say as an officer of the court I'm not so

23  sure that he is so capable.

24       This case, your Honor, as you know, is very

25  unique.  And Mr. Celani, I was talking to Mr. Lunger

1  before your Honor took the bench.  Mr. Celani has made it

2  very clear from day one in my relationship with him that

3  he intended, always has intended, to testify in his trial.

4  We know he can't be compelled to but has made it very

5  clear that he is going to tell his side of this whole

6  story.

7       And as you know, your Honor, the case from

8  Mr. Celani's perspective or from his statements, and

9  position is very, very different from what the government

10  puts forth as the theory of the prosecution.

11       So Mr. Celani in order to put his defense

12  forward as a practical matter, not as a legal matter but

13  as practical matter, really must take the witness stand

14  because there would be just no other way to get his side

15  of the story into the case.

16       So for that reason alone, the fact that he has

17  had these mental and physical maladies and serious

18  illnesses, makes me or concerns me about his ability to

19  put his defense forward as he has always intended to do.

20  This isn't some Johnny-Come-Lately defense strategy to try

21  to throw a monkey wrench in the works here, so to speak,

22  and exploit the fact he had a stroke to say that he cannot

23  testify.

24       He has made very clear from day one that he

25  wants to tell his side of the story, and there is no other

1   way, no other person, no other source of evidence, that

2   could replace Mr. Celani's testimony.

3   Believe me, your Honor, I know from speaking to

4   him for many, many hours.

5   THE COURT:  But you do not have any medical

6   records here.

7   MR. NEVILLE:  I did not bring the medical

8   records from Metropolitan.  But the first hospital that he

9   went to on October 14 was Lutheran so --

10  THE COURT:  What kind of doctor do you say

11  should examine him?

12  MR. NEVILLE:  A neurologist, I would think.  A

13  doctor that deals with the potential consequences of a

14  stroke and how that affects the brain and the motor

15  sensory system in the body.

16  THE COURT:  Mr. Lunger?

17  MR. LUNGER:  Yes, your Honor.

18  THE COURT:  What is your view on all of this?

19  MR. LUNGER:  Well, your Honor will recall what

20  precipitated this conference was Mr. Celani's desire not

21  to come to court.

22  The last status conference was scheduled for I

23  think January -- I'm sorry, February 24, and Mr. Neville

24  wrote to the court, seeking to waive Mr. Celani's

25  appearance.  The court had done it once before, on January

1  27, had waived Mr. Celani's appearance for essentially the

2  same reason.

3       The government's concern was that on a

4  going-forward basis if there are going to be status

5  conferences in which substantive issues in the case are

6  going to be discussed, that it is more appropriate for the

7  defendant to be here rather than to continue to waive his

8  appearance.

9       THE COURT:  I agree.  But I don't think we

10  discussed any substantive matters.

11       MR. LUNGER:  That is absolutely correct.

12       THE COURT:  The only thing we have been

13  discussing is his health and his ability to be here.

14       MR. LUNGER:  That is absolutely correct, your

15  Honor.

16       In fact, at the one appearance that your Honor

17  did accept his waiver, I don't believe any substantive

18  discussions were had.

19       At the last conference, on January 27, that was

20  a conference that was focused exclusively on Mr. Celani's

21  health.

22       And your Honor may recall on that January 27

23  conference Miss McFarland, from the MDC, came out and she

24  had some of his medical records in hand and she went

25  through the history of treatment that Mr. Celani has been

1   receiving since the stroke he sustained back in the fall

2   of last year.

3          So the reason why the government wrote to your

4   Honor is, we agree, he should be examined by a physician

5   to determine whether he is physically able to come to

6   court.  And I have been in touch with the MDC and they

7   have reported to me that his primary care physician at the

8   MDC says he is capable of taking care of himself and that

9   there is nothing that prevents from him coming to court.

10         Nevertheless, your Honor obviously has the

11  discretion to send him for a medical evaluation to

12  determine whether he is physically able to come to court.

13  And it is certainly within the court's discretion, and we

14  certainly wouldn't oppose it, if the court were to also

15  order a mental competency exam, although, again, we don't

16  think there is any problem with him mentally.  It is not a

17  situation where counsel is telling the court he cannot

18  communicate with his client, although I understand after

19  his stroke, as counsel states, his speech is maybe halting

20  a little bit and that he frequently moves slower.  I'm not

21  hearing any kind of claim that he is mentally incompetent.

22         But out of an abundance of caution, if the court

23  also wants to send him, in addition to a physical

24  examination to determine whether he is physically able to

25  come to court, if the court also wants to order a mental

1  competency exam, that can be done in relatively short

2  order.

3          I understand they are routinely done in the

4  Metropolitan Correction Center, in Manhattan, and the

5  court can order that to take place within the next 30 days

6  with a report to follow.

7          So again, the government doesn't think he is

8  mentally incompetent and the government also thinks he can

9  come to court.  Nevertheless, this is an issue that has

10 been raised so we think it should be addressed.

11         THE COURT:  I'm looking at some notes that I

12 made on two occasions, January 26 of this year and January

13 27, when Nicole McFarland -- I think she was here in

14 person, was she not?

15         MR. LUNGER:  Yes, your Honor.

16         THE COURT:  Well, the only consideration that I

17 have as far as an examination by a doctor or doctors is

18 who should appoint this doctor or doctors and where do we

19 get this doctor or doctors from.

20         Now, I have never appointed a doctor in a

21 criminal case to examine someone on behalf of the court,

22 or anything like that.  I would have to do some research

23 and call to find somebody who would be able to go to the

24 MDC.  Doctors who are specialists in neurology, for

25 example, are busy generally and do not do things like run

1　to the MDC to make an examination.  I do not know of any

2　doctors that I can call right now.  I would have to do

3　some research on it.

4　　　　　MR. NEVILLE:  Your Honor?

5　　　　　THE COURT:  Yes.

6　　　　　MR. NEVILLE:  May I?  I think your Honor has

7　pointed out a very important issue here.

8　　　　　I agree with the court that a neurologist should

9　see Mr. Celani.  I know Mr. Lunger just suggested that

10　Mr. Celani be taken to the MCC, the Metropolitan

11　Correctional Center, in Manhattan, for this examination.

12　　　　　On that I would ask respectfully that the court

13　consider ordering that Mr. Celani be taken to Metropolitan

14　Hospital, to Lutheran, where he already be has been taken,

15　or to New York Eye and Ear Infirmary in Manhattan, where

16　he has already been taken, to be examined by a doctor in

17　the doctor's own environment and office and where whatever

18　testing facilities are available, I don't know what tests,

19　an MRI or a CAT scan or any other kind of tests that might

20　be conducted.

21　　　　　It should done in a hospital setting.

22　Obviously, first of all, if something should happen to

23　Mr. Celani, he is right in the hospital.  But maybe for

24　our purposes more importantly, that an examination be done

25　in a doctor's office or a hospital with machinery and

1   nurses and aides and whoever else is there to support the

2   doctor; not at the MCC, your Honor, most respectfully.

3          I think that is an awful idea, with all due

4   respect to Mr. Lunger, especially since Mr. Celani has

5   been taken to these various hospitals already.  So we know

6   it can be done.

7          THE COURT:  You mentioned Lutheran and

8   Metropolitan.  What was the other hospital?

9          MR. NEVILLE:  New York Eye and Ear Infirmary, I

10  think is the name, if I'm not mistaken.  It is also in

11  Manhattan.  And I believe it is a hospital that the Bureau

12  of Prisons has some kind of contract with, I think.

13         But I know that Mr. Celani has been taken to

14  each of those three New York City hospitals, and to the

15  New York Eye and Ear, as I say, at least twice.

16         THE COURT:  I think that would be the right

17  place to have him examined, and then the doctor at the

18  hospital wouldn't have to travel to the facility or

19  anything like that.

20         MR. NEVILLE:  Right.  I agree.

21         MR. LUNGER:  Your Honor, what I would say is as

22  follows.

23         There are two examinations that I think should

24  occur here.  One is a mental examination, which are (sic)

25  routinely performed at Metropolitan Correctional Center.

1    They also may have appropriate physicians at the MCC, such

2    as neurologists, who could also --

3              THE COURT:  Such as what?

4              MR. NEVILLE:  Such as a neurologist.  I don't

5    know, and I can look into that, to determine whether the

6    Bureau of Prisons has neurologists on staff.  If they did

7    not, then Mr. Celani could be sent off premises, as he has

8    in the past.

9              What the government would ask is two things.

10   One, that the medical records be produced to the

11   government so that whoever examines Mr. Celani can have

12   those in hand; and that, secondly, that the Bureau of

13   Prisons be given a reasonable period of time, perhaps 30

14   days, to determine where the exam or exams should take

15   place, whether it be at any of the hospitals mentioned by

16   Mr. Neville or the Eye and Ear Infirmary that he

17   mentioned.

18             So that would be our request.

19             THE COURT:  Well, about that last request.

20             I think that in order to get a top doctor or

21   doctors to do this, I'm going to have to have him brought

22   to the hospital.  They are not going to go to the prison

23   to do this examination.

24             And, by the way, who is going to pay for these

25   examinations?

1          MR. LUNGER:  Well, your Honor, this is a case

2  where CJA counsel has, they are appointed, so at the end

3  of the day the government pays, whether it is -- in the

4  past it has been the MDC.  The MDC has sent the defendant

5  off premises for medical treatment and they have got, the

6  Bureau of Prisons has footed the bill.  So I assume that

7  is what is going the happen here, as well, your Honor.

8          If there is a mental competency exam performed

9  at MCC, my understanding is that is performed in house.

10  But if he has to go off premises for an examination, then

11  I think MDC.

12          THE COURT:  How do I know who will perform a

13  medical examination at the MDC?  Do we have a list of

14  doctors?  How do we know this?

15          MR. LUNGER:  I could find out what doctors are

16  available in terms of, if we are talking about a

17  neurologist I think that is going to be a specialist that

18  MDC is going to go outside to have him examined by.

19          THE COURT:  You are talking about two different

20  examinations.  One is a neurological exam, to see what his

21  condition is.

22          MR. LUNGER:  Yes.

23          THE COURT:  And a mental competency exam, to see

24  if he is competent to stand trial?

25          MR. LUNGER:  Yes.

1    THE COURT:  I now have these records here from

2    the Lutheran Health Care Center.  I'm going to let the

3    lawyers view them and get copies of them.

4         But for the purpose of this discussion, it says

5    here:

6         *Patient complaint.  October 14, 2011.  6:08 pm.*

7    *Transient ischemic attack.  He was transported to the*

8    *hospital by ambulance.  His chief complaint was expressive*

9    *aphasia.*

10        Then it says:  *The prisoner brought to the*

11   *hospital to R/O stroke about 4:15 pm.  Became aphasic.*

12   *Patient denies pain, cough, fever, or rash.*

13        *The history and complaint chief complaint is*

14   *difficulty speaking.  A 63-year-old male presents with an*

15   *expressive aphasia for approximately 20 minutes at 4:15*

16   *pm.  Patient states he was typing on his computer when he*

17   *developed blurry vision.  He went to the jail doctor and*

18   *he completely understood what the doctor was trying to*

19   *tell him but he could not express what he wanted to say*

20   *and was saying inappropriate words.*

21        *Bystanders said he repeating "banana" over and*

22   *over again.  Patient had a mild headache on the top of his*

23   *head which is resolving.  Patient denies any distal*

24   *numbness, weakness, chest pain.  No prior occurrences.*

25   *Examination of his various parts of his body are negative,*

1    *NEG.*

2          *Patient states he knew what he wanted to say but*

3    *couldn't say it.  Patient also states his words were not*

4    *making any sense.  No neurological deficits noted at this*

5    *time.  No facial droop or asymmetry noted.  No fall risks*

6    *identified.  Patient denies pain at present time.*

7          *Patient is federal prisoner with expressive*

8    *aphasia onset at 4:15 pm.  Improved over the next 20 to 30*

9    *minutes but patient still having some difficulty finding*

10   *words.  Seen by stroke team.*

11          *Patient is to be transferred to Metropolitan*

12   *Hospital if stable for transportation.  Patient was*

13   *medically stable for transfer to Metropolitan Hospital.*

14   *He will be transferred tonight.  Patient started on*

15   *heparin drip.  Transport here to take patient to*

16   *Metropolitan Hospital.*

17          Well, on a score sheet dated October 14, 2011,

18   where it is zero to 3, he is marked zero on every level

19   except movement of his right arm, and speech.  He has a

20   one for each of those, but everything else is zero, which

21   means normal.

22          In his neurological flow sheet, this is

23   interesting:

24          *His eye response:  spontaneous.  His motor*

25   *response, obeys commands.  His verbal response:  full.*

Again, the initial diagnosis is *transient expressive aphasia.*

There were tests made. X-rays, I suppose. Or even more than x-rays, I cannot make it out, because they say that images were reviewed.

*Findings: There is no evidence of intracranial hemorrhage or extraaxial collections. There were some findings made which they said could represent old infarcts.*

And he was given chest, apparently, x-rays.

*No evidence of acute pleural or parenchymal disease. Electrocardiogram.*

And again there was an MRI given to him and the impression:

*There is some abnormal flair signal in the right parietal lobe. This is a minimally abnormal diffusion signal in this area without abnormal signal to indicate an acute area of ischemia.*

*Differential diagnosis includes an infiltrative process or subacute infarction.*

Well, with my limited knowledge of medicine, looking at this record of the Lutheran Hospital, where he was taken immediately after sustaining this stroke, it does not look too serious to me. However, notwithstanding my previous occupation as a lawyer in medical cases and

1   notwithstanding fact that I took three medical courses at

2   the Society of Medicine on 105th Street in Manhattan in

3   three consecutive years because I wanted to learn about

4   orthopedic medicine; the first year I took the course I

5   understood about 10 percent.  This is a regular medical

6   course.  I understood about 10 percent of what the

7   professor was saying.  The next year I took the same

8   course and I understood about 25 percent of what the

9   professor was saying.  And the third year, I took the same

10  course again and I understood about one-third of what the

11  professor was saying.  But some of it has remained with

12  me.

13          However, we are going to have to have him

14  examined, and the question is by whom and where?  That is

15  the problem.

16          MR. LUNGER:  This is what I can tell the court,

17  your Honor.  I do know that there are psychiatrists or

18  psychologists on staff at the Metropolitan Correctional

19  Center who routinely do mental competency exams, so I

20  believe a mental competency exam can be done in fairly

21  short order.

22          I will inquire as to whether there are

23  neurologists also on staff at the MCC, and I can probably

24  get back to the court in a week's time or less.  In the

25  event there are no neurologists on staff, then I think the

1  defendant can be sent out for a neurological exam and a

2  report can be written up and provided to the court

3  thereafter.

4       THE COURT:  So you will let me know.

5       I would do it as soon as possible because this

6  case has lingered a lot.  It is mostly my fault that it

7  has lingered because I don't know who to call or to ask to

8  do this examination.  The doctors that I know are busy

9  practicing and they are too busy to do anything.

10      So the question is, who do we get to do these

11  exams?

12      MR. LUNGER:  I will get back to the court as

13  soon as possible.

14      THE COURT:  Let me know if there is anybody on

15  staff who will do it.  I want an impartial examination.  I

16  don't want anybody who has a predilection in favor of the

17  government or anything like that.

18      MR. LUNGER:  Absolutely, your Honor.  Okay.

19      MR. NEVILLE:  Your Honor, if I may.  Again, the

20  mental competency exam, in my opinion, should still be

21  done in conjunction with the neurological exam, and

22  therefore it makes sense that both of those exams be done

23  in the same place.

24      But certainly the neurological exam, your Honor,

25  with all due respect to Mr. Lunger and his statement about

1   the MCC and doctors on staff there, it makes no sense at

2   all to have a neurological examination of this man at the

3   MCC, at a prison.  I don't care who the doctor is, I don't

4   care if it is the number one doctor in the universe, he or

5   she is not going to do a proper neurological exam without

6   the attendants and appropriate support and equipment and

7   testing paraphernalia, if you will.  That has to be done

8   in a hospital.

9           I don't know why Mr. Lunger is harping on doing

10  a neurological in a prison.  That makes no sense.  Maybe

11  the psychological exam with somebody.  That, I can see his

12  logic; certainly from the government's perspective, to

13  save money, to have it be a doctor that works at the

14  prison.  But that does lead me to the next point, your

15  Honor, that I will make.

16          Your Honor already made the point, and I am

17  emphasizing what your Honor has already said, that these

18  exams must be done by an impartial person.  And I am

19  concerned that at the MCC, certainly the neurological

20  exam, I say with all confidence, with all due respect to

21  Mr. Lunger, that is a ridiculous idea, that the

22  neurological exam be done in a prison, but even the

23  psychological exam.

24          My respectful contention and assertion to this

25  honorable court is that both of these exams be conducted

1  in a doctor's own office, facility, hospital, whatever the

2  case may be; not at the MCC. And, your Honor, we do need,

3  and I ask pardon from the court for not bringing the

4  Metropolitan record with me today, I should have done that

5  but I didn't, but I do have them in my office.

6      THE COURT: What do they say?

7      MR. NEVILLE: They basically say the same thing

8  that your Honor has read from Lutheran. They are more

9  extensive because there was a more profound examination.

10 But I'm not prepared to try to repeat or reiterate or

11 summarize those records right now off the top of my head

12 because I never took any medical courses and I know I

13 would not have understood probably anything that was being

14 said there.

15      So I certainly can't piece together what I saw

16 of these Metropolitan records right now, but I do have

17 them and I will provide them to Mr. Lunger and to the

18 court.

19      THE COURT: Let us have a copy of those records.

20      MR. NEVILLE: Absolutely.

21      But as I say, I do not have the records from the

22 New York Eye and Ear Infirmary where Mr. Celani has gone

23 at least twice. I think we need those records and also

24 the records from the doctor at the MDC, in Brooklyn, who

25 has examined Mr. Celani many times. I think those records

1    should also be given to whoever the doctor is that does

2    this exam.

3              THE COURT:  I agree.

4              MR. NEVILLE:  So I think, with Mr. Lunger's

5    help, the MDC medical records could be obtained quite

6    quickly.  I will prepare a subpoena for him, your Honor,

7    to sign, although Metropolitan and Lutheran went ahead and

8    provided their documents on an attorney's subpoena which I

9    provided them, so if the court instructs me to go ahead

10   and do the same for the New York Eye and Ear, I will do

11   that.

12             If the court would like me to bring the subpoena

13   to the court for examination --

14             THE COURT:  I think, just to make sure, I will

15   so order the subpoena.  I would like to see all the

16   records.  I think that the doctor or doctors who do the

17   examination should have all the records and --

18             MR. LUNGER:  Your Honor, while we have been

19   talking, I have just received an email message from Ms.

20   McFarland, who your Honor remembers from the last

21   conference.  She is the attorney from the MDC.  She has

22   told us that there are no neurologists on staff and that

23   Mr. Celani would be sent out to see a neurologist.

24             THE COURT:  There is.

25             MR. LUNGER:  There are no neurologists on staff.

1          THE COURT:  Okay.

2          MR. LUNGER:  So Mr. Celani will be sent out to

3    see a neurologist.

4          As far as mental competency exam, those are

5    routinely and professionally done by staff psychiatrists

6    at the MCC.  These are doctors who have no knowledge of

7    this defendant.  They have no knowledge of this case.  I

8    have no direct contact with them.  They have no direct

9    contact with any of the prosecution team.  I have every

10   reason to believe that that will be a professional and

11   objective mental evaluation.

12         So again, what we propose is that a mental exam

13   be done at MCC and that, as we now know, that Mr. Celani

14   will be sent off premises for a neurological exam.

15         I can submit an order to the court, which your

16   Honor can sign, directing that this happen within the next

17   30 days, with reports to follow shortly thereafter.

18         THE COURT:  I think you should prepare an order.

19   But I do believe that both examinations should be done at

20   a hospital away from the MDC.

21         I'm sure that there are very fine doctors in the

22   MDC who are impartial and are going to tell what they see,

23   but just for my edification let's do it at the hospital.

24         MR. LUNGER:  Okay.  I will communicate that to

25   the Bureau of Prisons.

1    THE COURT:  It is much more effective to see
2  what the result is.
3    The order that has to be prepared will have to
4  provide that he is to be sent out for both the
5  neurological and the mental competency.
6    MR. LUNGER:  Very well, your Honor.
7    THE COURT:  I think it is better for everybody
8  if it is done that way.  Then there will be no doubt.
9    There would be no doubt by me if it was done in
10  the facility.  I understand that.  But just to make sure.
11    MR. LUNGER:  That is how I will draft the order,
12  your Honor.  Thank you.
13    THE COURT:  Okay.
14    MR. NEVILLE:  I'm sorry, your Honor.
15    THE COURT:  I think you each ought to get copies
16  of this medical record.
17    Would you be able to make copies, Mr. Lunger,
18  for counsel?
19    MR. LUNGER:  Yes, your Honor.
20    THE COURT:  Okay.  And return that to the court.
21    MR. LUNGER:  Okay.
22    MR. NEVILLE:  Your Honor --
23    THE COURT:  I'm going to tell you now,
24  Mr. Neville.  I see nothing in those records that would
25  lead me to believe that your client cannot stand trial.

1  That is from my layperson's viewpoint.

2          MR. NEVILLE:  Understood, your Honor.

3          Judge, I don't think I need to say this.  I

4  think it is obvious.  But before Mr. Celani is sent out

5  for these examinations, we need to get all these records

6  first.  So I don't want Mr. Lunger to tell --

7          THE COURT:  You have to get all the records

8  together so that the doctor or doctors who examine him

9  will have all the records.

10          MR. NEVILLE:  Thank you.  And Ms. McFarland does

11  have a release, a HIPPA authorization, signed by

12  Mr. Celani to release those medical records.  Miss

13  McFarland asked me to provide her with that and I did

14  that.  So that should be on file with the MDC.

15          THE COURT:  Okay.  And if we need further

16  authorizations, you will get them for us.

17          MR. NEVILLE:  Thank you.

18          THE COURT:  There is one other matter that was

19  brought to my attention, and that was a notice of motion

20  of nonparty Congressman John D. Dingell to quash a

21  subpoena duces tecum.

22          Did you see this at all, Mr. Neville?

23          MR. NEVILLE:  Yes.  I have seen the filing, your

24  Honor.  That is actually the second subpoena that I had

25  served on Congressman Dingell's office.  The first was

1    over a year ago.

2         Another staff attorney filed a motion to quash.

3    Your Honor granted that motion to quash.  I had a second

4    subpoena, a different subpoena, which included the same

5    material demanded in the first subpoena but then

6    additional material about other individuals in Congressman

7    Dingell's office, hence this second motion to quash, which

8    I have not yet responded to because, quite frankly, lately

9    the issues have been regarding Mr. Celani's health and so

10   I have not gone forward with any response to that.

11        But that does lead me to, I'm glad your Honor

12   brought this up because, getting back to the legal part of

13   this case, getting away from Mr. Celani's medical

14   condition, I have tried to obtain information that would

15   allow me to corroborate and verify what Mr. Celani has

16   told me in fact occurred throughout this case and we have

17   talked about it in this honorable court various times and

18   I won't go into it.

19        THE COURT:  I don't want to get into the merits,

20   either, because we don't have Mr. Celani here.

21        MR. NEVILLE:  Very well, your Honor.

22        THE COURT:  And even though he has waived his

23   appearance, I don't want to get into anything of substance

24   until he is here.

25        MR. NEVILLE:  I agree with that, your Honor.

1    I just will point out to the court that there is

2 an April 2, 2012, deadline set by this court for all

3 motions.  And since Mr. Celani's stroke and attendant

4 difficulties that I have witnessed, myself, your Honor,

5 notwithstanding what your Honor has said about the medical

6 record from Lutheran, I have seen Mr. Celani a lot and I

7 have seen the effects of the stroke and we have had

8 discussions about that, mostly his medical condition, and

9 we have had discussions about the case, but the case,

10 itself, and the preparation, the continued preparation of

11 the defense has slowed down quite a bit.

12    So I am concerned about that April 2 date, and

13 given this examination that we are going to have, I'm

14 asking the court or I'm just previewing to the court my

15 position, which is that that April 2 date should be

16 continued and extended.

17    THE COURT:  I think you are right.

18    How much time do you want?

19    MR. NEVILLE:  I would say 60 days beyond that,

20 your Honor, just to be on the safe side.

21    MR. LUNGER:  Can I be heard, your Honor, on

22 this?

23    THE COURT:  Yes.

24    MR. LUNGER:  This date was set on October 13 of

25 last year and your Honor said you were not going to change

1 this date, that this was a firm date, and that thereafter

2 a trial would be set.

3        This is not a situation where Mr. Neville cannot

4 communicate with his client. He has made that very clear

5 on the record today. This is about a motion deadline,

6 motions that were contemplated being made back in the

7 fall.

8        There is absolutely no reason why that date

9 can't stay put, irrespective of examinations that are

10 being contemplated here today. This is not a situation

11 where a defense attorney doesn't have any inkling of what

12 kind of motion he wants to make based upon a lack of

13 communication with his client.

14        And we respectfully request that that motion

15 date stay where it is.

16        MR. NEVILLE: With all due respect to

17 Mr. Lunger, I did not say that I could communicate with my

18 client as well as I always could. In fact, I explicitly

19 had said that the communication with Mr. Celani is

20 different than it was prior to the time he had his stroke.

21 And this motion date in fact was set, oddly enough, the

22 day before Mr. Celani had this stroke.

23        I believe, your Honor, that Mr. Celani's blood

24 pressure is now under control and that he has been

25 stabilized because of the efforts of the MDC and the

1  doctors that have examined and treated Mr. Celani, but

2  mostly because of this honorable court and my applications

3  concerning his medical issues, which have gone on now for

4  months.

5          I said earlier in this session that my

6  communication with Mr. Celani is different than it was

7  prior to his stroke, number one, so Mr. Lunger misspoke

8  there.  He is allowed to take whatever position he wants

9  to take regarding this motion date, but I would ask him

10 not to speak for me in terms of how I'm communicating with

11 my client.

12         And I don't think Mr. Lunger, even before the

13 stroke or after, has had too many discussions with

14 Mr. Celani, so I'm in a pretty good position to talk about

15 how I observe Mr. Celani these days.

16         THE COURT:  I think that this has been an

17 extraordinary event that occurred, having a stroke and

18 requiring all these examinations.  That would be a

19 proximate cause of an extension of time.

20         In my view that is a reasonable request, and I'm

21 extending the motion date from April 2, 2012, to June 4,

22 2012.

23         MR. NEVILLE:  Thank you, your Honor.

24         THE COURT:  All right.

25         Anything else at this time?

1    MR. LUNGER:  The only thing I would ask is, if

2    there is a HIPPA authorization that was signed by the

3    defendant to allow the MDC to turn over medical records, I

4    would just like to know how recent that was because I know

5    they expire.

6         THE COURT:  If necessary we will get a new one.

7         MR. LUNGER:  Very well, your Honor.

8         THE COURT:  Mr. Celani will sign another

9    authorization.

10        MR. NEVILLE:  Absolutely, your Honor.

11        THE COURT:  I would get another authorization.

12        MR. NEVILLE:  Yes, sir.

13        THE COURT:  And serve it on the government.

14        MR. NEVILLE:  Yes, sir.

15        THE COURT:  Okay?

16        MR. NEVILLE:  Thank you, your Honor.

17        THE COURT:  Very good.  I'm going to receive

18   these records and then we will see what happens.

19        (Proceedings adjourned at 10:10 am.)

20

21

22

23

24

25