1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,          :
                                        CR-09-405 & CR-13-183
       -against-                   :
                                        United States Courthouse
FREDERICK CELANI,                  :    Central Islip, New York

           Defendant.             :    November 6, 2013
                                        10:30 a.m.
------------------------------X


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE ARTHUR D. SPATT
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Government:         LORETTA E. LYNCH, ESQ.
                            UNITED STATES ATTORNEY
                            610 Federal Plaza
                            Central Islip, New York 11722
                            BY:  DEMETRI M. JONES, ESQ.
                                 MICHAEL P. CANTY, ESQ.


For the Defendant:          ANDREW L. OLIVERAS, ESQ.
                            26 Strangford Court
                            Oceanside, New York 11572
                                      and
                            ROBERT P. LaRUSSO, ESQ.



Official Court Reporter:    Ellen S. Combs, CSR
                            100 Federal Plaza - Suite 1180
                            Central Islip, New York 11722
                            Phone (631) 712-6107
                            Fax (631) 712-6123


Proceedings recorded by mechanical stenography
Transcript produced by Computer

2

1        (The following took place at 11:52 a.m.)

2        THE CLERK:  Criminal cause for sentencing,

3   Criminal 09-0405 and Criminal 13-0183, United States of

4   America vs Frederick Celani.

5        THE COURT:  Appearances, please.

6        MS. JONES:  Demetri Jones for the government.

7   Good morning, your Honor.

8        MR. CANTY:  Michael Canty also for the

9   government.

10       THE COURT:  One minute now, slow down.

11   Good morning, Ms. Jones.

12       MS. JONES:  Good morning, judge.

13       MR. CANTY:  Good morning, your Honor.  Michael

14   Canty also for the government.

15       THE COURT:  Good morning.

16       MS. HAASNOOT:  Good morning.  Sindee Haasnoot

17   from probation.

18       THE COURT:  And you are the lady who did the

19   probation report?

20       MS. HAASNOOT:  Yes, your Honor.

21       THE COURT:  Your name is pronounced Sindee

22   Haasnoot?  Is that correct?

23       MS. HAASNOOT:  Yes, your Honor.

24       THE COURT:  Yes, sir?

25       MR. LaRUSSO:  Robert LaRusso for Mr. Celani who

3

1    is present in court.

2              MR. OLIVERAS:  Andrew Oliveras.

3              Good morning, your Honor.

4              THE COURT:  What exactly is your title in this

5    case?  What is your capacity, Mr. Oliveras?

6              MR. OLIVERAS:  I was appointed by you to assist

7    Mr. LaRusso as counsel.

8              THE COURT:  As counsel?

9              MR. OLIVERAS:  Correct.

10             THE COURT:  So I appointed two counsels?

11             MR. OLIVERAS:  Correct.

12             MR. LaRUSSO:  Your Honor, if you may recall,

13   initially Mr. Oliveras was assigned as a paralegal to work

14   with Mr. Neville.  When I was assigned a couple of years

15   ago in order to properly prepare the case the Court felt

16   that the assistance of another attorney would be

17   appropriate.  And I had asked, quite candidly, for someone

18   that was on the CJA list.  The Court said, That's a waste

19   of time, basically because Mr. Oliveras has been working

20   diligently for years on this memo.  And since he had been

21   recently admitted to practice, the Court assigned him as

22   an attorney.  Which it turned out was the right choice,

23   your Honor.

24             He was been very helpful in putting all of this

25   together.  In fact the sentencing memorandum is primarily

4

1   his product.  And I don't know if I should have mentioned

2   that, but he worked very diligently and very hard on

3   behalf of Mr. Celani.

4            THE COURT:  That's good to hear.

5            Do we have any updated medical records?  Do you

6   have any, Mr. LaRusso, of the defendant?  Or just what

7   we've gotten up to now?

8            MR. LaRUSSO:  Your Honor, I don't have any

9   recent updated medical records of Mr. Celani.  What I can

10  tell the Court is about two months ago I had written a

11  very detailed letter to the legal department at MDC with

12  copies to the Bureau of Prisons' regional office down in

13  Philadelphia and to, I believe an associate director in

14  Washington, outlining all of the medical issues that

15  Mr. Celani had, including the impairment in one eye, the

16  loss of hearing in one ear, the loss of peripheral vision

17  in the second eye, the -- that still are happening to

18  Mr. Celani after the strokes occurred several years ago.

19           I have also indicated to them that his bulging

20  disks and the incontinency which has been a major problem

21  over the last three or four months have not been

22  addressed.  I had hoped to avoid, and quite candidly,

23  judge, the strategy and the decision we made is not to

24  burden the Court with that, hoping the Bureau of Prisons

25  would have addressed it.  Unfortunately I have to report

5

1   they never got back to me on it.

2           THE COURT:  My question is, do you have any

3   updated medical records other than what I received

4   already?

5           MR. LaRUSSO:  Other than those, no, I do not,

6   your Honor.

7           THE COURT:  Now there is a request by the

8   defendant, I think it;s in the sentencing memorandum, that

9   the defendant's sentencing memorandum should be annexed to

10  and made a part of the presentence report.  Why is that?

11          MR. LaRUSSO:  Well, I know it's a very unusual

12  request to make.  It has been made in a number of other

13  cases.

14          But in this particular matter it has

15  significance, judge, because after sentence today -- and

16  the Court is well aware -- the presentence report, the

17  judgment of conviction will be sent down to the Bureau of

18  Prisons classification center in Texas.  And they will

19  then review those documents and make a determination where

20  Mr. Celani would be placed, in what institution.

21          Based upon, in sum, the danger Mr. Celani faces

22  from retaliation because of his cooperation with law

23  enforcement, because of it being known in the bureau, in

24  the prison system that he had been -- he has actually been

25  placed in a separate facility in the MDC for his own

**6**

1    safety.  It is incumbent upon the Bureau of Prisons to

2    have an accurate record of the facts behind the danger

3    that he faces if he is placed in a prison without

4    consideration of the danger he faces.  Judge, not just

5    from the individuals that he originally cooperated

6    against, but from people who have been associated with my

7    industry and such as the Bloods, individuals who would

8    have it out for him, and the Mafia.

9            I mean, it is detailed in our sentencing

10   memorandum quite clearly that the Bureau of Prisons should

11   really take a look at the potential danger to Mr. Celani.

12   And when you place him in an institution, put him in an

13   institution where you can at least reasonably guarantee

14   that he will not have to look over his shoulder.

15           I make this request, judge, in the sense of he

16   is no longer a young man.  And he probably is not in a

17   position to even defend himself from the slightest

18   provocation from an inmate.  So added to that the fact

19   that he is in danger, added to the fact that his medical

20   condition would prevent him from any kind of self-defense,

21   I think the Bureau of Prisons should have access to these

22   facts.  That is what they are, judge, they're facts to

23   help them in the designation.

24           THE COURT:  That may be.  But it's very unusual

25   to annex it to the presentence report.  It doesn't belong

7

1    there.  It's not part of the presentence report.  And I'm

2    denying your request.

3           However, you can send it to whoever you want to

4    send it to.  But it's not going to be part of the

5    presentence report.

6           MR. LaRUSSO:  Could I ask the Court maybe to

7    allude to it in the presentence report, or in some way

8    when the Bureau of Prisons gets it they know there is

9    other document for consideration?

10          THE COURT:  They always know there is a

11   presentence report, don't they?  There is a sentencing

12   memorandum.  I'm sorry.  This is not different from other

13   cases.

14          (There was a pause in the proceedings.)

15          THE COURT:  I certainly would request that the

16   government notify the Bureau of Prisons of these matters.

17   If the government wants to send a copy of the sentencing

18   memorandum, fine.  But I'm not annexing it to the

19   presentence report.  It doesn't belong there.

20          MS. JONES:  Your Honor, I think the defendant's

21   job is to send his own memorandum to the Bureau of

22   Prisons, not the government's job.  It's not part of PSR.

23   It's not our file.

24          THE COURT:  If I request that the government do

25   it, why wouldn't they comply with it?

8

1          MS. JONES:  Judge, then if you direct it, we

2    will do it.

3          THE COURT:  Well, I'm going to direct you to do

4    it.

5          MS. JONES:  Okay, thank you.

6          THE COURT:  So that's that.

7          Well, if you want you can edit this and just

8    make sure that they keep him away from whoever he says is

9    going to bother him.

10         MS. JONES:  I think the most we can do, judge,

11   is request a separate order.  But I don't know how

12   effective that would be, because we don't know who he is

13   supposed to be separated from.

14         THE COURT:  Okay, just send them a copy.

15         MS. JONES:  Okay, we'll send them a copy, your

16   Honor.

17         THE COURT:  Do we have to be concerned with

18   victims' rights?

19         MS. JONES:  Your Honor, the victims in this case

20   have been made aware of the proceeding.  We received a

21   number of letters.  We have provided Court with a complete

22   list of the victims.  We provided documentation of their

23   losses.  It was attached to the plea agreement at the time

24   the plea was taken.  So the victims have all been notified

25   and have had the opportunity to come here and address the

9

1    Court if they so desire.

2         I have not received word from anyone that they

3    want to come today.  So as far as we know, we have

4    complied with our obligation.

5         THE COURT:  There is nobody in the courtroom

6    other than the people involved here?

7         MS. JONES:  No, your Honor.  Only from my office

8    and the court security officers.

9         THE COURT:  Okay.

10        MR. LaRUSSO:  Your Honor, just so the Court

11   understands, and I know you do, I have had this issue come

12   up a number of times with the Bureau of Prisons in terms

13   of classification.  And they are actually under procedural

14   guidelines in terms of what they consider when they are

15   making a designation.  And they're very specific as to

16   PSR, the judgment of conviction form.  And I believe also

17   the reason, the reasons for a judge's sentence.  That is

18   about all they are asked to use.

19        So this is very important, and I appreciate the

20   Court's, I guess practical way of resolving the problem,

21   insuring that the Bureau of Prisons gets all of the

22   necessary information.  And on behalf of Mr. Celani, I

23   thank the Court to do that.  I know it's highly unusual,

24   and we appreciate it.

25        THE COURT:  Can Mr. Frederick Celani stand up or

10

1    does he have to be seated?

2              MR. LaRUSSO:  Yes, he can, judge.

3              You're going to stand up during the sentencing,

4    Mr. Celani.

5              THE DEFENDANT:  Sorry, your Honor.

6              THE COURT:  You will stand up during the

7    sentencing.  If you have to sit down you will tell me and

8    you will sit down if you don't feel well.

9              THE DEFENDANT:  I feel --

10             THE COURT:  If you don't feel well you'll sit

11   down.  Okay?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  You are Frederick Celani?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  In previous proceedings in this

16   matter a determination of guilt was made that you're

17   guilty of the following crimes:  As to Count One,

18   conspiracy to commit wire fraud, Rainmaker investors

19   matter, a Class C felony.

20             As to Count Nine, money laundering, a Class C

21   felony.

22             Based on that determination of guilt it is now

23   the judgment of this Court that you are guilty of those

24   two crimes.

25             I have considered the file in this case and the

1    presentence report and recommendation, and the following

2    documents:

3              The letters from Robert P. LaRusso, Esq. dated

4    June 25, 2013; July 2, 2013; July 8, 2013; July 11, 2013;

5    August 28, 2013; and October 16, 2013.

6              The order of the Court, my order, dated July 18,

7    2013.

8              The letter from staff attorney Kenneth Bork,

9    dated October 4, 2013.

10             The letter from Assistant United States Attorney

11   Robert D. Tolemeni, dated October 15, 2013.

12             The addendum to the presentence report, dated

13   October 16, 2013.

14             A memorandum from the defendant, dated July 5,

15   2013.

16             The memorandum from the defendant to the medical

17   department of MDC, dated July 5, 2013.

18             The sentencing memorandum from Robert P.

19   LaRusso, Esq., dated October 30, 2013 with many annexed

20   documents and exhibits.

21             An email from the defendant, dated November 1,

22   2013.

23             And the second addendum to the presentence

24   report, dated November 5, 2013.

25             And finally, the letter from Assistant United

1   States Attorney Demetri M. Jones, dated November 5, 2013.

2          Also, I have considered all the time you have

3   spent in custody in this matter.  That is, since March 17,

4   2009.  Is that correct?

5          THE DEFENDANT:  Yes.

6          THE COURT:  That is a period of approximately 55

7   and-a-half months.

8          Mr. LaRusso, have you reviewed the presentence

9   report and the two addenda with the defendant?

10         MR. LaRUSSO:  I have.

11         May I have just one moment with my client,

12  judge?  He asked me a question and I want to make sure he

13  understands it before I answer the Court.

14         THE COURT:  Go ahead.

15         (There was a discussion between the defendant

16  and his attorney.)

17         MR. LaRUSSO:  Judge, just so the Court is aware,

18  I had gotten the second addendum from the Probation

19  Department, I guess a couple of days ago.  And I'm not

20  claiming that it was late.  I just didn't have the

21  opportunity to bring to Mr. Celani at the MDC.  So he

22  questioned me about that document.  And what I did was, I

23  said to him, I'm very familiar with it.

24         He is reviewing it now.  I outlined it for him.

25  It relates to several issues that we will be discussing

**13**

1    very shortly.  So for all intents and purposes Mr. Celani

2    has all the documents.  I have reviewed with him the

3    presentence report, the first addendum, and now, quite

4    candidly, judge, we've now completed our review of the

5    second addendum, thanks to your few minutes that you gave

6    us.

7              THE COURT:  Mr. LaRusso, are there any errors in

8    the presentence report and the two addenda?  Now you've

9    brought up some things.

10             MR. LaRUSSO:  I did, judge.

11             THE COURT:  Let's go over them.

12             MR. LaRUSSO:  Your Honor, if I may, may I start

13   with one that Mr. Celani noted in the second addendum.

14   And that is the existence of two outstanding warrants.

15             In our sentence memorandum I indicated to the

16   Court that the two warrants should have been vacated, both

17   warrants should have been removed from the system.

18   Unfortunately, both warrants are still in the marshals's

19   computer.  I have spoken with the marshal downstairs.

20   There is nothing they can do even though the warrants

21   should have been withdrawn.

22             I know Ms. Jones has been trying very diligently

23   over the last couple of days to try to get these two

24   warrants vacated and removed.  Because in this presentence

25   report --

14

1          THE COURT:  You say two warrants.  There has

2     been some discussion about a district of Illinois warrant.

3     Are you talking about another one besides that?

4          MR. LaRUSSO:  If I may.  Ms. Jones can correct

5     me if I'm wrong, judge.

6          There are actually two cases coming out of the

7     District of Illinois.  One is a 1984 case which resulted

8     in a violation of supervised release warrant being issued

9     for him.

10         THE COURT:  I'm getting nervous watching

11    Mr. Celani.  Have a seat, Mr. Celani.

12         MR. LaRUSSO:  Thank you, your Honor.

13         THE COURT:  I don't want him to collapse in the

14    courtroom here.

15         Go ahead.

16         I'm not going to worry too much about these two

17    outstanding warrants.

18         MR. LaRUSSO:  No, judge.  And I don't think from

19    a practical standpoint, in terms of affecting sentence, it

20    has any real significance.  But what it does -- and I know

21    it's very hard for lawyers sometimes to understand how the

22    information in a presentence report can impact a

23    defendant.  For example, if the Bureau of Prisons during

24    their review of that presentence report sees outstanding

25    warrants, that's going to make a determination on what

1    security level.  He is going to get additional points, and

2    probably be placed in an institution he shouldn't be

3    placed in.

4           So if these warrants should have been removed,

5    should have been vacated, and there should be no mention

6    in the presentence report about these warrants to create

7    that problem for my client.

8           So what Ms. Jones has tried to do is to contact

9    the assistant out in Illinois to get these actually

10   vacated.  And I appreciate her efforts, judge, because she

11   actually got the Court to vacate one of the warrants.

12          I have an order that was on ECF, actually

13   vacating the warrant.  I think the word they used was

14   *quash* the warrant.

15          But the marshal still has it in their system.

16   Nobody told them to take that warrant out of the system.

17   And that is what I have been told today.  That is on one

18   of the cases, judge.  That is the 1984 case.

19          There is a second warrant that is out on an

20   Illinois case, on an indictment in 2004.  He pled guilty

21   to that under a Rule 20 proceeding before your Honor.  And

22   he's going to be sentenced on that.  That was the 2004

23   case out of Illinois.  So that warrant should have been

24   vacated.  Should have been quashed.  Should have been

25   dismissed.  There should be no record of it whatsoever.

16

1    Again, we're trying to remove it.

2         And I am maybe being overly concerned, but I

3    don't want the Bureau of Prisons to think that there are

4    any outstanding warrants when they make a determination on

5    what classification Mr. Celani belongs in.

6         So actually there should be no reference to it.

7    Because, yes, the marshals' service has a record of it.

8    But factually they should not be there.  These warrants

9    have been satisfied.  One has been quashed, and one as I

10   have been told -- and the other one there was a Rule 20

11   hearing and he pled guilty to it.

12        THE COURT:  Well, I would request that the

13   probation officer amend the second addendum to the

14   presentence report where you mention in the next to the

15   last paragraph, "although counsel asserts that the

16   District of Illinois has removed their outstanding

17   warrants for the defendant, the undersigned officer

18   contacted the US Marshals Office for the Eastern District

19   of New York who advised that the detainer remains active."

20        However, I would add this -- however, according

21   to counsel for the defendant the two warrants involved in

22   the district of Illinois have been effectively vacated.

23        MR. LaRUSSO:  They have.  The government will

24   agree.  Both defense counsel and the government agree that

25   both warrants have been satisfied and should have been

17

1  vacated?

2          THE COURT:  I don't know, will the government

3  agree to that?

4          MS. JONES:  Your Honor, yes, we agree to that.

5          THE COURT:  So you will say that the attorney

6  for the defendant and the prosecutor have agreed?

7          MS. JONES:  Yes, your Honor.  I spoke to the

8  District of Illinois.

9          THE COURT:  That is the best we can do at this

10 point.

11         MR. LaRUSSO:  Thank you.  .

12         THE COURT:  Any other errors in the presentence

13 report or either addendum?  I think we might have brought

14 some other --

15         MR. LaRUSSO:  There were two other matters,

16 judge.

17         THE COURT:  What?

18         MR. LaRUSSO:  There were two other matters.

19         THE COURT:  Go ahead.

20         MR. LaRUSSO:  In regards to the guideline

21 calculation, in the plea agreement both the government and

22 the defendant agreed -- and I won't go through each of the

23 particulars -- agree to a guideline calculation of 135 to

24 168.

25         The Probation Department did their independent

1  calculation and they came back with a guideline range of

2  210 to 265. And what we did, judge, was we objected to

3  two of the calculations that the Probation Department

4  included in there. And that is the role adjustment. They

5  claim it was a four point role adjustment based upon his

6  participation and his leadership and supervisory role in

7  the charged offense.

8      In the plea agreement there was only two points.

9  The government has recently written to the Court and has

10  agreed that Mr. Celani's role adjustment is two points.

11  And quite candidly, judge, there are really only two,

12  possibly three individuals that were involved in the crime

13  he pled guilty to. So role adjustment was properly put in

14  the plea agreement as two rather than four.

15      So we ask that that correction be made to the

16  presentence report.

17      THE COURT: I'm not going to correct the

18  presentence report. The presentence report said what it

19  says and it's accurate. You and the government may have

20  agreed that the guideline range is different than what is

21  in the presentence report for various reasons. Excuse me.

22      The probation officer in the presentence report

23  states that the offense level is 34, Criminal History

24  Category IV, 210 to 262 months. Of course there is a

25  maximum term of 240 months.

1        You, and of course now the government, have

2    agreed in the plea agreement and in an affidavit given to

3    me, that the guideline range is different, it should be a

4    total offense level 30, Criminal History Category IV, 135

5    to 168 months.  And I'm going to have to determine what

6    I'm going to go by.  And I will.  But I'm not changing the

7    presentence report.

8        MR. LaRUSSO:  And your Honor, I apologize.  I

9    think my argument was not clear.  There is no factual

10   basis for the four point role enhancement.  It's

11   incorrect.

12       What the role enhancement did, your Honor, is

13   take the offense that Mr. Celani pled guilty to in Count

14   One, which is the Rainmaker offense, take the

15   participant -- I believe there were two mentioned in the

16   presentence report -- combined them with participants in

17   another scheme several years ago, years later, and now

18   says that there are five participants.

19       THE COURT:  So you're talking about paragraph

20   56, more than 50 victims?

21       MR. LaRUSSO:  No.

22       THE COURT:  Which one?

23       MR. LaRUSSO:  No.  I'm talking about, if I may,

24   your Honor, paragraph 59.

25       THE COURT:  Adjustment for role in the offense?

20

1          MR. LaRUSSO:  Exactly, judge.

2          If you take a look, judge, there are two schemes

3    on the third line in paragraph 59 that says a Rainmaker

4    scheme and the Golden Green scheme.  Mr. Celani pled

5    guilty to the Rainmaker scheme.  And the presentence

6    report in paragraphs 19 and 47 mention the people that

7    were involved with Mr. Celani knee in the Rainmaker

8    scheme, two of them, not five.

9          But what the Probation Department did is, they

10    took a count that he did not plead guilty to, took three

11    of the participants in that scheme which occurred several

12    years after Rainmaker, and made five.  But the government

13    has written to the Court, and they're agreeing that the

14    role should be two and not four.  And that they do not

15    have the evidence to be able to support the four.

16          So my argument, judge, is -- I'm not criticizing

17    the Probation Department, please.  I'm not doing that.

18    All I'm saying is, that when you he review the Rainmaker

19    scheme, there are only two other participants.  That's why

20    we had a plea agreement with a two role point enhancement

21    as opposed to a four point role enhancement.

22          And this should not really be an issue where I'm

23    looking to ask the Court to do something I didn't

24    factually support.  That's my argument, Judge.

25          I hope it's clear enough where we stand on that.

**21**

1          THE COURT:  I am not changing this, which says

2     that the defendant was the mastermind, organizer and

3     supervisor of the schemes encompassing the instant offense

4     and relevant conduct.  The Rainmaker scheme and the Golden

5     Green schemes which involved more than five participants.

6     I'm leaving it.  You have an exception.

7          Next.  That is not to say what I'm going to

8     determine the final range is going to be; whether I'm

9     going to go with the, you and the government, or I'm going

10    to go with the probation officer's recommendation.

11          That we will see.

12          MR. LaRUSSO:  I appreciate that, your Honor.

13          THE COURT:  I'm not going to reveal everything.

14    I got to leave a little bit for later.  But I'm not

15    changing that.

16          Next?

17          MR. LaRUSSO:  Your Honor, the argument is

18    similar to the obstruction of justice enhancement which is

19    paragraph 60.  The Probation Department has enhanced

20    Mr. Celani's guidelines by two because of the obstruction

21    of justice as set forth, not only in this paragraph, but

22    in earlier paragraphs.

23          We present in our sentencing memorandum an

24    objection to that, claiming that the evidence that the

25    Probation Department is relying upon doesn't support an

1    obstruction of justice enhancement.  Because quite

2    candidly, you have to obstruct justice in order to do it.

3    And in this particular case the Probation Department is

4    relying upon the fact that my client provided the name of

5    Sidney Levine, and a license to the officers when they

6    were executing a search warrant at the premises where the

7    scheme was operating.

8              And they claim because he provided a false

9    identity, that supports the obstruction.  Well that's,

10   that's unfortunately not factually correct.

11             What happened is, Mr. Celani actually

12   incriminated himself.  He told them that, You have

13   Mr. Levine under investigation.  Well, you got Mr. Levine.

14   You've now been able to identify who the party is, as a

15   mastermind.  And if you decide to bring a prosecution --

16   because one was not pending at this point in time, judge.

17             As the government points out in its letter to

18   the Court why there was no obstruction of justice

19   enhancement, is that there was no proceedings against

20   Mr. Levine or Mr. Celani.

21             So factually, judge, there is no basis for the

22   obstruction.  It wasn't included in the plea agreement,

23   and we ask the Court to remove that from the presentence

24   report, not because it's in the plea agreement, but

25   because a factual basis for it doesn't exist.

23

1          That is our argument, judge.

2          THE COURT:  Well, I know that's your argument.

3     And reading about this whole situation with this

4     defendant, I'm going to leave this in there, obstruction

5     of justice.

6          You have an exception.

7          Next?

8          Any other errors that you say are in the

9     presentence report?

10          MR. LaRUSSO:  I checked my notes, judge.  I

11     think we covered them all.

12          THE COURT:  Okay.

13          MR. LaRUSSO:  Quite candidly, judge, it is a

14     very good report in terms of Mr. Celani's background.  I

15     have no objection to any of the other parts reported by

16     the Probation Department.

17          THE COURT:  Mr. Celani, have you reviewed the

18     presentence report and the two addenda?

19          MR. LaRUSSO:  Yes, your Honor, I have.

20          THE COURT:  And other than what your lawyer has

21     brought before me, any other mistakes or errors in the

22     presentence report or the two addenda?

23          MR. LaRUSSO:  Not that I'm aware of, your Honor.

24          THE COURT:  You're answering like a lawyer.

25          Very good.  Have a seat.

24

```
 1              Ms. Jones, have you reviewed the presentence
 2   report and the two addenda?
 3              MS. JONES:  Yes, I have.
 4              THE COURT:  Are there any other errors in those
 5   records?
 6              MS. JONES:  No, your Honor.
 7              THE COURT:  Mr. Celani, you can remain seated.
 8   Stay seated.
 9              Mr. Celani, are you satisfied with the
10   representation provided to you by your attorney, Robert
11   LaRusso?
12              MR. LaRUSSO:  Yes, sir.
13              THE COURT:  You certainly should be.
14              THE DEFENDANT:  I know that, sir.  Very happy.
15              THE COURT:  Mr. LaRusso, now do you have
16   anything you would like to say or present on behalf of the
17   defendant before sentencing?
18              MR. LaRUSSO:  If I may?
19              THE COURT:  Yes.  Do you want to get to the
20   microphone?
21              MR. LaRUSSO:  Yes, your Honor.
22              Your Honor, at the outset, I have spoken to my
23   client about the remarks I proposed to make to the Court.
24   And he and I agreed that there is no question that he
25   regrets everything.  We know that when we submitted this
```

1  very voluminous sentencing memorandum.  The Court was very

2  interested in reviewing all of it.  And we actually

3  adjourned the case so all parties can be properly prepared

4  for today's proceeding.

5        And in that light, my client and I are fairly

6  confident that there is no need to go through a very

7  lengthy presentation to the Court about how, reasons why

8  the sentence below the guidelines is appropriate.

9        The only concern I have, judge, is that I know

10  the Court is saving for later what its decision is

11  regarding the guidelines.  But I'm going to assume, your

12  Honor -- and I hope I'm not wrong -- that a reasonable

13  guideline range is the one that both the government and

14  the defendant had agreed to in the plea agreement.  We

15  know the guidelines are only advisory and are not

16  mandatory.  And after an assessment by both parties we

17  feel that the Court may fairly consider that as the proper

18  range, 135 to 168.

19        Our sentencing memorandum is over 30, 35 pages.

20  It lays out a number of reasons why a sentence below is

21  appropriate.  There has been a very lengthy discussion

22  about his medical history.  I'm not going to review it.

23  The Court is well aware of the ailments that Mr. Celani

24  suffers from.  Well aware of the conditions that were

25  exacerbated by his incarceration at MDC.  The additional

**26**

1    medical concerns that arose while he was there, including

2    the stroke.

3            So what was most disturbing -- and I'll only

4    read this on the record -- the fact that I have tried over

5    a very long period of time to get what I thought was

6    reasonable care for Mr. Celani.  And quite candidly,

7    judge, I have come to a very disappointing conclusion that

8    it's very hard to get the kind of reasonable medical care

9    at MDC, for whatever reason it is.

10           I have seen too much of different -- I was told

11   a story.  This kind of sums it up, and I hope the Court

12   just bears with me for a moment.  But in my eyes, this

13   kind of tells the story.

14           I have another client who has having the same

15   problems in getting people to at least attend to what he

16   felt was serious a medical condition.  He was putting out

17   -- he was making requests, he was being ignored.  And in a

18   meeting at MDC he said to me, he says, *I don't know where*

19   *to go*.

20           And to prove to me that this is the condition at

21   the MDC, he says, hold on a minute.  He asked one of the

22   guards to come in to the witness room.  And said to the

23   guard, *You use the medical staff here at the MDC*?

24           And the guard's immediate response was, *Are you*

25   *kidding?*

1          You know, and finally the first time I thought

2    it was a joke, and I kind of downplayed it a little bit.

3    But the more I reviewed what has happened here to

4    Mr. Celani, it is just indicative of, even the officials

5    there know that the kind of care they're receiving is not

6    appropriate.

7          I would like the Court to know, it's my client

8    position not to bring it to your attention, knowing how

9    fair you are, knowing how you address an issue in the

10   past, immediately getting it resolved.  He felt that as

11   soon as he got out of the MDC, the quicker the sentence,

12   the best possibility of receiving the proper medical care

13   would be at an institution where he was doing the

14   sentence.  And that is why, judge, quite candidly, we

15   haven't burdened you with that substantial letter that we

16   sent to the Bureau of Prisons, and to which they ignored.

17          Judge, I'm not a complainer.  I have been in the

18   system a long time.  And I always felt that reasonable

19   care should be given, whether you're a pretrial detainee

20   or post.  I have greater concerns about MDC.  And I'll

21   continue to have them, and I'll continue to voice them

22   where appropriate.

23          The only significant factor that I would like to

24   address, judge, in regards to the sentence, because I know

25   that you're aware of his background, you're aware of his

1   criminal history, family history -- the presentence report

2   was very thorough and accurate in regard to all of that.

3          But over the last two years there has been a

4   change, and a substantial change in Mr. Celani.  I know

5   many of the people in the government service feel that

6   might not be true.  That they're very skeptical about it.

7   But I'll leave it for the Court to make a determination on

8   that issue after my comments on the cooperation that he

9   made, or attempted to make with the government over the

10  last few years.

11         I preface it by saying this, judge.  There is

12  nobody in here but law enforcement, so I feel confident

13  that I can make these remarks.  I may at the end, judge,

14  ask the Court to seal the portion dealing with

15  cooperation, not anything else, I'll ask that it be in my

16  remarks, at the end of my remarks, judge.

17         But the decision to cooperate, judge, comes with

18  the attendant danger to yourself from the inmates if that

19  ever became found out.  And in fact that actually occurred

20  here.

21         Back around, I guess it was late 2012, I was

22  speaking with Mr. Celani in the witness room.  And he told

23  me about information that he had received from other

24  inmates at MDC, particularly a man by the name of Ronell

25  Wilson, and man by the name of David Brooks.  Ronnel

1    Wilson, the Court might know, was convicted of murdering

2    two undercover police officers in Staten Island in cold

3    blood during an undercover purchase or attempted purchase

4    of weapons.  And he was sentenced by Judge Garaufis to the

5    death penalty after the jury verdict.  That was the first.

6    They had another hearing and the death penalty was

7    reinstated.

8               That man is a high ranking member of the street

9    gang known as the Bloods.

10              David Brooks was prosecuted out here in Long

11   Island, your Honor.  He made a fortune selling Kevlar

12   vests to the military and was accused of a very

13   significant fraud and received a 17 year sentence.

14              But Mr. Celani told me that from these two

15   inmates he learned that they were making threats against

16   the judges, the prosecutors and the witnesses.  You know,

17   in our sentencing memorandum we were a little more

18   specific.  I won't go into it.  I would just like to

19   highlight it.

20              In our discussions we realized that we couldn't

21   sit on this information.  Even if it wasn't true, even if

22   the inmates were just gossiping.  The fact that a man who

23   killed two police officers and is now threatening the

24   lives of members of law enforcement, and an individual who

25   faces a very substantial sentence before one of the judges

1   out here is making threats -- made a decision that, well I

2   got to do the right thing.  I know it's a colloquial term.

3   We hear it all the time.  That was his decision, not mine.

4   I'm his lawyer.  I can not break a privileged

5   communication.  He said to me, Look, let law enforcement

6   know.  Let them do with it what they want.  I ask for

7   nothing in return, other than if something comes from it,

8   let Judge Spatt know about it.

9          In short, he met with law enforcement officers,

10  told them what he knew.  He was originally asked to wear a

11  recording device.  And judge, he hesitated.

12         Just imagine being in MDC surrounded by some of

13  the worse criminals in our nation's history, and being

14  caught with a recording device in a unit full of inmates.

15  His hesitation is quite reasonable.  In discussions about

16  it, it was quite reasonable, and I believe the government

17  recognized it.

18         But ultimately, judge, the government asked him

19  try and corroborate the information he was being told by

20  these two inmates, and he agreed.  Unfortunately, judge,

21  both of those inmates were moved; one out of MDC, and the

22  other to another location.  So the recording never took

23  place.  I cite these two examples, judge -- I'm not saying

24  that these individuals in fact were going to take steps to

25  harm the prosecutors and the judges.  That was never

1    confirmed because there were no recordings made.

2            But it shows a willingness on the part of

3    Mr. Celani to change himself, to do something, maybe to

4    help others and not himself.  That's the reason I'm

5    bringing that out.

6            And that takes us to the actual cooperation,

7    which again must have covered like nine pages in our

8    sentencing memorandum.  And if you bear with me, judge,

9    I'm just going to highlight what happened.

10           Early part of this year the government arrested

11   two individuals, one of whom was charged with -- and I

12   wrote this down.  Because I'll tell you, judge, every time

13   I even look at it and read it, it kind of shakes me --

14   charged with conspiring to engage in sexual acts with a

15   three month old infant, a one and-a-half year old child,

16   and an eight year old girl.  Also charged with seeking to

17   exploit those children by photographing sexual acts with a

18   digital camera and disseminating material throughout the

19   world with demons.  Demons is my word.

20           But that is the charges, they're in the

21   indictment.  We gave a copy of that indictment to the

22   Court, it's in the complaint.  It was a sting operation.

23   The individuals were arrested in the process of going

24   through with that, those more horrendous acts.

25           You know, there are questions that we will all

32

1   probably ask ourselves about the motives of Mr. Celani,

2   why he decided at this point to cooperate.  But I think

3   when you look at the horror of the acts these individuals

4   are charged with, and what they were continuing to do, I

5   think the Court may see a different side of Mr. Celani

6   than the one that we all look at and say, he was a person

7   reflected in his record.

8           One of the individuals who was charged, judge,

9   actually told Mr. Celani that they, *they* meaning people on

10  the outside, were trying to on compromise the informant by

11  fabricating testimony that the informant himself was

12  engaged in such acts.

13          Additionally -- this is very strange, and I have

14  been in the system for a long time and I don't recall this

15  ever happening before -- but when the FBI conducted a

16  search of the defendant's home they seized computers,

17  files, evidence of the child abuse and child pornography

18  that the person was charged with.  And in one of the

19  photographs is a machine called a Drobo.

20          I have no idea what it was, Judge, until I was

21  told.  It is kind of an electronic storage device.  Now

22  you would assume that the FBI would have seized that

23  because it's in their own search warrant photographs.  A

24  mistake was made.  That machine was not taken, for

25  whatever reason.

33

1          This defendant, this inmate is confiding in

2     Mr. Celani that people on the outside have that machine

3     and they're going to destroy it because it contained on

4     there further evidence of this depravity.

5          In addition, to the compromising of the

6     informant and the destruction of evidence, this individual

7     told Mr. Celani that the FBI even seized a computer

8     containing files, and they can't get into that file.  That

9     file contains an amazing amount of evidence, not only of

10    his own criminal activity, that inmate, but of others

11    involved.

12          And, judge, you know what?  We learned after

13    this information was communicated that in fact the

14    government, in a letter to the judge who was overseeing

15    the prosecution, admitted that one of the files was

16    encrypted.  And they could not at this point access that

17    file.

18          Judge, Mr. Celani made a decision.  I was there.

19    It was unequivocal.  He wanted the government to know what

20    he knew.  He wanted the government to make whatever

21    decisions they felt were necessary based upon what he was

22    told.  There was no hesitation at this point.  This

23    individual, what he had done, and what evidence was still

24    out there was monumental.  Just one aspect -- it's still,

25    I'm struggling with it -- I'm having a hard time

34

1    understanding -- and this has all been confirmed, judge,

2    so what I'm telling you is equally verifiable.

3         One of the secretive files that this individual

4    had hoped to destroy was in the custody of the FBI.  And

5    how are you going to destroy files with the FBI?  Well,

6    after Mr. Celani meets with the FBI, asking nothing in

7    return, no request that, Look, I want this from you.  I'll

8    give the information.  Do with it what you want.  I'll

9    record conversations if that is what you think is

10   necessary.  All right.

11        They get the evidence and find out in fact,

12   judge, that one of those files has within it the names of

13   150 individuals who produce child pornography.  And in

14   addition a list of over 2000 individuals who access this

15   through the Internet for their own sick gratification.

16        Now judge, I'm not standing here and saying that

17   in fact that is what happened, that the FBI has been able

18   to uncover that evidence because we don't know.  We don't

19   know what actually was found.  But what I can tell you,

20   judge, is that through the efforts of Mr. Celani and

21   through his ability to get this inmate to confide in him,

22   he was able to have the FBI create an email account called

23   fuzzball -- and that was created by the FBI -- and

24   actually had the defendant inmate communicate to the FBI

25   in this undercover sting operation the information

35

1  regarding the encryption codes that the FBI had not been

2  able to break.

3          Judge, it's mind-boggling.  I was going to read

4  that section that Mr. Oliveras wrote about how they were

5  able to get this individual to disclose this information.

6  But the point of the fact is, he made the decision to

7  cooperate.  He made it without any demand upon the

8  government.  He produced and took into his own hands a

9  danger of being discovered.

10          THE COURT:  Do you want to move along.

11          MR. LaRUSSO:  I'm almost done, judge.  I'm

12  almost done.  I just want to let the Court know how

13  significant it was.

14          You have a letter from government.  In general

15  terms it describes what I indicated to the Court.  But

16  there was also that little vignette a little story, judge.

17  And I'm sure it's in the memo.  The agent that he worked

18  with was so pleased with the work that he had done, she

19  herself said that I will contact the -- I don't know if it

20  was done, judge.  It just shows how law enforcement was

21  appreciative of the efforts Mr. Celani made.

22          Judge, again I don't say this as excusing the

23  conduct.  I don't think it does.  But what I do say,

24  judge, we all know the value of individuals who cooperate

25  with law enforcement.  And I think in this particular

36

1   case, judge, this was what we know as substantial

2   cooperation.

3           We have an individual who was arrested.  We have

4   an ongoing investigation into an area of criminal law that

5   is despicable.  And I just hope that the government is

6   able to conclude their investigation successfully.

7           What I struggled with, judge, in the last two

8   days -- and I haven't even talked to Mr. Celani about

9   this, and I hope he doesn't mind me doing this.  Probably

10  the most difficult decision a Court makes, and I'm sure

11  the Court is aware of it -- the most difficult decision a

12  defense attorney has to make is the recommendation to the

13  Court based upon the facts.  We don't want to lose our

14  credibility with the Court.  We want to tie in and

15  reasonably argue from the facts, what is appropriate in a

16  particular case.  And I'll leave you, judge, with these

17  two thoughts.

18          Both the government and the defendant entered

19  into a plea agreement.  We felt that a range of 135 to 165

20  was reasonable.  All right.  And again I don't what the

21  Court will conclude is the proper guideline range -- but

22  if you look at that and say, Mr. Celani, that is where you

23  should be sentenced, I feel that your cooperation was

24  substantial enough that I'm going to consider it -- where

25  do you go from there?  And I thought about it and I'm not

37

1    coming in here and saying probation, or anything else like

2    that.  That would be ridiculuous.  And I hope Mr. Celani

3    bears with me.

4         I'm looking, judge, at a reduction, probably

5    somewhere in the neighborhood of about 96 months, if you

6    look at the cooperation he provided and what it tells you

7    about the individual and where he is.

8         Again judge, I have hesitated to do it.  I hope

9    my client is not disappointed.  But I felt that in this

10   particular case it would warrant such a request for the

11   Court's consideration.

12        Thank you.

13        THE COURT:  Mr. Frederick Celani, do you have

14   anything to say or present on your own behalf before

15   sentence is imposed?

16        THE DEFENDANT:  Your Honor, I wrote you a letter

17   on November 1st.  You mentioned it, so I assume you read

18   it.  And I don't think there is really much more to say

19   than what I said in that letter.

20        And everything that the government has brought

21   forward in the PSR is obvious.  I'm not going to try to

22   put a dress on a figure.  You know what it's all about.

23        And the first 64 years of my life is nothing to

24   be proud of.  What I did, I did.  And I apologize to the

25   Court and to those I have harmed.

38

1        But in the last year of my life since I have had

2   the stroke, and since I have met Mr. Neville and

3   Mr. Oliveras and Mr. LaRusso, I had an 180 degree change

4   in thoughts.  Then there came one day, sir -- 64 years of

5   living, I never in my life had a moment where I was left

6   speechless by anything.

7        And I sat and talked with a man would told me

8   that he was raping three month old babies.  And for the

9   first time in my life I just had nothing to say.  I

10  thought back to what happened to me when I was a little

11  boy.  And I said to myself, Come hell or high water this

12  guys has got to be stopped.  And then he waved a piece of

13  paper around, and he said, *They'll never catch me*.  He

14  said, *I'm too smart*.  And, I wrote a -- I think the word

15  was *encryption*, or something like that.

16       And he said, *I wrote it and the FBI can't break

17  it.  And I took these Dobos and I sent them to Israel*, or

18  I did all of these things.  And I just sat there thinking

19  to myself, You know you can't -- I don't care what I am.

20  I am what I am and I admit what I am.  That's why I pled

21  guilty.  But I said to myself I would rather have a

22  thousand threats of lying living next to one of these

23  guys.  And I did the best I could.  And we ended up

24  getting the secret codes for the FBI, and they opened it.

25  And they ended up finding out --  I don't know if they

1   found it all, but at least they found would took the

2   Drobo.  And that was it, your Honor.  I did the best I

3   could.  And I apologize to you for my behavior, but I have

4   no excuse for it.

5           THE COURT:  Ms. Jones, anything you would like

6   to say or present to the Court before sentence is imposed?

7           MS. JONES:  No, your Honor.  We would just

8   request that there be a sentence imposed within the

9   guideline range that we calculated in the PSR.

10          THE COURT:  The one in the plea agreement?

11          MS. JONES:  Yes, your Honor.

12          THE COURT:  Counsel, any legal cause why

13  sentence should not now be pronounced, or anything

14  additional you would like to say?

15          MR. LaRUSSO:  Nothing.  Thank you, your Honor.

16          THE COURT:  First of all I would like to commend

17  attorney Robert LaRusso for the extraordinary work

18  representing Mr. Celani.  He has been diligent,

19  hard-working, and performed his duties in an exemplary

20  fashion.

21          I also would like to commend the United States

22  probation officer Cindy Hasnoot for her outstanding work

23  and the detailed recommendation that she has given me, and

24  the addendum.  And all of that has been very helpful.

25          Thank you.

**40**

1          Also, I would like to commend the prosecutor

2    Demetri Jones.  And I have one word to say about her

3    actions during this matter.  Fairness.  Fairness.

4          MS. JONES:  Thank you, your Honor.

5          THE COURT:  By a prosecutor in agreeing to the

6    lower guideline range.  I thought it was very appropriate

7    for her to do that.  But what prosecutor would do it?  Not

8    many.

9          With respect to this sentence, I accept the

10   facts as revised.  In particular, Count One charges that

11   between December 8, 2004 and August 3, 2005, this

12   defendant and others conspired to defraud Rainmaker

13   investors and obtain money and property from them by

14   making false and fraudulent representations and committing

15   wire fraud.

16         Count Nine charges that on May 3, 2001, in the

17   Central District of Illinois, the defendant transferred a

18   check drawn on a certain bank as payment for a lease of a

19   copier which involved the proceeds of mail fraud.

20         In April 2000 the defendant was released from

21   prison and placed under the supervision of the Probation

22   Department of the District of Illinois under severe

23   prohibition.  Notwithstanding, the defendant continued his

24   fraudulent activities.  He began using the title and name

25   of "Reverend Bob Hunt," to hide his real identity.  And he

**41**

1    used this identity to operate a scheme to defraud prison

2    inmates, their families and friends by offering purported

3    legal services to those serving time.  He represented

4    himself to be a minister and an attorney.  Not so.

5              In June 2000 the defendant paid for induction as

6    a minister of the Universal Life Church in California.

7    And that was in the name, another induction in the name of

8    Bob Hunt, conferred by an email.

9              And then he started a congregation in East

10   Peoria, Illinois.  He bought a pulpit and at least on one

11   occasion conducted a church service.  And what was the

12   topic?  "Honesty".

13             And then the defendant -- this goes on and on.

14   I have to put this down for the record.

15             The defendant created the quote, "Regent

16   Foundation ,"again using the name the Reverend Bob Hunt.

17   He claimed to be the deputy director of the Regent

18   Foundation.  And that organization was a civil rights

19   organization that assisted prisoners in appeals.

20             He said that the foundation had 25 years of

21   service providing quality postconviction appellate

22   assistance, and had offices in Madison, Wisconsin, and

23   Mexico city.  In fact the defendants created this

24   fictional Regent Foundation, and there were no such

25   offices.

1    He mailed newsletters to inmates offering

2  assistance, stating that the Regent Foundation was founded

3  in 1976 and was celebrating its 25th anniversary.  He also

4  again represented that Reverend Bob Hunt was an attorney.

5  And to get the Regent Foundation to act inmates paid an

6  evaluation donation of $100 increased to $250 in January

7  2001.  This goes on and on.  And then the membership in

8  the Regent Foundation was $1500 increased to $2500.

9    As a result of this scam approximately 150

10  inmates, their families and friends were defrauded of

11  $192,000.

12    Now this is the conspiracy to defraud the

13  Rainmaker investors.  This Rainmaker managed Living, LLC

14  was a New York limited liability company.  It purported to

15  be in the business of purchasing and developing real

16  estate for the use as assisted living centers and

17  operating assisted living centers.

18    The defendant, utilizing the identity of "Sidney

19  F Levine" and "Alphonse Michael Farrantino" as Rainmaker's

20  chief operating officer and managing partner.  The

21  defendant at this time was also the chief operating

22  officer of another company, Golden Green Equity Group

23  which purported to be managing members of another company,

24  Kiosk, LLC, in the business of acquiring and leasing

25  distressed commercial properties and subdividing them.

43

1          Investments in Rainmaker, New York, advertised

2     in major newspapers for $1,000 units with a minimum

3     purchase of $10,000.

4          Between December 2004 and July 2005, $6.61

5     million was deposited in this Rainmaker account, plus

6     additional monies totalling $8 million deposited in the

7     Rainmaker account.

8          The defendant and a co-conspirator withdrew

9     large amounts of cash from Rainmaker accounts on a weekly

10     basis.  And the defendant routinely kept amounts of up to

11     $10,000 in cash for himself.  He did try to purchase

12     facilities in Kings Park, New York.  However, it fell

13     through.  Nevertheless, Rainmaker sent investors a letter,

14     *you're now the owners*.

15          The loss to Rainmaker victims was more than $8

16     million.  The Securities and Exchange Commission stepped

17     in, seized and distributed about $4 million back to the

18     victims.  Presently owed is $4,829,000.

19          And on August 23, 2005 a search warrant was

20     executed for the Rainmaker offices.  The defendant was

21     present in the office when agents came in.  He said he

22     needed to get insulin and he left the office and never

23     returned.  Talk about obstruction.

24          In September 2005 an arrest warrant was issued

25     for "Sidney F Levine" the name he used at Rainmaker.  He

44

1    was put on the *most wanted "white collar crime criminals.*

2              There's more to come.

3              Between December 4, 2007 and March 17, 2009, the

4    defendant solicited investors for Kiosk Company by falsely

5    promising that their money would be used to purchase and

6    lease real estate, including shopping centers and

7    warehouses.  And that the Kiosk investors would receive a

8    minimum return of 37.5 percent on a monthly basis.

9              Kiosk earned little if anything, and the monthly

10   returns to the investors were paid from money deposited by

11   other Kiosk investors.  The defendant used the name, *"Al*

12   *Michael Farrantino"*, as chief operating officer.

13             And then on March 17, 2009, the defendant was

14   arrested in Oakdale and his true name revealed.

15             The agents have advised us that there are three

16   sets of victims of Celani's fraudulent activities.  One,

17   the 12 victims of the Golden Green Private Equity Group

18   defrauded of $793,000; two, the 91 victims of the

19   Rainmaker, New York fraud owed a total of $4,800,000; and

20   third, to the 143 victims of the Illinois fraud for a

21   total of $192,000 which is a total loss of $5,815,000 with

22   more than 200 victims.  And many of them, many of these

23   victims are listed in the presentence report.

24             The defendant has a criminal history of three

25   prior convictions -- I'm sorry, four.  And has a criminal

1  history category of IV.

2          The defendant has substantial health problems.

3  Starting at the age of 17 when he was hurt in an

4  automobile accident and suffered a spine fracture.  And

5  now since his arrest in 2009 he suffered three strokes,

6  seizures, hypertension, is blind in his right eye, and,

7  apparently 85 percent deaf, wearing now hearing aids.

8          His weight has come down from 355 pounds to 195

9  pounds, according to him.  He is "half dead."  He

10  complains that he recently loss all feeling in his body

11  from the waist down, and had an MRI in prison -- or I

12  don't know where it took place -- but an MRI in April.

13          I think he is still awaiting the results of the

14  MRI.  He takes ten prescription medications for his

15  various conditions.  And he has other problems besides.

16  And it goes on in the presentence report for pages.  *I am

17  in severe pain.  I have no feeling below the waist.  My

18  legs feel like they are on fire.  My feet are numb.  I can

19  not feel my feet or toes.  Each night I lie in bed with

20  tears in my eyes from the severity of the pain and

21  attendant humility.*  And he has problems with his

22  defecation and urination.  I'm not going to get into that.

23  It's all in the presentence report.  Very serious

24  problems.

25          And he has had in his time alcohol abuse.

1    Hopefully that's over now.

2              The very fine and efficient probation officer

3    came to the conclusion that the guidelines determination

4    was total offense level of 34, Criminal History Category

5    IV, 210 to 262 months with a maximum of 240 months, a ten

6    year mandatory maximum.  And she set forth reasons for

7    that.  I'm sorry, 20 years maximum.  I was never too good

8    in arithmetic.

9              In addition to that of course we have to look at

10   the reason that Congress has given us because we know the

11   guidelines are no longer mandatory.  I have to seriously

12   consider the guidelines, but they're no longer mandatory.

13             And the reason that Congress has given us, and

14   the statute, that is Title 18 Section 3553(a).

15             The Court, in determining the particular

16   sentence shall consider:  One, the nature and

17   circumstances of the offense.  Well, I've gone through

18   some of it and it's serious.

19             The history and characteristics of the

20   defendant.  Very serious.

21             The need for the sentence imposed to reflect the

22   seriousness of the offense.

23             To promote respect for the law and provide just

24   punishment for the offense, which is something we all know

25   about, punishment, something we know of from the time

47

1   we're young.

2          To afford adequate deterrence to criminal

3   conduct.

4          To protect the public from further crimes of the

5   defendant.

6          To provide the defendant with needed medical

7   care.

8          So we have the probation officer coming out with

9   the guideline range of 34, 210 to 262 months.

10         A life of problems starting when he was young.

11  Abused by his father and brother, beaten by his father and

12  brother when he was young.  By his own administration,

13  never gainfully employed.  Always supported himself with

14  these fraudulent schemes since childhood.  Serious health

15  conditions.  You have someone that couldn't have worse

16  combinations.  A troubled childhood.  A life of fraud and

17  committing crimes.  Serious health conditions.  And what

18  happens?  Decides to cooperate with the government, and

19  his cooperation has been outstanding and involving very

20  serious crimes.  And involving risks to himself, serious

21  risks by other inmates by cooperating against the Blood

22  characters, who are violent and would stoop to nothing to

23  hurt him.  Substantial cooperation, many cooperations.

24  And I can't believe what I read that he did not ask for a

25  5K already.  This is the first time that I have ever heard

48

1  of anything like that.

2         If anyone deserved a 5K letter, Mr. Celani

3  deserved it, but he didn't ask.  Well, I'm going to give

4  him a 5K letter, an informal 5K letter for that kind of

5  cooperation.

6         To the government's credit they entered into a

7  plea agreement that said that he would plead guilty to

8  Counts One and Nine.  And that according to the plea

9  agreement if he does accept responsibility and pleads

10  guilty before March 22nd, 2013, he will have an adjusted

11  offense level of 30, not 34, 30. And this level with his

12  criminal history of IV results in a range of 135 to 168

13  months, not 210 to 262 months.  And of course the

14  guideline range is not mandatory, but it should be

15  seriously considered.

16         And to her credit the prosecutor sent me a

17  letter on November 5th, which states in part, *"Initially*

18  *the government intended to rely on the guidelines estimate*

19  *contained in its plea agreement dated March 21, on 2013.*

20  *We note that the PSR contains a four point enhancement for*

21  *aggravated role in the offense involving five or more*

22  *participants.  The government submits that it would not*

23  *likely be able to establish beyond a preponderance of the*

24  *evidence that the offense involved five or more*

25  *participants.  In addition the government maintains that*

49

1    *the two point enhancement for obstruction of justice*

2    *should not apply.*"

3    　　　　And they go on to say why.

4    　　　　And then Ms. Jones finishes her letter, very

5    short letter and to the point, and very fair, very

6    appropriate for a prosecutor to send this kind of letter.

7    　　　　"*Finally the government takes no position on the*

8    *defendant's downward departure request.*"

9    　　　　My first obligation is to decide what the

10   guidelines are.  And I'm going along with the government

11   and the defendant, and I'm finding that the guideline

12   range is a total offense level 30, Criminal History

13   Category IV, 135 to 168 months.

14   　　　　How fortunate you are, Mr. Celani, to have a

15   very forthright and courageous prosecutor, and an

16   outstanding probation officer in the same case.  Because

17   this probation officer, notwithstanding that she found 210

18   to 262 months, made a very fair recommendation to me.

19   Very fair.  And she substantiated the recommendation by

20   considering his serious health conditions, and I so

21   certainly consider that.  And I consider his outstanding

22   cooperation without a 5K letter.

23   　　　　No legal cause appearing why sentence should not

24   now be imposed, it is ordered that the defendant be

25   committed to the custody of the Attorney General of the

1    United States for a term of 132 months.

2            It is further ordered that the defendant is to

3    be given credit for time already served.  That is since

4    March 17, 2009.  It is further ordered that the Court

5    imposes a term of supervised release of three years to

6    commence upon the release of the defendant from custody

7    with respect to the sentence imposed.

8            And there are going to be all kinds of

9    conditions for his supervised release; such as complying

10   with the restitution order and forfeiture agreement,

11   making full financial disclosure to the Probation

12   Department, no more involvement in companies that invest

13   money or ask people to contribute money to, to participate

14   in.  If at the recommendation of the Probation Department,

15   outpatient or inpatient drug or alcohol program and mental

16   health treatment programs.

17           That would be in the judgment of conviction.

18           With respect to forfeiture, the defendant has

19   waived his interest in any personal property that was

20   seized.  That is forfeited.  The defendant has withdrawn

21   -- there was approximately $205,400 in US currency seized.

22   That is forfeited.  And there are Citibank accounts in the

23   names of Golden Green Private Equity Group and Kiosk.

24   That is forfeited.  And all of this is to be made

25   available to the eligible victims.

1          Also, the defendant shall pay restitution in the

2     sum of $4,829,663.84 to the Rainmaker victims, $793,678.45

3     to the Golden Green victims; and $192,308.95 to the

4     Illinois inmate victims.  They're all listed.  There is

5     eleven pages of victims listed.  Towards whatever the

6     victims receive by way of forfeiture shall be deducted

7     from the restitution.

8          With regard the imposition of a fine, the Court

9     finds that the defendant is economically unable to pay a

10    fine.  Therefore, no fine is imposed.

11         It is further ordered that mandatory special

12    assessment of $200 be imposed.

13         Two things that I omitted.  One, this sentence

14    of 132 months is on Count One.  The same sentence of 132

15    months on Count Nine is concurrent, one sentence of 132

16    months.

17         Also with respect to the restitution, it should

18    be paid in the following manner.

19         Within 30 days of the defendant obtaining

20    employment, ten percent of his gross earnings per month

21    payable to the Clerk of the Court.

22         Also, the supervised release of three years is

23    concurrent with Counts One and Nine, one term of

24    supervised release for three years.

25         Also, the restitution is to be paid even after

52

1  the term of supervised release has expired, after the

2  three years.

3         Frederick Celani, you are further advised that

4  except as previously waived -- and I think there was a

5  waiver of appeal in the plea agreement?

6         MS. JONES:  Yes, your Honor.

7         THE COURT:  The defendant agreed to waive an

8  appeal if the Court imposes a term of imprisonment of 188

9  months or less.  Well, you would have had a right to

10  appeal if you didn't waive it.  You would have had a right

11  to have a lawyer represent you on appeal.

12         And if you could not afford a lawyer one would

13  be appointed for you.  And if you had asked the Clerk of

14  the Court to file a notice of appeal, the Clerk would do

15  so.

16         If you do appeal you must appeal within ten days

17  from today.  If you do not you will lose your right to

18  appeal.  Of course we have a waiver here.

19         As far as the place of incarceration.  The

20  defendant should be, and I recommend, I will recommend to

21  the Bureau of Prisons that he be incarcerated at a place

22  where his medical conditions can be alleviated, his very

23  serious medical condition.  I haven't even gone into some

24  of them.

25         Also, he should be, and this is going to be

53

1    sealed.

2                    (FOLLOWING PORTION SEALED PURSUANT TO COURT

3    ORDER.)

4                    THE COURT:  (Continuing)

5                    Are there any outstanding counts, Ms. Jones.

6                    MS. JONES:  Yes, your Honor.

7                    And the government moves to dismiss with regard

8    to Indictment Number 09-CR-405, the underlying indictment,

9    as well as any open counts.

10                   And with regard to Indictment Number 13-CR-183,

11   any outstanding counts.

12                   THE COURT:  That motion is granted.

13                   MS. JONES:  Thank you, judge.

14                   THE COURT:  Is there a final order of

15   forfeiture, Ms. Jones.

16                   MS. JONES:  Your Honor, we will have one

17   prepared.  It has not yet been prepared.  And we'll submit

18   it to counsel and the Court for final approval.

19                   THE COURT:  Okay.

20                   Anything else, Ms. Jones, at this time?

21                   MS. JONES:  Nothing from the government, your

22   Honor.

23                   THE COURT:  Mr. LaRusso, anything else at this

24   time?

25                   MR. LaRUSSO:  No.  Thank you, your Honor.

54

1          THE COURT:  This sentencing proceeding is

2    terminated.  And I wish that you feel better, Mr. Celani.

3          THE DEFENDANT:  Thank you, your Honor.

4          THE COURT:  These minutes are sealed except for

5    the parties.

6          (The proceedings were concluded at 1:29 p.m.)

7                    *        *        *

8

9                    CERTIFICATION

10       I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled

12   matter.

13

14   _____

15   Ellen S. Combs, CSR

16

17

18

19

20

21

22

23

24

25